UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:11-cv-00116-F |
| RANGE PRODUCTION COMPANY, | § | |
| A Delaware Corporation; and | § | |
| RANGE RESOURCES CORPORATION, | § | |
| A Delaware Corporation, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

TO THE HONORABLE JUDGE OF THE COURT:

Defendants Range Production Company and Range Resources Corporation

("Defendants") file this Appendix in support of their Motion to Dismiss for Lack of Subject

Matter Jurisdiction. The Appendix contains true and correct copies of the following described

and indexed documents:

## INDEX

| Document | Page No. |
|---|---|
| Complaint filed by Plaintiff | 1-22 |
| March 11, 2011 Railroad Commission of Texas Revised Examiners' Report and Proposal for Decision | 23-65 |

| Document | Page No. |
|---|---|
| Excerpts from the January 25, 2011 deposition of John Blevins | 66-94 |
| Declaration of Chris Lister filed under Docket Number: SDWA-06-2011-1208; In the Matter of Range Resources Corporation and Range Production Company, Environmental Protection Agency, Region VI | 95-100 |
| Email dated November 28, 2010 from Doug Beck to Chris Lister | 101-104 |
| EPA Request for Information dated March 9, 2011 | 105-108 |

Respectfully submitted,


David P. Poole, General Counsel
State Bar No. 16123750
Range Production Company
100 Throckmorton St., Suite 1200
Fort Worth, Texas 76102
Tel. 817.869.4254
dpoole@rangeresources.com


HARRIS, FINLEY & BOGLE, P.C.
Andrew D. Sims
State Bar. No. 18415600
Russell R. Barton
State Bar. No. 01857250
777 Main Street, Suite 3600
Fort Worth, Texas 76102
Tel. 817.870.8700
Fax 817.332.6121
Asims@hfblaw.com
Rbarton@hfblaw.com

KELLY HART & HALLMAN LLP
Dee J. Kelly
State Bar No. 11217000
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Tel. 817.332.2500
Fax 817.878.9280
dee.kelly@kellyhart.com

KELLY HART & HALLMAN LLP
301 Congress Avenue, Suite 2000
Austin, Texas  78701
Tel. 512. 495.6400
Fax 512.495.6401

By:     _/s/ J. Stephen Ravel_____
       J. Stephen Ravel
       State Bar No. 16584975
       Steve.Ravel@kellyhart.com
       Diana L. Nichols
       State Bar No. 00784682
       diana.nichols@kellyhart.com

Attorneys for Range Resources Corporation
and Range Production Company

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the forgoing document was served as indicated below on this the 21st day of March, 2011, as follows:

**Via E-Mail: Katherine.mcgovern@usdoj.gov**
**& U.S. First Class Mail**
Katherine S. McGovern
Assistant United States Attorney
1100 Commerce Street, Suite 300
Dallas, Texas  75242

**Via E-Mail:  henson.tucker@epamail.epa.gov**
**& U.S. First Class Mail**
Tucker Henson
U.S. EPA Region VI
Office of Regional Counsel (6RC-EW)
1445 Ross Avenue, Suite 1200
Dallas, Texas  75202

**Via E-Mail:  keith.tashima@usdoj.gov**
**& U.S. First Class Mail**
Keith T. Tashima
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, DC 20044-7611

*/s/ J. Stephen Ravel*
J. Stephen Ravel

296991

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civ. A. No. _____ |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| RANGE PRODUCTION COMPANY, | : | |
| a Delaware Corporation; and | : | |
| RANGE RESOURCES CORPORATION, | : | |
| a Delaware Corporation, | : | |
| | : | |
| Defendants. | : | |

The United States of America, by authority of the Attorney General of the United States

and through the undersigned attorneys, acting at the request of the Administrator of the United

States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

NATURE OF THE CASE

1. This is a civil action for injunctive relief and civil penalties pursuant to Section

1431(b) of the Safe Drinking Water Act ("SDWA" or "the Act"), 42 U.S.C. § 300i(b).

Specifically, this civil action seeks to (a) require defendants Range Production Company and

Range Resources Corporation (collectively, "Range" or "Defendants") to achieve and maintain

compliance with an Emergency Administrative Order issued by the EPA, pursuant to Section

1431 of the SDWA, 42 U.S.C. § 300i, on December 7, 2010 ("Emergency Order"); and (b)

obtain civil penalties to redress Range's continuing violations of the Emergency Order.  A true

and correct copy of the Emergency Order, dated Dec. 7, 2010, is attached hereto as Exhibit A.

<u>JURISDICTION AND VENUE</u>

2.  This Court has jurisdiction over the parties and the subject matter of this action under

28 U.S.C. §§ 1331, 1345, and 1355, as well as Section 1431 of the Act, 42 U.S.C. § 300i.  This

Court has personal jurisdiction over Defendants because Range is located in this district.

3.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) and

1395(a), and Section 1431(b) of the Act, 42 U.S.C. § 300i(b), because the Defendants are located

in this district and the events or omissions giving rise to this action occurred in this district.

<u>PARTIES</u>

4.  Plaintiff is the United States of America, acting by the authority of the Attorney

General and on behalf of the Administrator of the EPA.

5.  Range Production Company and Range Resources Corporation (collectively "Range"

or "Defendants") are corporations organized under the laws of the State of Delaware and are

registered to do business in Texas.  Range is engaged in the exploration, development, and

acquisition of gas-bearing properties, including some gas-bearing properties located adjacent to

drinking water wells in Parker County and Hood County, Texas.  Range Production Company

and Range Resources Corporation may be served through their registered agent, David P. Poole,

100 Throckmorton Street, Ste. 1200, Fort Worth, Texas 76102.

6.  Range acknowledged receiving the Emergency Order on December 7, 2010.

2

## STATUTORY AND REGULATORY FRAMEWORK

7. Pursuant to the authority under Section 1412 of the SDWA, 42 U.S.C. § 300g-1, EPA has promulgated National Primary Drinking Water Regulations ("NPDWRs") setting maximum contaminant levels for specified drinking water contaminants. The term "maximum contaminant level" is defined in Section 1401(3) of the SDWA, 42 U.S.C. § 300f(3), as the "maximum permissible level of a contaminant in water which is delivered to any user of a public water system."

8. Under Section 1413 of the SDWA, 42 U.S.C. § 300g-2, States may obtain primary responsibility for administering and enforcing federally-mandated standards, including the NPDWRs, provided that the State satisfy certain statutory requirements.

9. In the State of Texas, the Texas Commission on Environmental Quality ("TCEQ") has primary enforcement responsibility for the SDWA. 42 U.S.C. § 300g-2.

10. TCEQ and the Railroad Commission of Texas ("TRRC") have entered into a Memorandum of Understanding concerning the commissions' division of responsibility for matters which arise under overlapping jurisdictions of different statutes. See 16 T.A.C. § 3.30.

11. Even if a State has obtained primary responsibility for administering and enforcing EPA's standards, EPA retains the authority to issue emergency administrative orders pursuant to the emergency powers provision of Section 1431(a) of the SDWA, 42 U.S.C. §300i(a).

12. Section 1431(a) of the SDWA, 42 U.S.C. § 300i(a) reads, in pertinent part:

> Notwithstanding any other provision of this subchapter, the Administrator, upon receipt of information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water, . . . which may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to

3

protect the health of such persons, may take such actions as he may
deem necessary in order to protect the health of such persons.

13. Pursuant to Section 1431 of the SDWA, 42 U.S.C. § 300i, the United States may
bring a civil judicial action to require compliance with an emergency administrative order issued
by the EPA, as well as to seek civil penalties for violations of such order.

14. Section 1431 of the SDWA, 42 U.S.C. §300i(b), provides that any person who
violates or fails or refuses to comply with an emergency administrative order issued by EPA may
be subject to a civil penalty of not more than $16,500 for each day in which such violation
occurs or failure to comply continues after January 12, 2009. See Debt Collection Improvement
Act of 1996, Pub. L. No. 101-134, and 40 C.F.R. § 19.4 (Table).


## BACKGROUND AND GENERAL ALLEGATIONS

15. Range is engaged in the production of natural gas from the Barnett Shale Formation,
located in and around the Fort Worth, Texas area.

16. By mid to late 2009, Range drilled and completed well stimulation operations at –
and began producing natural gas from – two gas extraction wells known as the Butler 1-H well
("Butler Well") and the Teal 1-H well ("Teal Well") in the Newark East (Barnett Shale) Field.

17. The Butler and Teal Wells are located on a shared surface site and were identified by
TRRC as two gas wells that terminate within a 1/4 mile radius of a domestic drinking water well
("Lipsky Well"). Both the Butler and Teal Wells consist of vertical wellbores, which extend for
more than 5,800 in depth before continuing in a generally horizontal direction for several more
thousand feet.

18. TRRC identified no other active gas wells within a ½ mile radius of the Lipsky Well.

4

**4**

19.  Two domestic drinking water wells, the Hayley Well and the Lipsky Well, were drilled in 2002 and 2005, respectively.  The Hayley Well is located approximately 470 feet in horizontal distance from the track of the lateral wellbore of the Butler Well; the Lipsky Well lies approximately 120 feet in horizontal distance from the track of the lateral wellbore of the Butler Well.

20.  The drilling records prepared contemporaneously with the construction of the Hayley and Lipsky water supply wells do not indicate the presence of natural gas in the wells (including methane).

21.  At some point in time between September 2009 and September 2010, the Hayley residence experienced a lack of water pressure from its water supply well.

22.  From approximately mid 2005 through late 2009, the Lipskys used water from the Lipsky Well for residential and agricultural purposes, without noticing problems with water quality.

23.  Recent water samples from the Hayley and Lipsky Wells reveal the presence of contamination, including methane.  Additional analysis of the gas recovered from the Lipsky Well indicate that it is thermogenic natural gas, the kind formed by geologic processes deep within the earth.

24. The Hayley Well sample indicated the presence of methane, ethane, and propane, while the Lipsky Well sample indicated the presence of elevated levels of dissolved methane, ethane, propane, benzene, toluene, and hexane.

25.  Beginning in or around August 2010 and continuing through December 7, 2010, EPA received and considered information, such as that noted above, as well as (but not limited

5

**5**

to) gas well drilling permit applications, plugging records, and other oil and gas well information recorded in documents of the Oil and Gas Division of the TRRC; water well location information from the Water Information Integration & Dissemination System of the Texas Water Development Board relating to residential and public water supply wells; well water laboratory test results; and other water and gas sampling analyses (including comparative gas analysis and isotopic fingerprinting analysis).

26.  Upon the information before it, including but not limited to any actions taken by the appropriate State and local officials, EPA determined that the contaminants identified in the Emergency Order "may present an imminent and substantial endangerment to the health of persons because methane in the levels found by EPA are potentially explosive or flammable, and benzene if ingested or inhaled could cause cancer, anemia, neurological impairment and other adverse health impacts." (See Emergency Order Para. 41).

27.  On December 7, 2010, EPA memorialized its findings in an Emergency Administrative Order issued to Range under Section 1431 of the Safe Drinking Water Act, 42 U.S.C. § 300i(a), in which EPA determined expressly that the contamination in two domestic water wells that draw water from the Trinity Aquifer may present an imminent and substantial endangerment to the health of persons.

28.  In the Emergency Order, EPA also found that appropriate State and local authorities, including TRRC, had not taken sufficient action to address the endangerment. (See Emergency Order Para. 40).

29.  Based on findings in the Emergency Order and pursuant to Section 1431 of the SDWA, 42 U.S.C. § 300i, the Emergency Order requires Range to perform six Ordered

6

**6**

Provisions.  (Emergency Order Paras. 50(A) through 50(F)).

    30. Range disputes the validity of the Emergency Order.  Range has explained it will not comply with a number of the directives of the Emergency Order, e.g., Paragraphs 50(D), (E), and (F).

ALLEGED VIOLATIONS

    31.  Range has and will violate a number of the requirements of the Emergency Order. As a result, the contaminants identified in the Emergency Order may pose an imminent and substantial endangerment to the health of persons.  42 U.S.C. § 300i.

    32.  Specifically, Range already has failed or has reported to EPA that Range will fail to comply with the following requirements of the Emergency Order:

    (i) within five (5) days of receipt of the Emergency Order, submit to EPA a survey of all private water wells within 3,000 feet of the Butler and Teal wellbore tracks and all of Lake Country Acres' public water supply system wells, together with a sampling plan for EPA's approval to determine if any of the identified wells have been impacted (Emergency Order Para. 50(D));

    (ii) within fourteen (14) days of receipt of the Emergency Order, submit to EPA for approval a plan to conduct soil gas surveys and indoor air concentration analyses for the properties and dwellings serviced by Domestic Wells 1 and 2 (Emergency Order Para. 50(E));

    (iii) within sixty (60) days of receipt of the Emergency Order Range must develop and submit to EPA for approval a plan to

        (1) identify gas flow pathways to the Trinity Aquifer;

7

(2) eliminate gas flow to the aquifer, if possible; and

(3) remedy the areas of the aquifer that have been affected

(Emergency Order Para 50(F)).

### FIRST CLAIM FOR RELIEF
(Injunctive Relief)

33. Paragraphs 1 through 32 are re-alleged and incorporated by reference as if fully set forth below.

34. Pursuant to Section 1431 of the SDWA, 42 U.S.C. § 300i, the United States seeks permanent injunctive relief to require Range to comply with Ordered Provisions 50(D), (E), and (F) of the Emergency Order.

35. To date, Range has not complied with these requirements of the Emergency Order. As a result, the contaminants identified in the Emergency Order, which are present in the underground source of drinking water, may pose an imminent and substantial endangerment to the health of persons, in violation of the SDWA. 42 U.S.C. § 300i.

36. Therefore, unless permanently enjoined, Range will continue to violate the Emergency Order.

### SECOND CLAIM FOR RELIEF
(Civil Penalty)

37. Paragraphs 1 through 36 are re-alleged and incorporated by reference as if fully set forth below.

38. Range has violated the Emergency Order. Pursuant to Section 1431(b) of the SDWA, 42 U.S.C. § 300i(b), and the Debt Collection Improvement Act of 1996, Pub. L. No.

8

**8**

101-134, and 40 C.F.R. § 19.4 (Table), Range is liable for a civil penalty not to exceed $16,500 for each day of each violation.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States of America requests that this Court grant it relief as follows:

(1) Direct Range to comply with the Emergency Order Paragraphs 50 (D), (E), and (F);

(2) Enter judgment against Range and in favor of the United States for civil penalties up to the amount of $16,500 for each day of each such violation of Emergency Order Paragraphs 50 (D), (E), and (F); and

(3) Grant the United States such further relief as is just and appropriate.

Respectfully submitted,

JAMES T. JACKS
UNITED STATES ATTORNEY

s/Katherine Savers McGovern

Dated: January 18, 2011

_____
KATHERINE SAVERS MCGOVERN
Assistant United States Attorney
Texas State Bar No. 13638020
1100 Commerce Street, Suite 300
Dallas, TX 75242
(214) 659-8650 (tel)
(214) 767-2916 (fax)
katherine.mcgovern@usdoj.gov

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

s/Keith T. Tashima

Dated: January 18, 2011

_____
JEFFREY K. SANDS
Senior Attorney
Maryland State Bar No. 199412150130
KEITH T. TASHIMA
Trial Attorney
New York State Bar No. 3938701
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, DC 20044-7611
(202) 514-3908 (Sands)
(202) 616-9643 (Tashima)
(202) 616-2427 (fax)
jeffrey.sands@usdoj.gov
keith.tashima@usdoj.gov

OF COUNSEL:

SCOTT McDONALD
Chief, Water Enforcement Branch
TUCKER HENSON
Assistant Regional Counsel, Water Enforcement Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region VI
1445 Ross Avenue, Suite 1200
Dallas, TX 75202
(214) 665-2718 (McDonald)
(214) 665-8148 (Henson)

**Exhibit A**
**to the Complaint**
U.S. v. Range Production Company and Range Resources Corporation

Dbt f !4;22.dw.11227.G!!Epdvn f ou2.2!!!!Gjrhe!12Q29Q22!!!!Qbhf !3!pg23!!!Qbhf JE!23

## ENVIRONMENTAL PROTECTION AGENCY
### REGION VI

| | |
|---|---|
| IN THE MATTER OF: | ) Docket Number: SDWA-06-2011-1208 |
| | ) |
| RANGE RESOURCES CORPORATION | ) |
| and | ) |
| RANGE PRODUCTION COMPANY | ) |
| | ) |
| Respondents. | ) EMERGENCY ADMINISTRATIVE |
| | ) ORDER |
| (Texas RRC Operator I.D. No. 691703) | ) |
| | ) |
| Proceedings Under Section 1431(a) of the | ) |
| Federal Safe Drinking Water Act, 42 U.S.C. | ) |
| § 300(i)(a). | ) |

## STATUTORY AUTHORITY

The following findings are made and Order issued under the authority vested in the Administrator of the United States Environmental Protection Agency ("EPA") pursuant to the authority of Section 1431 of the Safe Drinking Water Act ("SDWA" or "Act"), 42 U.S.C. § 300(i).

EPA may issue such Orders upon receipt of information that contaminants are present in or are likely to enter an underground source of drinking water and may present an imminent and substantial endangerment to the health of persons, and EPA has determined that appropriate State and local authorities have not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time, as described in Section 1431(a) of the Act, 42 U.S.C. § 300(i)(a).

The Administrator delegated the authority to issue this Order to the Regional Administrator of EPA Region 6, who further delegated such authority to the Director of the Compliance Assurance and Enforcement Division.

Federal law provides that violation of any terms of this Order may subject Respondents to a civil penalty of up to $16,500 per day of violation, assessed by an appropriate United States District Court, under SDWA § 1431(b), 42 U.S.C. §300i(b), as modified by the Debt Collection Improvement Act, 31 U.S.C. § 3701 and codified at 40 C.F.R. § 19.4.

Dbt f !4;22.dw11227.Gll!Epdvn f ou2.2!!!!Gjrhe!12029022!!!!Qbhf !4!pg23!!!Qbhf JE!24

Docket No. SDWA-06-2010-1208
Page 2

## FINDINGS OF FACT

1.  Range Resources Corporation ("RRC") is a Fort Worth, Texas based independent natural gas company engaged in the exploration, development and acquisition of primarily natural gas properties in the Southwestern and the Appalachian regions of the United States. RRC is a Delaware corporation with its common stock listed and traded on the New York Stock Exchange under the symbol "RRC."

2.  Range Production Company ("RPC") is a wholly-owned subsidiary of Range Resources Corporation operating in the State of Texas.

3.  At all times relevant to this Order, RRC and RPC (hereinafter "Respondents") owned or operated the natural gas production facilities (collectively, "Gas Wells") identified as the Butler Unit Well 1-H ("Butler Well") (permitted at Atwood, JB Survey, Abstract #802, Hood County, 660 feet from the N line and 986 feet from the SE line) and the Teal Unit Well 1-H ("Teal Well") (permitted at Atwood, JB Survey, Abstract #802, Hood County, 703 feet from NE line and 948 feet from SE line).

4.  Respondents contracted for and directed the drilling of the Butler Well in June 2009 and completed hydraulic fracture stimulation operations in August 2009. Gas production began from the Butler Well in August 2009.

5.  Respondents contracted for and directed the drilling of the Teal Well in March and April of 2009 and completed hydraulic fracture stimulation operations in April 2009. Gas production began from the Teal Well in August 2009.

6.  The Trinity Aquifer exists under twenty Texas counties, including Parker and Hood counties where the Gas Wells and the private drinking water wells described below are located.

7.  As set forth more fully below, two domestic drinking water wells ("Domestic Well 1" and "Domestic Well 2"), located near the Gas Wells and utilizing the Trinity Aquifer, have been shown to contain methane, benzene, toluene, ethane, propane, and hexane. Some of these contaminants are at levels that may endanger the health of persons.

8.  Domestic Well 1 lies approximately 120 feet in horizontal distance to the east-northeast from the track of the horizontal section of the Butler Well bore.

9.  Domestic Well 2 lies approximately 470 feet in horizontal distance to the southeast from the track of the horizontal section of the Butler Well bore.

10. Domestic Wells 1 and 2 provide drinking water to nine people including both adults and children.

Dbt f !4;22.dw11227.G!!Epdvn f ou2.2!!!!Gjrhe!12029022!!!!Qbhf !5!pg23!!!Qbhf .E!25

Docket No. SDWA-06-2010-1208
Page 3

11.  The Gas Wells are the only gas production facilities within approximately 2,000 feet of Domestic Wells 1 and 2.

12.  Domestic Well 1 (32.56312 latitude, -97.79144 longitude) was drilled in April 2005 and was immediately used for human consumption, building construction, and landscape irrigation.

13.  Neither the consumer, nor the well drilling service, observed or reported that the water from Domestic Well 1 contained any noticeable natural gas at the time of its drilling.

14.  In late December 2009, approximately four months after the Gas Wells began producing gas, the owner of Domestic Well 1 first noticed that the water had begun to effervesce.

15.  On July 26, 2010, the down-hole pump in Domestic Well 1 began experiencing mechanical problems soon identified by a water well service company as "gas locking."

16.  "Gas locking" is a condition sometimes encountered in a down-hole pump when dissolved gas is released from solution by the action of the pump and prevents the pump from moving water.

17.  In addition, on July 26, 2010, the gas in Domestic Well 1 was determined to be flammable.

18.  On August 8, 2010, the owner contracted for water samples to be taken from Domestic Well 1. The samples showed the presence of benzene (3.1 µg/L), toluene (2.0 µg/L), dissolved methane (7,810 µg/L) and dissolved ethane (1,580 µg/L).

19.  On August 17, 2010, TRRC took water samples from Domestic Well 1 that showed the presence of benzene (6.84 µg/L) and toluene (6.12 µg/L).

20.  The consumer and well owner removed Domestic Well 1 from service during the first week of September 2010 due to the rising gas content within the drinking water and concerns with water quality, indoor air quality and potential explosivity.

21.  EPA took samples of the gas from Domestic Well 1 and the Butler Well production stream on October 26, 2010 to perform compositional analysis and isotopic fingerprinting.

22.  Isotopic fingerprinting is a method for determining the ratio of different isotopes of a particular element in an investigated material. Understanding this ratio helps scientists know the source of the investigated material.

23.  Methane is a molecule comprised of one carbon atom for every four hydrogen atoms. Its chemical formula is $CH_4$.

Dbt f !4;22.dw11227.Gl!!Epdvn f ou2.2!!!!Gjrhe!12029022!!!!Obhf !6!pg23!!!Obhf .E!26

Docket No. SDWA-06-2010-1208
Page 4

24.   While the carbon atoms in methane may be chemically identical, they may have different numbers of neutrons and different atomic mass. Atoms of the same element with different atomic mass are known as isotopes.

25.   The isotopic fingerprint analysis of methane obtained on October 26, 2010 from Domestic Well 1 ($\delta^{13}C = -47.05$, $\delta D = -188.5$) and the isotopic fingerprint analysis of commingled produced gas from the Butler and Teal Wells ($\delta^{13}C = -46.60$, $\delta D = -183.9$) indicates that both gases are thermogenic in origin and likely to be from the same source.

26.   The term "thermogenic," when applied to a gas like methane, means that the gas formed through deep geologic processes involving pressure, heat and time. The term is used to distinguish such gas from biogenic gas, which is formed through biological processes.

27.   The compositional analysis of the gas obtained on October 26, 2010 showed that both gases contain significant amounts of heavier hydrocarbon components and that the hydrocarbon portion of each gas contains the same components. The presence of these hydrocarbons further indicates the presence of gas in Domestic Well 1 is likely to be due to impacts from gas development and production activities in the area.

28.   On October 26, 2010, EPA also collected samples of water from Domestic Well 1 that showed the presence of dissolved methane (20,100 µg/L), ethane (5,27 µg/L), propane (2,820 µg/L), benzene (4.55 µg/L), toluene (3.47 µg/L), and hexane (31.7 µg/L).

29.   The chemicals found in Domestic Well 1 pose a variety of risks to health of persons.

30.   Methane poses a risk of explosion and fire. In large concentrations in air, it may pose a risk of asphyxiation. Natural methane, unlike treated methane, pumped to homes for cooking and heating, is odorless and colorless. Usually a minute amount of an odorant such as t-butyl mercaptan is added to natural gas used by consumers.

31.   Benzene is a known human carcinogen. It can also cause anemia, neurological impairment and other adverse health impacts.

32.   Hexane, propane, ethane and toluene may also cause adverse health impacts if inhaled or ingested.

33.   On November 16, 2010, EPA advised the consumers of Domestic Well 1 to continue not using the water due to water quality and potential explosivity concerns.

34.   Domestic Well 2 (32.56505 latitude, -97.79041 longitude) was drilled and completed in August 2002 and was immediately used for human consumption and landscape irrigation.

35.   Neither the owner, nor the well drilling service company, observed or reported that the water from Domestic Well 2 contained any noticeable natural gas at that time.

15

Dbt f !4;22.dw11227.G!!Epdvn f ou2.2!!!!Gjrhe!12@29@22!!!!Qbhf !7!pg23!!!Qbhf JE!27

Docket No. SDWA-06-2010-1208
Page 5

36.   In May 2010, the owner of Domestic Well 2 first noticed that the water had begun to effervesce.

37.   On August 26, 2010, the consumer contracted for water samples to be taken from Domestic Well 2. The samples showed the presence of dissolved methane (10.9 µg/L). EPA sampled the water from Domestic Well 2 on October 26, 2010. Results from this sample showed the presence of dissolved methane (627 µg/L), ethane (38.5 µg/L), and propane (2.05 µg/L).

38.   On November 23, 2010, EPA advised the consumers of Domestic Well 2 of the levels of natural gases in the water and that they may wish to cease using the water due to water quality and potential explosivity concerns.

39.   EPA has consulted with the appropriate State of Texas and local authorities, including the Railroad Commission of Texas, the Texas Commission on Environmental Quality, and the Parker County fire marshal, regarding the presence of contaminants in the source of drinking water identified below and disclosed the potential endangerment to the health of persons.

40.   The Railroad Commission of Texas ("TRRC") is the state agency with regulatory authority over oil and gas production activities and the potential endangerment discussed below. EPA has informed the TRRC of the endangerment and the proposed issuance of this Order. EPA has shared data and findings related to this matter with the TRRC and has consulted with the TRRC on the accuracy of the information upon which this Order is based. EPA has determined that that appropriate State and local authorities have not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time.

41.   The contaminants identified herein may present an imminent and substantial endangerment to the health of persons because methane in the levels found by EPA are potentially explosive or flammable, and benzene if ingested or inhaled could cause cancer, anemia, neurological impairment and other adverse health impacts.

## CONCLUSIONS OF LAW

42.   Benzene, methane, toluene, ethane and propane are "contaminants," as that term is defined in SDWA § 1401(6), 42 U.S.C. § 300f(6) and 40 C.F.R. § 141.2.

43.   The Trinity Aquifer is an "underground source of drinking water," as that term is defined at 40 C.F.R. § 144.3.

44.   The contaminants identified herein are present in the Trinity Aquifer.

Dbt f !4;22. dw11227.Gl!!Epdvn f ou2.2!!!!Gjrhe!12í2902!!!!Cbhf !8!pg23!!!Cbhf JE!28

Docket No. SDWA-06-2010-1208
Page 6

45. Respondents are "person(s)," as defined by Section 1401(12) of the Act, 42 U.S.C.
§ 300f(12).

46. Respondents caused or contributed to the endangerment identified herein.

47. In accordance with SDWA § 1431(a), 42 U.S.C. § 300i(a), EPA has consulted with
appropriate State and local authorities to confirm the correctness of the information on
which this action is based.

48. EPA has determined that that appropriate State and local authorities have not taken
sufficient action to address the endangerment described herein and do not intend to take
such action at this time.

49. EPA has determined that this action is necessary to protect the health of persons.


## ORDER AND GENERAL PROVISIONS

50. Based on these findings and pursuant to the authority of Section 1431(a) of the Act, 42
U.S.C. § 300i(a), EPA Orders that Respondents take the following actions:

A) Within twenty-four (24) hours of receipt of this Order, Respondents shall notify EPA
in writing whether they intend to comply with this Order.

B) Within forty-eight (48) hours of receipt of this Order, Respondents shall provide
replacement potable water supplies for the consumers of water from Domestic Well 1
and Domestic Well 2.

C) Within (48) forty-eight hours of receipt of this Order, Respondents shall install
explosivity meters, approved by EPA, in the dwellings served by Domestic Wells 1
and 2.

D) Within five (5) days of receipt of this Order, Respondents shall submit to EPA a
survey listing and identifying the location description (latitude and longitude) of all
private water wells within 3,000 feet of the Butler wellbore track and 3,000 feet of the
Teal wellbore track and all of the Lake Country Acres (TX1110059) public water
supply system wells. This submittal shall include a plan for EPA's approval, to
sample those wells identified in Order to determine if any of those wells have been
impacted. The plan shall include head space (air) and dissolved constituent (water)
sampling. The head space sampling shall commence no later than five (5) days after
submittal of the plan.

Dbt f !4;22.dw 11227.G!!Epdvn f ou2.2!!!!Grfne!12@29@22!!!!Cbhf !9!pд23!!!Cbhf JE!29

Docket No. SDWA-06-2010-1208
Page 7

E) Within fourteen (14) days of receipt of this Order, Respondents shall submit to EPA, for approval, a plan to conduct soil gas surveys and indoor air concentration analyses of the properties and dwellings served by Domestic Wells 1 and 2.

F) Within sixty (60) days of receipt of this Order Respondents shall develop, and submit to EPA for approval, a plan to: 1) identify gas flow pathways to the Trinity Aquifer; 2) eliminate gas flow to the aquifer if possible, and 3) remediate areas of the aquifer that have been impacted.

51.    Each submittal made pursuant to this Order shall be sent by U.S. mail or by certified mail, with receipt requested to the address below.  Electronic submittals will also be accepted.

     U.S. EPA, Region 6
     Water Enforcement Branch
     1445 Ross Ave., Suite 1200
     Dallas, TX  75202
     Attn.: Chris Lister, (6EN-WR)
     FAX: (214) 665-6672
     Email:  lister.chris@epa.gov

     Railroad Commission of Texas
     Site Remediation Section
     William Travis Building
     Austin, TX 78701
     Attn: Peter Pope
     Email:  peter.pope@rrc.state.tx.us

52.    Each submittal shall include reference to the docket number as shown on the first page of this Order.

53.    All plans, reports, notices, or other documents submitted by Respondents pursuant to this Order, which make any representation concerning Respondents' compliance or noncompliance with any requirement of this Order, shall be accompanied by the following statement signed by a responsible corporate officer of the Respondents:

     "I certify under the penalty of law that this document and all attachments were prepared by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel gathered and evaluated the information submitted. Based on my inquiry of any and all persons directly responsible for gathering and analyzing the information obtained, I certify that the information contained in or accompanying this submittal is to the best of my knowledge and belief, true, accurate, and complete. As to those identified portion(s) of this submittal for which I cannot personally verify the accuracy, I certify that this submittal and all attachments were prepared in accordance with procedures designed

Dbt f !4;22.dw.11227.G!!Epdvn f ou2.2!!!!Gjrhe!12029022!!!!Qbhf !: !pd23!!!Qbhf JE!2:

Docket No. SDWA-06-2010-1208
Page 8

to assure that qualified personnel properly gathered and evaluated the Information submitted. Based on my inquiry of the person or persons who manage the system, or those directly responsible for gathering the information, or the immediate supervisor of such person(s), the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

54.   The certification shall also include the name, title, date and signature of the person or persons completing the certification.

55.   Respondents shall submit to EPA and the State of Texas, at the addresses listed in Paragraph 53, the results of all sampling, tests, or other data generated pursuant to this Order by Respondents or their agents, consultants, or contractors.

56.   If any event occurs which causes delay in the achievement of any requirement of this Order, Respondents shall have the burden of proving that the delay was caused by circumstances beyond the reasonable control of Respondents or any entity controlled by Respondents, including but not limited to their contractors and consultants, which could not have been overcome by due diligence. Respondents shall notify EPA verbally within 72 hours, and in writing within 7 days of the verbal notification, of the anticipated length and cause of the delay, the measures taken and/or to be taken to prevent or minimize the delay, and the time table by which Respondents intend to implement these measures. If EPA agrees that the delay or anticipated delay has been or will be caused by circumstances beyond the reasonable control of the Respondents, the time for performance hereunder shall be extended for a period equal to the delay resulting from such circumstances. Respondents shall adopt all reasonable measures to avoid or minimize delay. Failure of Respondents to comply with the notice requirements of this paragraph shall constitute a waiver of Respondents' right to request an extension to meet the requirements of this Order.

57.   Nothing in this Order shall be construed to limit or otherwise affect EPA's authority under any applicable law or regulation including but not limited to EPA's authority to conduct inspections, to seek access to property, to request the provision of information, or to bring a civil or criminal enforcement action under the Safe Drinking Water Act or other applicable statutes or regulations.

Dbt f !4;22.dw.11227.G!!Epdvn f ou2.2!!!!Gjfne!12029022!!!!Qbnf !21!pg23!!!Qbhf JE!31

Docket No. SDWA-06-2010-1208
Page 9

58.     Respondents may assert a confidentiality claim covering all or part of any information
        submitted to EPA pursuant to this Order. Any assertion of confidentiality must be
        accompanied by information that satisfies the items listed in 40 C.F.R. § 2.204(e)(4) or
        such claim shall be deemed waived. Information determined by EPA to be confidential
        shall be disclosed only to the extent permitted by 40 C.F.R. Part 2. If no such
        confidentiality claim accompanies the information when it is submitted to EPA,
        the information may be made available to the public by EPA without further notice to
        Respondents. EPA will not accept any confidentiality claim with regard to any physical
        or analytical data.

59.     EPA, its contractors, employees, and representatives are authorized to enter and freely
        move about all property at Gas Wells pursuant to this Order for the purposes of, *inter
        alia,* interviewing facility personnel and contractors; inspecting records, operating logs,
        and contracts related to the facility; reviewing the progress of the Respondents in
        carrying out the terms of this Order; conducting such tests, sampling, or monitoring as
        EPA or its representatives deem necessary; using a camera, sound recording, or other
        documentary type equipment; and verifying the reports and data submitted to EPA by the
        Respondents. Respondents shall provide EPA and its representatives access to the
        facility at all reasonable times and to any other property to which access is required for
        implementation of this Order. Respondents shall permit such persons to inspect and copy
        all records, files, photographs, documents, and other writings, including all sampling and
        monitoring data, that pertain to work undertaken pursuant to this Order and that are
        within the possession or under the control of Respondents or their contractors or
        consultants.

60.     This Order is effective upon receipt and will remain in effect until EPA provides notice
        of its termination. Notice will be given after the requirements of the Order have been
        satisfied.

61.     This Order does not constitute a waiver, suspension, or modification of the requirements
        of the Act or implementing regulations, which remain in full force and effect. Issuance
        of this Order is not an election by EPA to forego any civil or criminal action otherwise
        available under the Act.

62.     EPA expressly reserves all rights and defenses that it may have, including but not limited
        to the right to disapprove work performed by Respondents pursuant to this Order and to
        modify documents submitted by Respondents and require that Respondents implement
        those modifications. Nothing in this Order shall diminish, impair, or otherwise adversely
        affect the authority of EPA to enforce the provisions of this Order. This Order shall not
        be interpreted to relieve Respondents of their obligations to comply with any provision of
        the Act, its implementing regulations, or any other federal, state, or local law.

Dbt f !4;22.dw.11227.G!!Epdvn f ou2.2!!!!Gjrfe!12Œ9Œ22!!!!Qbhf !22!pg23!!!Qbhf JE!32

Docket No. SDWA-06-2010-1208
Page 10

63.  Failure to timely complete any requirement of this Order shall be deemed a violation of this Order, beginning on the first day that performance is scheduled to commence.

64.  This Order shall not limit or otherwise preclude EPA from taking additional enforcement action, civil or criminal, pursuant to the SDWA, or any other available legal authority, should EPA determine that such action is appropriate. Issuance of this Order is not an election by EPA to forego any civil or criminal action otherwise authorized under the Act or other laws.

65.  All actions required to be taken pursuant to this Order shall be undertaken in accordance with the requirements of all applicable local, State, and federal laws and regulations.

66.  Respondents shall obtain or cause their representatives to obtain all permits and approvals necessary under such laws and regulations to perform work pursuant to this Order and shall submit timely applications and requests for any such permits and approvals. Failure to obtain any necessary permits or approvals shall not constitute grounds for an extension pursuant to Paragraph 56 of this Order.

67.  This Order may be modified or amended by EPA to ensure protection of the health of persons. Such an amendment shall be in writing, shall have as its effective date the date on which it is received by Respondents, and shall be incorporated into this Order.

68.  If any provision or authority of this Order, or the application of this Order to any party or circumstance, is held by any judicial or administrative authority to be invalid, the application of such provision(s) to other parties or circumstances and the remainder of the Order shall remain in force and shall not be affected thereby.

69.  This Order shall be binding upon the Respondents cited herein and all their heirs, successors, and assignees. No change in ownership of the leases or properties shall alter the responsibility of the Respondents under this Order.

70.  This Order constitutes final agency action for purposes of SDWA § 1448, 42 U.S.C. § 300j-7.

Dbt f !4;22.dw 11227.G!!!Epdvn f ou2.2!!!!Gjrﬁe!12029022!!!!Qbhf !23!pg23!!!Qbhf .E!33

Docket No. SDWA-06-2010-1208
Page 11

## OPPORTUNITY TO CONFER WITH EPA

71.    Respondents have the opportunity to confer informally with EPA concerning the terms
and applicability of this Order.  Respondents must contact Tucker Henson, Office of
Regional Counsel, at (214) 665-2718 within seven (7) days of receipt of this Order to
schedule such a conference.  This conference is not an evidentiary hearing, does not
constitute a proceeding to challenge the Order, and does not give Respondents a right to
seek review of this Order. Any such conference with EPA will be held at the following
location:

    U.S. EPA, Region 6
    Office of Regional Counsel (6RC-EW)
    ATTN:  Tucker Henson
    1445 Ross Avenue, Suite 1200
    Dallas, TX  75202

12-7-10
Date

John Blevins
Director
Compliance Assurance and
    Enforcement Division

22

ELIZABETH A. JONES, *CHAIRMAN*
MICHAEL L. WILLIAMS, *COMMISSIONER*
DAVID PORTER, *COMMISSIONER*

LINDIL C. FOWLER, JR., *GENERAL COUNSEL*
COLIN K. LINEBERRY, *DIRECTOR*
*HEARINGS SECTION*



# RAILROAD COMMISSION OF TEXAS

## OFFICE OF GENERAL COUNSEL

**OIL AND GAS DOCKET NO. 7B-0268629**

---

**COMMISSION CALLED HEARING TO CONSIDER WHETHER OPERATION OF THE RANGE PRODUCTION COMPANY BUTLER UNIT WELL NO. 1H (RRC ID 253732) AND TEAL UNIT WELL NO. 1H (RRC ID 253729) IN THE NEWARK, EAST (BARNETT SHALE) FIELD, HOOD COUNTY, TEXAS, ARE CAUSING OR CONTRIBUTING TO CONTAMINATION OF CERTAIN DOMESTIC WATER WELLS IN PARKER COUNTY, TEXAS**

---

**Heard by:**  Donna K. Chandler, Technical Examiner
Gene Montes, Hearings Examiner

**Appearances:**                          **Representing:**

David Jackson                          Range Production Company
Stephen Ravel
John Riley
Andrew Sims
Mike Middlebrook
Norman Warpinski
John McBeath
Mark McCaffrey
Keith Wheeler
Charles Kreitler
Alan Kornacki
Chris Hosek
David Poole

David Cooney                          Railroad Commission staff

Barry Hageman                          Enervest Operating Co, LLC

Bill Stevens                          Texas Alliance of Energy Producers

OIL AND GAS DOCKET NO. 7B-0268629                                          **Page 2**

**Procedural history:**

| | |
|---|---|
| Notice of Hearing: | December 8, 2010 |
| Hearing held: | January 19-20, 2011 |
| Transcript date: | January 24, 2011 |
| Record Closed: | February 17, 2011 |
| PFD issued: | March 7, 2011 |
| Revised PFD issued: | March 11, 2011 |

## REVISED EXAMINERS' REPORT AND PROPOSAL FOR DECISION

### STATEMENT OF THE CASE

This hearing was called by the Railroad Commission of Texas ("RRC") to determine whether the Butler Unit Well No. 1H ("Butler well") or the Teal Unit Well No. 1H ("Teal well"), both horizontal drainhole wells operated by Range Production Company ("Range") and producing from the Newark, East (Barnett Shale) Field, are causing or contributing to the contamination of certain domestic water wells in Parker County. The Notice of Hearing specifically states:

> "...the Commission will consider the extent and causation of and responsibility for, any contamination that may have occurred, or which is likely to occur, in domestic water wells in the area of the Range Production Company Butler Unit, Well No. 1H (RRC No. 253732) and the Teal Unit, Well No. 1H (RRC No. 253779), and, more particularly, whether the operation of these wells has caused or contributed, or may cause or contribute, to any such contamination. The Commission may also consider whether there is any alternative cause or contributor to any contamination that may have occurred."

The RRC has had an ongoing investigation into the cause of gas being produced in the domestic water wells since August 2010. In October 2010, the Environmental Production Agency ("EPA") began its own investigation into the cause of the contamination of the wells, and on December 7, 2010, the EPA issued an Emergency Administrative Order to Range. (See Attachment A, Range Exhibit No. 5). In the order, the EPA concluded that, "[Range] caused or contributed to the endangerment identified herein [inter alia, benzene and methane in two nearby domestic water wells.]" (See Attachment A, Conclusion of Law No. 46). The Order further described to Range "..... the action you must take to ensure the Butler Unit and Teal Unit production facilities pose no imminent and substantial endangerment to public health through methane contamination of an underground source of drinking water."

24

OIL AND GAS DOCKET NO. 7B-0268629                                    **Page 3**

The Notice of this hearing was sent to Range, the owners of the two domestic water wells at issue and to three EPA officials. The Notice stated "The Commission encourages the participation of EPA in the hearing and presentation by EPA of evidence in its possession supporting the findings of fact and conclusions of law in the Emergency Administrative Order." Range appeared at the RRC hearing and presented evidence in support of its position that the operations of its Teal well and Butler well are not contributing to the production of methane in domestic water wells.

RRC staff appeared at the hearing and cross-examined Range's witnesses. Staff presented an exhibit summarizing the RRC's investigations in this matter, beginning August 6, 2010. (See Attachment B, Staff Exhibit 1).

There was no appearance at the hearing by any representative of the EPA or by owners of the water wells identified as contaminated.

### DISCUSSION OF THE EVIDENCE

Background

In August 2010, Mr. Steven Lipsky complained to the Abilene District Office of the RRC that his domestic water well contained natural gas. On August 17, 2010, the RRC collected water samples from the Lipsky well for analysis. On August 26, 2010, the RRC collected gas samples from the Lipsky well for analysis. At approximately the same time, the RRC requested Range to provide a gas analysis from both the bradenhead (the space between the surface casing and the production casing of the well) and from the production tubing of its Butler well.[1] The RRC further requested that Range test the mechanical integrity of the casing of its Butler well. The Butler well is the nearest producing well to the Lipsky well. The path of the Butler well comes within a horizontal distance of approximately 450 feet of the location of the Lipsky water well, but at that point, the Butler wellbore is more than 5,000 feet deeper than the Lipsky water well.

In a memo dated September 22, 2010, the RRC Abilene District Office staff stated "Each of the gas samples taken, the Lipsky water well, the Butler Unit production and the Butler Unit bradenhead gas had distinct characteristics from each of the others." Range conducted the requested production casing integrity test on its Butler No. 1 on October 14, 2010. The test, which was witnessed by RRC personnel, indicated no communication between the surface casing, production casing, or production tubing.

---

[1] The Butler well is a horizontal drainhole well producing from the Newark, East (Barnett Shale) Field at a depth of approximately 5,700 feet.

OIL AND GAS DOCKET NO. 7B-0268629

Page 4

On October 26, 2010, the EPA collected the following samples for its investigation:

1.   water and gas samples from the Lipsky water well;
2.   a water sample from the Rick Hayley domestic water well storage tank;
3.   gas and water samples from the tubing of the Butler well; and
4.   gas sample from the tubing of the Teal Unit Well No. 1H.[2]

The horizontal portions of the Teal well and Butler well are approximately 1,000 feet apart and the wells are drilled from the same surface location. The Rick Hayley domestic water well is on property adjacent to the Lipsky property to the north and is a horizontal distance of approximately 300 feet from the path of the Butler well. However, at that point, the Butler well is more than 5,000 feet deeper than the Hayley water well.(See Attachment C, portion of Range Exhibit No. 30).

In a letter dated December 3, 2010, Range notified John Tintera, Executive Director of the RRC, that Range would continue to work with the RRC to demonstrate that both the Teal well and the Butler well were in compliance with all RRC regulations. In the same letter, Range offered to collect soil samples to investigate the possible source of gas production in the Lipsky well, provide gas monitoring equipment and alternative water sources to Mr. Lipsky, and install monitoring wells as directed by the RRC. The letter further indicated that Range's initial analyses indicated that the gas produced in the Lipsky water well had a different constituent analysis than gas from both the Butler well production tubing and from the Butler well bradenhead.

On December 7, 2010, the EPA issued an Emergency Administrative Order ("EAO") to Range. On December 8, 2010, the RRC issued its Notice of Hearing in this docket.

<u>Range Operations</u>

Michael Middlebrook, Vice President of Operations for the Barnett Shale and Northeast Marcellus Shale for Range, testified regarding Range's operations in the area, specifically concerning the Teal and Butler wells. The Teal well was drilled beginning in March 2009 and the Butler well was drilled beginning in June 2009. Both wells were put on production in August 2009. The wells are drilled from the same surface location, which is approximately 2,300 feet southeast of the Lipsky water well.

In August 2010, after Mr. Lipsky's complaint to the RRC about his water well, RRC staff inspected the Teal and Butler wells. Both wells were producing at the time of the inspection. The inspection revealed that the Teal well had no pressure on the bradenhead and the Butler well had 30 psi on the bradenhead. The pressure on the Butler well bled

---

[2]   The Teal Unit Well No. 1H is another horizontal drainhole well producing from the Newark, East (Barnett Shale) and operated by Range.

OIL AND GAS DOCKET NO. 7B-0268629                                    Page 5

down to 0 psi within 10 seconds.[3]  Pressure on the bradenhead of a well is an indication
that formations behind uncemented production casing are seeping fluid into the space
behind the production casing.  Range was requested to collect and analyze gas samples
from the production tubing and from the bradenhead of the Butler well.

The Butler well has surface casing set at 394 feet and cemented to surface.  The
well has production casing set from its total measured depth of 9,054 feet to surface,
including a horizontal lateral approximately 3,300 feet in length. The top of cement behind
the production casing is found in the vertical portion of the wellbore at approximately 4,850
feet, as verified by a cement bond log. There is no cement behind the production casing
from a depth of 4,850 feet to surface.  The gas sample taken from the tubing is therefore
gas from the Barnett Shale producing interval. The gas sample taken from the bradenhead
is gas from any formation open to the wellbore above 4,850 feet.

Because of the pressure found on the bradenhead of the Butler well, the RRC
requested Range to perform a pressure test on the well to confirm the integrity of the
production casing.  This test was performed on October 14, 2010 and was witnessed by
RRC personnel.  In order to perform the test, Range placed a packer on the tubing to
isolate the tubing from the casing/tubing annulus.  The well held 845 psi on the annulus
between the tubing and casing for 30 minutes, while the tubing pressure held at 540 psig.
The bradenhead pressure was 28 psi during the entire test.  These pressures demonstrate
that the casing in the well has integrity, i.e. that there are no pathways for gas to migrate
from the production tubing to the annulus or from the tubing/casing annular space to the
back side of the production casing.

In late October, Range was contacted by the EPA, requesting that EPA be allowed
to take gas samples from the Butler well.  On October 26, 2010, the EPA collected a gas
sample from the tubing of the Butler well.  At the same time that the EPA was collecting
its single sample, Range collected additional samples of gas from the Butler well tubing,
the Butler bradenhead, and the Teal tubing.  Because there was no bradenhead pressure
on the Teal well, no gas sample could be collected from the bradenhead of that well at that
time.  Range also collected a sample of the gas that is being reinjected into the casing in
both wells for gas lift purposes.

Approximately 30 days after the EPA had collected its sample, Range was notified
by phone of the EPA's position that the gas in the Lipsky water well was the same as
Range's production gas.  Range requested the EPA's gas sampling data, but the EPA did
not provide the data.

---

[3] More recently, the bradenhead pressure in the Butler well builds only to about 5 psi and bleeds down to
0 psi immediately.

**OIL AND GAS DOCKET NO. 7B-0268629**                                  **Page 6**

Geology and hydrogeology

Dr. Charles Kreitler was called by Range to testify regarding geology and aquifers in the area. The Trinity aquifer group (including the Paluxy, Glen Rose and Twin Mountains formations) is part of the Cretaceous system. In this area of Parker County, the Strawn, which is part of the Pennsylvanian system, directly underlies the Trinity. The base of the Cretaceous/top of Pennsylvanian varies from approximately 200 feet below surface (in the area of the Lipsky water well) to approximately 400 feet below surface (in the area of water wells approximately one mile to the east).[4] The base of the Pennsylvanian/top of Mississippian in the area of the Butler/Teal wells is approximately 5,700 feet. The Barnett Shale is part of the Mississippian system. The Cretaceous dips to the southeast while the Pennsylvanian section dips to the west. An erosional unconformity exists which allows a natural communication between the Cretaceous and the Pennsylvanian. The Pennsylvanian contains hydrocarbons and salt water, while the Cretaceous section contains fresh water. The unconformity is verified by seismic data. In summary, the area from the surface to the base of Cretaceous (ranging from 200 feet to 400 feet below surface) contains fresh water. Immediately below this zone, from the base of the Cretaceous to about 5,700 feet is Pennsylvanian age rock containing natural gas, oil and salt water. Below that, starting at a depth of approximately 5,700 feet, is Mississippian age rock that includes the gas-bearing Barnett Shale formation.

A structure map of the area around the Butler well and Teal well was drawn based on 3-D seismic data. There is no indication of faulting in the vicinity of the wells and therefore no pathway to communicate the Barnett Shale all the way up, over 5,000 feet vertically, to the Cretaceous.

Most of the domestic water wells in the area are completed in the Twin Mountains. Some are completed in the shallower Paluxy. The two are separated by the Glen Rose aquitard, which retards the vertical movement of water between the Twin Mountains and Paluxy. The Twin Mountains is not a highly productive aquifer. As water wells are pumped, the water level in the Twin Mountains falls. Because the Twin Mountains is in communication with the Strawn due to the unconformity, gas and water from the Strawn can move to the Twin Mountains and mix.

Water wells within 3,000 feet of the Butler/Teal surface location were sampled to determine methane concentration. Some homeowners did not allow their wells to be sampled. In the samples, methane concentrations ranged from non-detect to almost 3

---

[4] This variance in the base of cretaceous is due to differences in ground level elevations.

OIL AND GAS DOCKET NO. 7B-0268629                                      Page 7

parts per million (ppm).[5] The Perdue water well had the highest methane concentrations, at 2.8 ppm. The Perdue well is the deepest water well in the area, extending about 100 feet into the Strawn. The Lipsky well had a methane concentration of 2.3 ppm, the second highest concentration found. The concentrations in the various water wells do not demonstrate any type of plume, which would be expected if the gas was from a single source. Instead, the concentrations in the wells vary randomly over the area.

The water well samples also indicate variations in total dissolved solids from about 500 ppm to about 1,800 ppm. The normal range for total dissolved solids in the Trinity aquifer is 500-700 ppm. Chlorides in the water well samples varied from 20 ppm to 535 ppm. The total dissolved solids and chloride concentrations vary randomly over the area, just as the methane concentrations. Range believes that the methane, total dissolved solids and chlorides are all indications of communication between the Twin Mountains aquifer and the higher salinity waters of the underlying Strawn.

The United States Department of Interior ("USDI"), Office of Surface Mining, advises that owners of water wells with methane concentrations less than 10 ppm require no action other than periodic monitoring to make sure concentrations do not change. The USDI further advises that methane will not accumulate in the wellbore of a water well if it is properly vented to the air. The TCEQ requires that all public water supply wells be vented to prevent gas accumulations of any kind in the wellbores.

Microseismic Analysis and Hydraulic Fracturing

Norman Warpinski, the Director of Technology for Pinnacle-Halliburton Service, was called to testify regarding microseismic data and hydraulic fracturing in the Barnett Shale. In order to produce hydrocarbons, tight rocks such as the Barnett Shale, must be hydraulically fractured, thereby creating pathways for hydrocarbons to move to the wellbore. Fracture stimulations are designed to keep the injected fluid within the productive formation. Fracturing is effective in the Barnett Shale because the Barnett Shale is overlain by the Marble Falls and underlain by either the Viola or Ellenburger, all of which are carbonate rocks effective in preventing growth of fractures out of the intended zone.

Microseismic monitoring is used to monitor the results of hydraulic fracturing. During the hydraulic fracturing process, microseisms occur as a result of rock fracturing. These microseisms emit seismic energy which can be detected in geophones which have been placed in nearby wells. By mapping the microseisms, the geometry, dimension and growth behavior of a fracture can be determined.

---

[5] Some of the wells that indicated "non-detect" of methane were sampled at the outlet side of the treatment equipment and any gas which had been dissolved in the water would likely have already fallen out of solution.

OIL AND GAS DOCKET NO. 7B-0268629                                    Page 8

Microseismic data is available for about 2,400 fracture stimulations in the Barnett Shale. In Parker County alone, data is available for more than 320 fracture stimulations. For the Parker County data, the greatest fracture height seen is about 400 feet, or to a vertical depth no higher than 4,500 feet. The separation between any drinking water source and the highest fracture height is more than 4,000 feet. Dr. Warpinski stated that it would be impossible to create a fracture height of such magnitude.

Range believes that the microseismic data available for wells in Parker County confirm that hydraulic fracturing of Barnett Shale wells is not the cause of natural gas production in the Lipsky well or any other water well in the area.

Geochemical Gas Fingerprinting

Mark McCaffrey, Senior Technical Advisor of Fluid Services for Weatherford Laboratories, was called by Range to testify regarding the various gas analyses. Dr. McCaffrey presented results of geochemical gas fingerprinting which demonstrate that gas from the Lipsky water well does not match gas from the Barnett Shale. Dr. McCaffrey believes that the EPA's geochemical gas fingerprinting study is flawed because the EPA did not attempt to identify other potential sources of gas in the Lipsky well besides the Barnett Shale. Further, the geochemical parameter used in the EPA fingerprinting study was the methane carbon isotope. This parameter does not differentiate between Barnett Shale gas and gas from Pennsylvanian age rock such as the Strawn formation, but simply provides a determination that both gases are thermogenic. Gas found in the shallower Strawn formation would be expected to have similar carbon isotopic composition because the Barnett Shale is the source rock for all gas bearing zones in and above the Barnett Shale. Over geologic time, gas has migrated up from the Barnett Shale into other formations and it is not surprising that the gas samples collected by the EPA have similar methane isotopes and are both thermogenic.

Dr. McCaffrey believes that the appropriate geochemical parameters to use in this case are nitrogen and carbon dioxide ($CO_2$). These two parameters are more useful when considering that the source of gas in the Lipsky well may be the Pennsylvanian age Strawn formation. Available publications provide data indicating that Pennsylvanian age reservoir gases typically have higher nitrogen and lower $CO_2$ than Barnett Shale gas.

For its fingerprinting study, Range used solution gas samples and headspace gas samples from 25 water wells within 3,000 feet of the surface location of the Butler and Teal wells. Solution gas is the gas which is dissolved in the water. Headspace gas is the gas above the water level in a well. Additionally, Range had samples from the Butler well tubing (Barnett Shale) gas, Butler well bradenhead gas, Teal well tubing and Teal well bradenhead. Range also had samples of gas being injected into both the Teal and Butler

wells. Elevated nitrogen concentrations were found in the headspace gas of the Lipsky well, indicating that the gas is derived from a Pennsylvanian reservoir, and not the Barnett Shale. The Butler bradenhead gas is approximately 50% nitrogen enriched Pennsylvanian gas and 50% microbial gas. The Teal bradenhead sample was found to be almost entirely microbial. Neither bradenhead gas sample contained Barnett Shale gas. Further, Barnett Shale gas contains no microbial gas, as was found in the two bradenhead samples.

If Barnett Shale gas were migrating upwards and communicating to shallower zones, some component of Barnett Shale gas would have been present in the bradenhead samples of the Teal and Butler wells. Further, the gas found in most of the water well samples has differing degrees of biodegradation, indicating that gas had seeped into the aquifer over geologic time, and not in a single event.

Petroleum Engineering

John McBeath, consulting petroleum engineer, was called by Range to testify regarding the history of gas in water wells and about the mechanical integrity of Range's wells. He also testified as to the extent of Range's investigation into the reason gas is found in the Lipsky well, as requested by the RRC.

Gas production from water wells is not uncommon in this area, and has occurred for many years prior to Barnett Shale gas development. In October 2005, a water well was drilled on the Hurst property, slightly less than 900 feet west of the Lipsky well. The Hurst water well was drilled to a depth of 180 feet and flowed sufficient gas such that the well was flared when initially completed. The gas in the well depleted after a few months and the well is now used as an irrigation supply well. In 2007, a water well was drilled on the Oujesky property to a depth of 220 feet. This well, approximately 750 feet north of the Lipsky well, also flowed gas for a couple of months. The Lake Country Acres public water supply had five wells, the earliest drilled in 1995. These water supply wells are approximately 7,000 feet to the east of the Lipsky well. One of the wells, the No. 4, flowed 122 MCF (thousand cubic feet) of gas per day and was plugged shortly after drilling in 2003. The storage tanks for the remaining four Lake Country Acres water supply are aerated to de-gas the water and signs around the tanks warn of flammable gas.

The Lipsky well was drilled in 2005 to a depth of 200 feet, which Range estimates is within 25 feet of the base of the Cretaceous. According to the Lipsky's deposition, there were no problems with his water well until August 2010 when the output from the well decreased. Lipsky had the pump in the well replaced with a smaller pump in an effort to prevent the water level from falling below the pump. The decreased output from the well continued. Range notes that Mr. Lipsky's home on the property was completed in early 2010, a very large home with extensive landscaping and a swimming pool, likely resulting in an increase in water consumption by Lipsky. Range believes the increased water

**OIL AND GAS DOCKET NO. 7B-0268629**                                    **Page 10**

consumption by Lipsky, in combination with increased development in the subdivision, may have drawn down water levels in area water wells such that gas could be drawn in from the Strawn formation.

Prior to the drilling of the Teal and Butler wells in 2009, there is significant evidence of shallow gas production within a 2½ mile radius of the wells. The Strawn formation directly underlies the Cretaceous formation, which is the aquifer in the area. Water well records indicate that numerous water wells penetrated the Strawn formation, while numerous others are completed within 25 feet of the top of the Strawn. In addition to gas produced in the numerous water wells, several gas wells were completed in the Center Mills (Strawn) Field approximately one mile to the southeast of the Butler and Teal wells. These wells produced gas in the mid-1980's from the Strawn, with depths ranging from 358 feet to 426 feet. The Lake Country Acres water supply wells are drilled to depths ranging from 385 feet to 420 feet.

Range identified 74 oil/gas wells within 2½ miles of the surface location of the Butler and Teal wells, some of which are abandoned locations which were permitted but never drilled. Range studied the available drilling, completion and plugging records for the wells and found that 11 wells have potential to communicate to freshwater zones due to inadequate surface casing or improper plugging. However, the closest of the 11 wellbores is about one mile away in the area of the Center Mills (Strawn) Field. Range does not believe that any of the 11 wells have any connection to the Lipsky well problem, but Range cannot rule out the possibility that any of the 11 wells may have contributed to gas production in water wells in other areas, such as the Lake Country Acres water supply wells. Eight of the 11 wells are within about ½ miles of the Lake Country Acres water wells.

The surface casing for the Butler well is set at 394 feet and the surface casing for the Teal well is set at 409 feet. The surface casing on the Butler well was tested to 1,500 psi and the surface casing on the Teal was tested to 1,200 psi. The Texas Commission on Environmental Quality ("TCEQ") recommends that the interval from land surface to 20 feet below the base of the Cretaceous be protected, with the Cretaceous estimated to occur at 175 feet. Surface casing on both wells exceed the requirements of the TCEQ. Range's experience in the area is that the Cretaceous generally extends to approximately 320 feet.

The top of cement behind the production casing in the Butler No. 1 is 4,580 feet, based on a cement bond log. The production casing was pressure tested to 845 psig on October 15, 2010. The top of cement behind the production casing in the Teal No. 1 is 4,810 feet, also verified by a cement bond log. The production casing in the Teal No. 1 was pressure tested on December 28, 2010 to 705 psig. The production casings in both wells have mechanical integrity to prevent migration of Barnett Shale gas behind pipe.

OIL AND GAS DOCKET NO. 7B-0268629                                    **Page 11**

Groundwater Investigation

      Keith Wheeler was called by Range to testify regarding the groundwater investigation performed by Range per the RRC's December 16, 2010 letter to Range. In late December, ambient air samples were collected from different sources near the area water wells, such as near the wellhead or in the pump house. A headspace gas sample and a water sample was taken from each of the water wells. Additionally, 117 soil gas samples were collected from around the water wells.

      The highest measured concentration found in any of the ambient air samples was 6 ppm for ethane, 13.9 ppm for methane, and 61 ppm for propane. The lower explosive limit is 30,000 ppm for ethane, 50,000 ppm for methane, and 21,000 ppm for propane. These ambient air samples indicate insignificant potential for any fire or explosion.

      Each of the 25 water samples was field tested at the time of sampling for temperature, specific conductance, dissolved oxygen, pH, oxidation reduction potential and turbidity. Each sample was then sent to a lab for testing of more than 135 constituents. The constituents include 108 volatile organic compounds (VOC). Of this 108, 16 were detected in at least one of the water wells. However, no sample contained a level in excess of the Texas Risk Reduction Program Protective Concentration Level (PCL) established by the TCEQ. The PCL is the value at which the analyte does not present an unacceptable risk to human health. RCRA metals barium, chromium, and lead were detected in at least one water sample, but no sample had a level exceeding the PCL. Dissolved butane, ethane, isobutane, methane or propane was found in at least one water sample. However, there are no established PCL for these dissolved gases because they are not toxic for ingestion of groundwater. Three other analytes (chloride, sulfate and total dissolved solids) were detected in all samples, but there are no established PCL for these analytes. In some wells, the concentrations of these three analytes exceeded the Secondary Maximum Contaminant Levels (SMCL) for drinking water in the State of Texas, as established by TCEQ pursuant to the EPA standards for the Safe Drinking Water Act. However, the presence of these three analytes indicates the aesthetic quality of the water such as odor and taste, and does not indicate risks to human health.

      Soil gas samples were collected from 117 locations around the domestic water wells in the area of the Lipsky well. The samples were retrieved from depths between 1 and 3 feet below surface. Each gas sample was tested for presence of methane, ethane, propane and butane. The highest concentration of any of these gases was less than 0.2% of the lower explosive limit for each gas. As in the other analyses, the concentrations were randomly distributed over the area, with no indication of any single source.

OIL AND GAS DOCKET NO. 7B-0268629                                    Page 12

## EXAMINERS' OPINION

The examiners find that Range's evidence clearly demonstrates that its drilling and operations of the Teal and Butler wells have not contributed to contamination of any domestic water wells. The examiners further find that the most likely source of gas in the Lipsky well and other domestic water wells in the area is the shallow Strawn formation.

Most of the domestic water wells in this area are completed in the Twin Mountains formation within the Cretaceous. The Cretaceous and the underlying Pennsylvanian are in direct communication as a result of an erosional unconformity between the two systems of rock. The Strawn is the shallowest formation within the Pennsylvanian. The Strawn is found at a depth of about 200 feet below surface in the area of the Lipsky water well and at a depth of approximately 400 feet below surface in the Lake Country Acres water supply wells about one mile to the west. Water wells records show that some water wells in the area were actually drilled into the Strawn formation. Additionally, there was gas production in the mid-1980's from the shallow Strawn formation in the Center Mills (Strawn) Field, with gas production from depths of less than 400 feet below surface.

Domestic water wells in the area of the Lipsky water well have contained methane gas for many years. The nearby Hurst water well produced sufficient gas to flare when it was initially completed in 2005. The Oujesky water well also produced gas for a couple of months just after completion in 2007. One water well in the Lake Country Acres water supply produced 122 MCF of gas per day upon completion, so much gas that it had to be abandoned as a water supply well. All of these wells were drilled prior to the drilling of both the Butler and Teal wells by Range in 2009.

The EPA's investigation compared gas produced from the tubing of the Butler well (Barnett Shale gas) to gas found in the Lipsky water well. The methane carbon isotope fingerprint analysis of the gases were found to be very similar and both gases were determined to be thermogenic. Range demonstrated that use of the methane carbon isotope in the EPA analysis was inappropriate because the Barnett Shale is the source rock for all gas bearing zones above the Barnett Shale, including the much shallower Strawn formation. All gas produced from the same source rock would be expected to have a similar methane carbon isotope. The EPA did not attempt to identify any other potential source of the gas produced from the Lipsky well. Range further showed the appropriate geochemical parameters to use for fingerprinting in this case are nitrogen and carbon dioxide. Published literature confirms that Pennsylvanian age gases, including the Strawn, have higher nitrogen and lower carbon dioxide than Barnett Shale gas.

For its gas fingerprinting analysis, Range collected samples of headspace gas and solution gas from 25 water wells within 3,000 feet of the surface location of the Butler/Teal wells. Range also collected samples from the tubing of the Butler well, tubing of the Teal

34

well, bradenhead of the Butler well, bradenhead of the Teal well, and injection gas used in both the Teal and Butler wells. The fingerprinting analyses performed by Range demonstrates that gas found in the Lipsky water well and other water wells had elevated nitrogen concentrations, indicating Pennsylvanian gas, not Barnett Shale gas. Additionally, gas produced from the Barnett Shale in the Butler and Teal wells contained no microbial gas, but the bradenhead samples from each well did contain microbial gas. These differentials confirm that the Barnett Shale is not in communication with any other zone, including the much shallower Strawn.

In addition to the fingerprinting analysis, additional testing for the presence of 135 constituents was performed on water samples from the 25 water wells. The constituents include 108 volatile organic compounds. No sample contained a level in excess of the Texas Risk Reduction Program Protective Concentration Level (PCL) established by the TCEQ. The PCL is the value at which the analyte does not present an unacceptable risk to human health. The water samples were also tested for eight RCRA metals. Three of these metals, barium, chromium, and lead, were detected in at least one water sample, but no sample had a level exceeding the PCL. Dissolved butane, ethane, isobutane, methane or propane was found in at least one water sample, but these gases are not toxic for ingestion of groundwater and there are no established PCL for these gases. Three other analytes (chloride, sulfate and total dissolved solids) were detected in all samples and some exceeded the SMCL . However, the presence of these three analytes affects only the aesthetic quality of the water such as odor and taste, and are not indications of risks to human health.

Ambient air samples were collected from various areas around the wellbores and pump houses of the water wells. These ambient air samples were tested for ethane, methane and propane. All samples were far below the lower explosive limit for the three gases, meaning there is insignificant potential for explosion for fire. Additionally, 117 soil gas samples were tested for presence of methane, ethane, propane and butane. The highest concentration of any of these gases was less than 0.2% of the lower explosive limit for each gas.

Range also presented extensive microseismic data to demonstrate that hydraulic fracturing has not caused communication between the Barnett Shale and Cetaceous aquifers in the area. Microseismic data is available for 320 fracture stimulations for wells in Parker County. For these 320 stimulations, the greatest fracture height is about 400 feet. Given that the separation between the Barnett Shale and the aquifer is about 5,000 feet, it is evident that hydraulic fracturing of the Barnett Shale has not caused any communication with the aquifer.

OIL AND GAS DOCKET NO. 7B-0268629

The Butler and Teal wells have mechanical integrity which will prevent any migration of gas out of the Barnett Shale. The surface casing in each well is set below the base of the Cretaceous and is cemented to surface. The surface casings and production casings of both wells were tested when set during the drilling process. Further, Range performed a mechanical integrity test on the Butler well at the request of the RRC to demonstrate that the low bradenhead pressure on the well was not related to any type of casing problem. The cement behind the production casing is verified by a cement bond log in both wells.

Based on the evidence, the examiners conclude that gas produced in the Lipsky water well and other area water wells is from the Strawn formation which is in direct communication with the Cretaceous aquifer in which the water wells are completed. Some of the water wells even penetrated the Strawn formation. There is no evidence to indicate that either the Teal well or the Butler well is the source of gas production in area water wells. When the appropriate parameters are used in a fingerprinting study, it is clear that the gas produced from the water wells is from Pennsylvanian rock (Strawn) which is significantly different in composition than Barnett Shale gas.

## FINDINGS OF FACT

1. Notice of this hearing was given on December 8, 2010 to all parties entitled to notice, including Range Production Company, the owners of the two domestic water wells at issue, and three officials of the Environmental Protection Agency.

2. The hearing was called by the Railroad Commission of Texas to consider the extent and causation of and responsibility for, any contamination that may have occurred, or which is likely to occur, in domestic water wells in the area of the Range Production Company Butler Unit, Well No. 1H (RRC No. 253732) and the Teal Unit, Well No. 1H (RRC No. 253779), and, more particularly, whether the operation of these wells has caused or contributed, or may cause or contribute, to any such contamination. The call of the hearing was also to consider whether there is any alternative cause or contributor to any contamination that may have occurred.

3. Range Production Company presented evidence in support of its position that neither its Butler Unit Well No. 1 or its Teal Unit Well No. 1 has caused or contributed to contamination of any domestic water wells in the area. The EPA did not appear at the hearing. Neither owner of the two domestic water wells appeared at the hearing.

4.     The Teal Unit Well No. 1H was drilled beginning in March 2009 and the Butler Unit Well No. 1H was drilled beginning in June 2009. The wells are horizontal drainhole wells completed in the Newark, East (Barnett Shale) Field.

5.     The Butler Unit Well No. 1H and the Teal Unit Well No. 1H were drilled from the same surface location, which is approximately 2,300 feet southeast of the domestic water well on Steven Lipsky's property in Parker County.

6.     Both the Butler Unit Well No. 1H and the Teal Unit Well No. 1H have sufficient surface casing to protect usable quality water as recommended by the Texas Commission on Environmental Quality.

   a.     The Texas Commission on Environmental Quality recommends that the interval from land surface to 20 feet below the base of the Cretaceous be protected, with the Cretaceous estimated to occur at 175 feet.

   b.     The surface casing for the Butler Unit Well No. 1H is set at 394 feet and cemented to surface.

   c.     The surface casing for the Teal Unit Well No. 1H is set at 409 feet and cemented to surface.

7.     Both the Teal Unit Well No. 1H and the Butler Unit Well No. 1H have production casing cemented in a manner to prevent migration of fluids behind pipe.

   a.     The top of cement behind the production casing in the Butler Unit Well No. 1H is 4,580 feet, based on a cement bond log. The production casing was pressure tested to 845 psig on October 15, 2010.

   b.     The top of cement behind the production casing in the Teal Unit Well No. 1H is 4,810 feet, based on a cement bond log. The production casing in the Teal No. 1H was pressure tested on December 28, 2010 to 705 psig.

8.     The Lipsky water well was drilled in 2005 to a depth of 200 feet. The horizontal drainhole of the Butler Unit Well No. 1H comes within a horizontal distance of approximately 450 feet of the Lipsky well, but is more than 5,000 feet deeper than the Lipsky water well.

9.  Mr. Lipsky's first complaint to the District Office of the Railroad Commission in Abilene regarding natural gas in his water well was in August 2010. The Railroad Commission collected a water sample from the Lipsky well on August 17, 2010 and collected a gas sample from the well on August 26, 2010.

10. The Rick Hayley domestic water well is on property adjacent to the Lipsky property to the north. The horizontal drainhole of the Butler Unit Well No. 1H comes within a horizontal distance of approximately 300 feet of the Hayley well, but is more than 5,000 feet deeper than the Hayley water well.

11. On October 26, 2010, the EPA collected water and gas samples from the Lipsky water well, a water sample from the Rick Hayley domestic water well storage tank, gas and water samples from the tubing of the Butler Unit Well No. 1 and a gas sample from the tubing of the Teal Unit Well No. 1H.

12. On December 7, 2010, the EPA issued an Emergency Administrative Order to Range Resources Company.  Range was advised of the EPA's determination that Range's oil and gas production operations related to the Butler Unit Well No. 1H and the Teal Unit Well No. 1H "....were directly related to imminent and substantial endangerment to a public drinking water aquifer."

13. In the subject area of Parker County, the Pennsylvanian age Strawn directly underlies the Trinity aquifer group which is composed of the Paluxy, Glen Rose and Twin Mountains. The Trinity is Cretaceous age.

14. The depth of the base of the Cretaceous/top of Pennsylvanian occurs at depths ranging from approximately 200 feet to approximately 400 feet in this area. An erosional unconformity exists which allows communication between the Cretaceous and the Pennsylvanian.

15. The Barnett Shale occurs at a depth of approximately 5,700 feet in the area of the Butler Unit Well No. 1H and Teal Unit Well No. 1H.

16. The Barnett Shale is Mississippian age rock, but is the source rock for all gas-bearing formations in the Fort Worth Basin including the subject area.

17. Gas production in water wells in Parker and Hood Counties has occurred since at least 2003, several years before the drilling and production of both the Teal Unit Well No. 1H and the Butler Unit Well No. 1H.

     a.    A domestic water well on the Hurst property, approximately 900 feet west of the Lipsky water well, was completed in October 2005 and flowed gas sufficient to flare for a few months. The well is 180 feet deep.

     b.    In 2007, a domestic water well on the Oujesky property approximately 750 feet to the north of the Lipsky property, flowed gas upon completion which continued for a couple of months. The well is 220 feet deep.

     c.    Well No. 4 of the Lake Country Acres water supply flowed 122 MCF per day upon completion in 2003 and was plugged. This well is approximately 7,000 feet to the east of the Lipsky water well and was drilled to a total depth of approximately 400 feet.

18.    Production from the Strawn formation occurred in the mid-1980's from the Center Mills (Strawn) Field approximately one mile to the southeast of the surface location of the Butler/Teal wells. The Strawn in this field was productive from depths as shallow as 358 feet.

19.    Lipsky first reported gas production from his water well after construction of a home, extensive landscaping and pool construction on his property in 2010.

20.    Samples from 25 water wells within 3,000 feet of the Butler/Teal surface location were analyzed for 135 constituents, including 108 volatile organic compounds, eight RCRA metals, and dissolved gases. None of the samples had levels of any of the constituents which exceed the Texas Risk Reduction Program Protective Concentration Level established by the TCEQ standards.

21.    Ambient air samples taken from various areas around the 25 water wells contained concentrations of methane, ethane and propane far below the lower explosive limit for the gases. The highest concentration of any of the gases was 0.29% of the lower explosive limit.

22.    Soil gas samples from 117 sites were tested for methane, ethane, propane and butane, and the concentrations of these gases were far below the lower explosive limits for each gas. The highest concentration of any of the gases was 0.176% of the lower explosive limit.

23.    Because the Barnett Shale is the source rock for shallower gas-bearing formations, the methane carbon isotope fingerprint for Barnett Shale gas is expected to be similar to Strawn gas, as determined by the EPA's analysis.

OIL AND GAS DOCKET NO. 7B-0268629                                    Page 18

24. The appropriate geochemical parameters for fingerprinting to distinguish Strawn gas of Pennsylvanian age from Barnett Shale gas of Mississippian age, are nitrogen and carbon dioxide, not methane carbon isotope. Gas from Pennsylvanian age rock, including the Strawn, has higher nitrogen concentration and lower carbon dioxide concentration than Barnett Shale gas.

25. Gas found in the 25 water wells, including the Lipsky and Hayley water wells, does not match the nitrogen fingerprint of Barnett Shale gas. The gas found in the water wells matches Pennsylvanian gas.

26. Bradenhead gas samples from both the Teal Unit Well No. 1H and the Butler Unit Well No. 1H do no match Barnett Shale gas, confirming that gas is not migrating up the wellbores and that the Barnett Shale producing interval in the wells is properly isolated.

27. Hydraulic fracturing of the Barnett Shale in the Teal Unit Well No. 1H and the Butler Unit Well No. 1H did not result in communication of the Barnett Shale with shallow aquifers from which water wells in the area produce.

   a. Based on available 3D seismic, there is no evidence of faulting in the area of the Butler/Teal wells.

   b. Microseismic data available for more than 320 fracture stimulations in Parker County indicate a maximum fracture height of approximately 400 feet, meaning that almost one mile of rock exists between the highest fracture and the shallow aquifer.

## CONCLUSIONS OF LAW

1. Proper notice was issued in accordance with applicable statutory and regulatory requirements.

2. All things have occurred to give the Railroad Commission jurisdiction to consider this matter.

3. Specifically, the Commission has jurisdiction over the issues in this proceeding pursuant to Title 3, Oil and Gas, Subtitles A, B, and C of the Texas Natural Resources Code, Chapter 26, 27 and 29 of the Texas Water Code, and Tex. Gov't Code Ann. §§ 2001 et seq. (2010).

4. No person conducting activities subject to regulation of the Commission may cause or allow pollution of surface or subsurface water in the state. 16 *Tex. Admin. Code Ann.* § 3.8(b).

OIL AND GAS DOCKET NO. 7B-0268629                                      Page 19

5.   Pursuant to 16 *Tex. Admin. Code* § 1.47, in response to a written complaint or on the Commission's own motion, the Commission may issue a notice commanding a person or agency subject to the Commission's jurisdiction to appear at a public hearing and show cause why the person or agency should not be compelled to do the act required or refrain from doing an act.

6.   The Railroad Commission has acted appropriately in its investigation of, and actions with regard to, the Lipsky complaint.

7.   The Environmental Protection Agency (EPA) through the following individuals, were provided notice of this hearing: Dr. Alfredo Almendariz, Regional Administrator, Tucker Henson, Office of Regional Counsel, John Blevins, Office of Compliance Assurance and Enforcement Tex. Gov't Code Ann. § 2001.051 et seq. and 16 Tex. Admin. Code §1.45.

8.   Steven Lipsky and Rick Hayley were provided notice of this hearing pursuant to Tex. Gov't Code Ann. §2001.051 et seq. and 16 Tex. Admin. Code § 1.45.

9.   The EPA, Mr. Lipsky and Mr. Hayley did not to appear or participate in the evidentiary hearing.

10.  Range has met its burden of proof as to the matters considered in this proceeding and has established that none of its activities in the subject wells are in violation of Statewide Rule 8.

11.  The Protective Concentration Levels (PCL) are the default cleanup standards in the Texas Risk Reduction Program, found at 30 *Tex. Admin. Code* §350 et seq. and the water well sampling results established that PCLs were not exceeded for any of the wells sampled.

## EXAMINERS' RECOMMENDATION

Based on the evidence presented and summarized in the above findings of fact and conclusions of law, the examiners recommend that a Final Order be issued which finds that the operations of the Teal Unit Well No. 1H and the Butler Unit Well No. 1H by Range Resources Company have not contributed and are not contributing to contamination of any domestic water wells.

Respectfully submitted,

Gene Montes                                Donna K. Chandler
Hearings Examiner                          Technical Examiner

# Attachment A



## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 6
1445 Ross Ave., Suite 1200
Dallas, TX 75202

December 7, 2010

CERTIFIED MAIL – RETURN RECEIPT REQUESTED (7007 0710 0002 1385 1927)

Mr. Mike Middlebrook
Vice President of Operations
Range Resources Corporation and
Range Production Company
100 Throckmorton Street, Suite 1200
Fort Worth, TX 76102

> Exhibit No. **5**
> Operator: **Range Resources**
> Docket No. **7B-0268629**
> Date: **January 19, 2011**

Re:   Findings and Emergency Order
Docket No. SDWA-06-2011-1208
Butler Unit, Lease No.: 253732, Well # 1-H
Teal Unit, Lease No.: 253779, Well #1-H

Dear Mr. Middlebrook:

As a result of investigatory work performed, the U.S. Environmental Protection Agency (EPA) Region 6 has determined that an imminent and substantial endangerment to a public drinking water aquifer has occurred (or may occur) through methane contamination which is directly related to oil and gas production facilities under your operation. The Agency has data to indicate that two private drinking water wells, and potentially more, have been significantly impacted by the methane contamination which presents a potential threat of explosion due to high levels found dissolved in the drinking water and methane vapors present in the headspace of the drinking water wells, and therefore presents a potential imminent endangerment to the health of persons using those private drinking water wells.

Due to these conditions, I am enclosing an Emergency Order (Order) issued to Range Resources Corporation and Range Production Company (Range or Respondents) pursuant to Section 1431 of the Safe Drinking Water Act (Act), 42 U.S.C. § 300i. This Order is issued to Range as owner and/or operator of the referenced oil and gas production facilities. Presently, the operation of these facilities presents, or may present, an imminent and substantial endangerment to public health. The Order describes the actions you must take to ensure the Butler Unit and Teal Unit production facilities pose no imminent and substantial endangerment to public health through methane contamination of an underground source of drinking water.

2

Specifically, the Order requires Range to:

A) Within twenty-four (24) hours of receipt of this Order, Respondents shall notify EPA in writing whether they intend to comply with this Order.

B) Within forty-eight (48) hours of receipt of this Order, Respondents shall provide replacement potable water supplies for the consumers of water from Domestic Well 1 and Domestic Well 2.

C) Within (48) forty-eight hours of receipt of this Order, Respondents shall install explosivity meters, approved by EPA, in the dwellings served by Domestic Wells 1 and 2.

D) Within five (5) days of receipt of this Order, Respondents shall submit to EPA a survey listing and identifying the location description (latitude and longitude) of all private water wells within 3,000 feet of the Butler wellbore track and 3,000 feet of the Teal wellbore track and all of the Lake Country Acres (TX1110059) public water supply system wells. This submittal shall include a plan for EPA's approval, to sample those wells identified in Order to determine if any of those wells have been impacted. The plan shall include head space (air) and dissolved constituent (water) sampling. The head space sampling shall commence no later than five (5) days after submittal of the plan.

E) Within fourteen (14) days of receipt of this Order, Respondents shall submit to EPA, for approval, a plan to conduct soil gas surveys and indoor air concentration analyses of the properties and dwellings served by Domestic Wells 1 and 2.

Within sixty (60) days of receipt of this Order, Respondents shall develop and submit to EPA for approval, a plan to: 1) identify gas flow pathways to the Trinity Aquifer; 2) eliminate gas flow to the aquifer if possible, and 3) remediate areas of the aquifer that have been impacted.

Effective upon receipt of the Order, Range shall immediately comply with all of the provisions specified in the "ORDER" Section of the enclosed Order.

Additional requirements will be set forth by the EPA after plans are reviewed.

3

If your staff has questions specific to the Order, please contact Mr. Chris Lister at (214) 665-6672 for technical questions or Tucker Henson at (214) 665-2718 for legal questions. We urge your prompt attention to this matter.

Sincerely,

John Blevins
Director
Compliance Assurance and
Enforcement Division

Enclosure



ENVIRONMENTAL PROTECTION AGENCY
REGION VI

| | |
|---|---|
| IN THE MATTER OF: ) | Docket Number: SDWA-06-2011-1208 |
| ) | |
| RANGE RESOURCES CORPORATION ) | |
| and ) | |
| RANGE PRODUCTION COMPANY ) | |
| ) | |
| Respondents. ) | EMERGENCY ADMINISTRATIVE |
| ) | ORDER |
| (Texas RRC Operator I.D. No. 691703) ) | |
| ) | |
| Proceedings Under Section 1431(a) of the ) | |
| Federal Safe Drinking Water Act, 42 U.S.C. ) | |
| § 300(i)(a). ) | |

STATUTORY AUTHORITY



The following findings are made and Order issued under the authority vested in the Administrator of the United States Environmental Protection Agency ("EPA") pursuant to the authority of Section 1431 of the Safe Drinking Water Act ("SDWA" or "Act"), 42 U.S.C. § 300(i).

EPA may issue such Orders upon receipt of information that contaminants are present in or are likely to enter an underground source of drinking water and may present an imminent and substantial endangerment to the health of persons, and EPA has determined that appropriate State and local authorities have not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time, as described in Section 1431(a) of the Act, 42 U.S.C. § 300(i)(a).

The Administrator delegated the authority to issue this Order to the Regional Administrator of EPA Region 6, who further delegated such authority to the Director of the Compliance Assurance and Enforcement Division.

Federal law provides that violation of any terms of this Order may subject Respondents to a civil penalty of up to $16,500 per day of violation, assessed by an appropriate United States District Court, under SDWA § 1431(b), 42 U.S.C. §300i(b), as modified by the Debt Collection Improvement Act, 31 U.S.C. § 3701 and codified at 40 C.F.R. § 19.4.

45



Docket No. SDWA-06-2010-1208
Page 2

## FINDINGS OF FACT

1. Range Resources Corporation ("RRC") is a Fort Worth, Texas based independent natural gas company engaged in the exploration, development and acquisition of primarily natural gas properties in the Southwestern and the Appalachian regions of the United States. RRC is a Delaware corporation with its common stock listed and traded on the New York Stock Exchange under the symbol "RRC."

2. Range Production Company ("RPC") is a wholly-owned subsidiary of Range Resources Corporation operating in the State of Texas.

3. At all times relevant to this Order, RRC and RPC (hereinafter "Respondents") owned or operated the natural gas production facilities (collectively, "Gas Wells") identified as the Butler Unit Well 1-H ("Butler Well") (permitted at Atwood, JB Survey, Abstract #802, Hood County, 660 feet from the N line and 986 feet from the SE line) and the Teal Unit Well 1-H ("Teal Well") (permitted at Atwood, JB Survey, Abstract #802, Hood County, 703 feet from NE line and 948 feet from SE line).

4. Respondents contracted for and directed the drilling of the Butler Well in June 2009 and completed hydraulic fracture stimulation operations in August 2009. Gas production began from the Butler Well in August 2009.

5. Respondents contracted for and directed the drilling of the Teal Well in March and April of 2009 and completed hydraulic fracture stimulation operations in April 2009. Gas production began from the Teal Well in August 2009.

6. The Trinity Aquifer exists under twenty Texas counties, including Parker and Hood counties where the Gas Wells and the private drinking water wells described below are located.

7. As set forth more fully below, two domestic drinking water wells ("Domestic Well 1" and "Domestic Well 2"), located near the Gas Wells and utilizing the Trinity Aquifer, have been shown to contain methane, benzene, toluene, ethane, propane, and hexane. Some of these contaminants are at levels that may endanger the health of persons.

8. Domestic Well 1 lies approximately 120 feet in horizontal distance to the east-northeast from the track of the horizontal section of the Butler Well bore.

9. Domestic Well 2 lies approximately 470 feet in horizontal distance to the southeast from the track of the horizontal section of the Butler Well bore.

10. Domestic Wells 1 and 2 provide drinking water to nine people including both adults and children.

**46**



Docket No. SDWA-06-2010-1208
Page 3

11. The Gas Wells are the only gas production facilities within approximately 2,000 feet of Domestic Wells 1 and 2.

12. Domestic Well 1 (32.56312 latitude, -97.79144 longitude) was drilled in April 2005 and was immediately used for human consumption, building construction, and landscape irrigation.

13. Neither the consumer, nor the well drilling service, observed or reported that the water from Domestic Well 1 contained any noticeable natural gas at the time of its drilling.

14. In late December 2009, approximately four months after the Gas Wells began producing gas, the owner of Domestic Well 1 first noticed that the water had begun to effervesce.

15. On July 26, 2010, the down-hole pump in Domestic Well 1 began experiencing mechanical problems soon identified by a water well service company as "gas locking."

16. "Gas locking" is a condition sometimes encountered in a down-hole pump when dissolved gas is released from solution by the action of the pump and prevents the pump from moving water.

17. In addition, on July 26, 2010, the gas in Domestic Well 1 was determined to be flammable.

18. On August 8, 2010, the owner contracted for water samples to be taken from Domestic Well 1. The samples showed the presence of benzene (3.1 μg/L), toluene (2.0 μg/L), dissolved methane (7,810 μg/L) and dissolved ethane (1,580 μg/L).

19. On August 17, 2010, TRRC took water samples from Domestic Well 1 that showed the presence of benzene (6.84 μg/L) and toluene (6.12 μg/L).

20. The consumer and well owner removed Domestic Well 1 from service during the first week of September 2010 due to the rising gas content within the drinking water and concerns with water quality, indoor air quality and potential explosivity.

21. EPA took samples of the gas from Domestic Well 1 and the Butler Well production stream on October 26, 2010 to perform compositional analysis and isotopic fingerprinting.

22. Isotopic fingerprinting is a method for determining the ratio of different isotopes of a particular element in an investigated material. Understanding this ratio helps scientists know the source of the investigated material.

23. Methane is a molecule comprised of one carbon atom for every four hydrogen atoms. Its chemical formula is $CH_4$.



Docket No. SDWA-06-2010-1208
Page 4

24. While the carbon atoms in methane may be chemically identical, they may have different numbers of neutrons and different atomic mass. Atoms of the same element with different atomic mass are known as isotopes.

25. The isotopic fingerprint analysis of methane obtained on October 26, 2010 from Domestic Well 1 ($\delta^{13}C = -47.05$, $\delta D = -188.5$) and the isotopic fingerprint analysis of commingled produced gas from the Butler and Teal Wells ($\delta^{13}C = -46.60$, $\delta D = -183.9$) indicates that both gases are thermogenic in origin and likely to be from the same source.

26. The term "thermogenic," when applied to a gas like methane, means that the gas formed through deep geologic processes involving pressure, heat and time. The term is used to distinguish such gas from biogenic gas, which is formed through biological processes.

27. The compositional analysis of the gas obtained on October 26, 2010 showed that both gases contain significant amounts of heavier hydrocarbon components and that the hydrocarbon portion of each gas contains the same components. The presence of these hydrocarbons further indicates the presence of gas in Domestic Well 1 is likely to be due to impacts from gas development and production activities in the area.

28. On October 26, 2010, EPA also collected samples of water from Domestic Well 1 that showed the presence of dissolved methane (20,100 µg/L), ethane (5,27 µg/L), propane (2,820 µg/L), benzene (4.55 µg/L), toluene (3.47 µg/L), and hexane (31.7 µg/L).

29. The chemicals found in Domestic Well 1 pose a variety of risks to health of persons.

30. Methane poses a risk of explosion and fire. In large concentrations in air, it may pose a risk of asphyxiation. Natural methane, unlike treated methane, pumped to homes for cooking and heating, is odorless and colorless. Usually a minute amount of an odorant such as t-butyl mercaptan is added to natural gas used by consumers.

31. Benzene is a known human carcinogen. It can also cause anemia, neurological impairment and other adverse health impacts.

32. Hexane, propane, ethane and toluene may also cause adverse health impacts if inhaled or ingested.

33. On November 16, 2010, EPA advised the consumers of Domestic Well 1 to continue not using the water due to water quality and potential explosivity concerns.

34. Domestic Well 2 (32.56505 latitude, -97.79041 longitude) was drilled and completed in August 2002 and was immediately used for human consumption and landscape irrigation.

35. Neither the owner, nor the well drilling service company, observed or reported that the water from Domestic Well 2 contained any noticeable natural gas at that time.

Docket No. SDWA-06-2010-1208
Page 5

36.  In May 2010, the owner of Domestic Well 2 first noticed that the water had begun to effervesce.

37.  On August 26, 2010, the consumer contracted for water samples to be taken from Domestic Well 2. The samples showed the presence of dissolved methane (10.9 μg/L). EPA sampled the water from Domestic Well 2 on October 26, 2010. Results from this sample showed the presence of dissolved methane (627 μg/L), ethane (38.5 μg/L), and propane (2.05 μg/L).

38.  On November 23, 2010, EPA advised the consumers of Domestic Well 2 of the levels of natural gases in the water and that they may wish to cease using the water due to water quality and potential explosivity concerns.

39.  EPA has consulted with the appropriate State of Texas and local authorities, including the Railroad Commission of Texas, the Texas Commission on Environmental Quality, and the Parker County fire marshal, regarding the presence of contaminants in the source of drinking water identified below and disclosed the potential endangerment to the health of persons.

40.  The Railroad Commission of Texas ("TRRC") is the state agency with regulatory authority over oil and gas production activities and the potential endangerment discussed below. EPA has informed the TRRC of the endangerment and the proposed issuance of this Order. EPA has shared data and findings related to this matter with the TRRC and has consulted with the TRRC on the accuracy of the information upon which this Order is based. EPA has determined that that appropriate State and local authorities have not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time.

41.  The contaminants identified herein may present an imminent and substantial endangerment to the health of persons because methane in the levels found by EPA are potentially explosive or flammable, and benzene if ingested or inhaled could cause cancer, anemia, neurological impairment and other adverse health impacts.

## CONCLUSIONS OF LAW

42.  Benzene, methane, toluene, ethane and propane are "contaminants," as that term is defined in SDWA § 1401(6), 42 U.S.C. § 300f(6) and 40 C.F.R. § 141.2.

43.  The Trinity Aquifer is an "underground source of drinking water," as that term is defined at 40 C.F.R. § 144.3.

44.  The contaminants identified herein are present in the Trinity Aquifer.

Docket No. SDWA-06-2010-1208
Page 6

45.  Respondents are "person(s)," as defined by Section 1401(12) of the Act, 42 U.S.C. § 300f(12).

46.  Respondents caused or contributed to the endangerment identified herein.

47.  In accordance with SDWA § 1431(a), 42 U.S.C. § 300i(a), EPA has consulted with appropriate State and local authorities to confirm the correctness of the information on which this action is based.

48.  EPA has determined that that appropriate State and local authorities have not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time.

49.  EPA has determined that this action is necessary to protect the health of persons.

## ORDER AND GENERAL PROVISIONS

50.  Based on these findings and pursuant to the authority of Section 1431(a) of the Act, 42 U.S.C. § 300i(a), EPA Orders that Respondents take the following actions:

A) Within twenty-four (24) hours of receipt of this Order, Respondents shall notify EPA in writing whether they intend to comply with this Order.

B) Within forty-eight (48) hours of receipt of this Order, Respondents shall provide replacement potable water supplies for the consumers of water from Domestic Well 1 and Domestic Well 2.

C) Within (48) forty-eight hours of receipt of this Order, Respondents shall install explosivity meters, approved by EPA, in the dwellings served by Domestic Wells 1 and 2.

D) Within five (5) days of receipt of this Order, Respondents shall submit to EPA a survey listing and identifying the location description (latitude and longitude) of all private water wells within 3,000 feet of the Butler wellbore track and 3,000 feet of the Teal wellbore track and all of the Lake Country Acres (TX1110059) public water supply system wells. This submittal shall include a plan for EPA's approval, to sample those wells identified in Order to determine if any of those wells have been impacted. The plan shall include head space (air) and dissolved constituent (water) sampling. The head space sampling shall commence no later than five (5) days after submittal of the plan.

Docket No. SDWA-06-2010-1208
Page 7

    E) Within fourteen (14) days of receipt of this Order, Respondents shall submit to EPA, for approval, a plan to conduct soil gas surveys and indoor air concentration analyses of the properties and dwellings served by Domestic Wells 1 and 2.

    F) Within sixty (60) days of receipt of this Order Respondents shall develop, and submit to EPA for approval, a plan to: 1) identify gas flow pathways to the Trinity Aquifer; 2) eliminate gas flow to the aquifer if possible, and 3) remediate areas of the aquifer that have been impacted.

51.   Each submittal made pursuant to this Order shall be sent by U.S. mail or by certified mail, with receipt requested to the address below. Electronic submittals will also be accepted.

> U.S. EPA, Region 6
> Water Enforcement Branch
> 1445 Ross Ave., Suite 1200
> Dallas, TX 75202
> Attn.: Chris Lister, (6EN-WR)
> FAX: (214) 665-6672
> Email: lister.chris@epa.gov
>
> Railroad Commission of Texas
> Site Remediation Section
> William Travis Building
> Austin, TX 78701
> Attn: Peter Pope
> Email: peter.pope@rrc.state.tx.us

52.   Each submittal shall include reference to the docket number as shown on the first page of this Order.

53.   All plans, reports, notices, or other documents submitted by Respondents pursuant to this Order, which make any representation concerning Respondents' compliance or noncompliance with any requirement of this Order, shall be accompanied by the following statement signed by a responsible corporate officer of the Respondents:

> "I certify under the penalty of law that this document and all attachments were prepared by me or under my direction or supervision in accordance with a system designed to assure that qualified personnel gathered and evaluated the information submitted. Based on my inquiry of any and all persons directly responsible for gathering and analyzing the information obtained, I certify that the information contained in or accompanying this submittal is to the best of my knowledge and belief, true, accurate, and complete. As to those identified portion(s) of this submittal for which I cannot personally verify the accuracy, I certify that this submittal and all attachments were prepared in accordance with procedures designed



Docket No. SDWA-06-2010-1208
Page 8

to assure that qualified personnel properly gathered and evaluated the Information submitted. Based on my inquiry of the person or persons who manage the system, or those directly responsible for gathering the information, or the immediate supervisor of such person(s), the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

54.   The certification shall also include the name, title, date and signature of the person or persons completing the certification.

55.   Respondents shall submit to EPA and the State of Texas, at the addresses listed in Paragraph 53, the results of all sampling, tests, or other data generated pursuant to this Order by Respondents or their agents, consultants, or contractors.

56.   If any event occurs which causes delay in the achievement of any requirement of this Order, Respondents shall have the burden of proving that the delay was caused by circumstances beyond the reasonable control of Respondents or any entity controlled by Respondents, including but not limited to their contractors and consultants, which could not have been overcome by due diligence. Respondents shall notify EPA verbally within 72 hours, and in writing within 7 days of the verbal notification, of the anticipated length and cause of the delay, the measures taken and/or to be taken to prevent or minimize the delay, and the time table by which Respondents intend to implement these measures. If EPA agrees that the delay or anticipated delay has been or will be caused by circumstances beyond the reasonable control of the Respondents, the time for performance hereunder shall be extended for a period equal to the delay resulting from such circumstances. Respondents shall adopt all reasonable measures to avoid or minimize delay. Failure of Respondents to comply with the notice requirements of this paragraph shall constitute a waiver of Respondents' right to request an extension to meet the requirements of this Order.

57.   Nothing in this Order shall be construed to limit or otherwise affect EPA's authority under any applicable law or regulation including but not limited to EPA's authority to conduct inspections, to seek access to property, to request the provision of information, or to bring a civil or criminal enforcement action under the Safe Drinking Water Act or other applicable statutes or regulations.



Docket No. SDWA-06-2010-1208
Page 9

58. Respondents may assert a confidentiality claim covering all or part of any information submitted to EPA pursuant to this Order. Any assertion of confidentiality must be accompanied by information that satisfies the items listed in 40 C.F.R. § 2.204(e)(4) or such claim shall be deemed waived. Information determined by EPA to be confidential shall be disclosed only to the extent permitted by 40 C.F.R. Part 2. If no such confidentiality claim accompanies the information when it is submitted to EPA, the information may be made available to the public by EPA without further notice to Respondents. EPA will not accept any confidentiality claim with regard to any physical or analytical data.

59. EPA, its contractors, employees, and representatives are authorized to enter and freely move about all property at Gas Wells pursuant to this Order for the purposes of, *inter alia*, interviewing facility personnel and contractors; inspecting records, operating logs, and contracts related to the facility; reviewing the progress of the Respondents in carrying out the terms of this Order; conducting such tests, sampling, or monitoring as EPA or its representatives deem necessary; using a camera, sound recording, or other documentary type equipment; and verifying the reports and data submitted to EPA by the Respondents. Respondents shall provide EPA and its representatives access to the facility at all reasonable times and to any other property to which access is required for implementation of this Order. Respondents shall permit such persons to inspect and copy all records, files, photographs, documents, and other writings, including all sampling and monitoring data, that pertain to work undertaken pursuant to this Order and that are within the possession or under the control of Respondents or their contractors or consultants.

60. This Order is effective upon receipt and will remain in effect until EPA provides notice of its termination. Notice will be given after the requirements of the Order have been satisfied.

61. This Order does not constitute a waiver, suspension, or modification of the requirements of the Act or implementing regulations, which remain in full force and effect. Issuance of this Order is not an election by EPA to forego any civil or criminal action otherwise available under the Act.

62. EPA expressly reserves all rights and defenses that it may have, including but not limited to the right to disapprove work performed by Respondents pursuant to this Order and to modify documents submitted by Respondents and require that Respondents implement those modifications. Nothing in this Order shall diminish, impair, or otherwise adversely affect the authority of EPA to enforce the provisions of this Order. This Order shall not be interpreted to relieve Respondents of their obligations to comply with any provision of the Act, its implementing regulations, or any other federal, state, or local law.

Docket No. SDWA-06-2010-1208
Page 10

63. Failure to timely complete any requirement of this Order shall be deemed a violation of this Order, beginning on the first day that performance is scheduled to commence.

64. This Order shall not limit or otherwise preclude EPA from taking additional enforcement action, civil or criminal, pursuant to the SDWA, or any other available legal authority, should EPA determine that such action is appropriate. Issuance of this Order is not an election by EPA to forego any civil or criminal action otherwise authorized under the Act or other laws.

65. All actions required to be taken pursuant to this Order shall be undertaken in accordance with the requirements of all applicable local, State, and federal laws and regulations.

66. Respondents shall obtain or cause their representatives to obtain all permits and approvals necessary under such laws and regulations to perform work pursuant to this Order and shall submit timely applications and requests for any such permits and approvals. Failure to obtain any necessary permits or approvals shall not constitute grounds for an extension pursuant to Paragraph 56 of this Order.

67. This Order may be modified or amended by EPA to ensure protection of the health of persons. Such an amendment shall be in writing, shall have as its effective date the date on which it is received by Respondents, and shall be incorporated into this Order.

68. If any provision or authority of this Order, or the application of this Order to any party or circumstance, is held by any judicial or administrative authority to be invalid, the application of such provision(s) to other parties or circumstances and the remainder of the Order shall remain in force and shall not be affected thereby.

69. This Order shall be binding upon the Respondents cited herein and all their heirs, successors, and assignees. No change in ownership of the leases or properties shall alter the responsibility of the Respondents under this Order.

70. This Order constitutes final agency action for purposes of SDWA § 1448, 42 U.S.C. § 300j-7.



Docket No. SDWA-06-2010-1208
Page 11

## OPPORTUNITY TO CONFER WITH EPA

71.   Respondents have the opportunity to confer informally with EPA concerning the terms and applicability of this Order.  Respondents must contact Tucker Henson, Office of Regional Counsel, at (214) 665-2718 within seven (7) days of receipt of this Order to schedule such a conference.  This conference is not an evidentiary hearing, does not constitute a proceeding to challenge the Order, and does not give Respondents a right to seek review of this Order.  Any such conference with EPA will be held at the following location:

> U.S. EPA, Region 6
> Office of Regional Counsel (6RC-EW)
> ATTN:  Tucker Henson
> 1445 Ross Avenue, Suite 1200
> Dallas, TX 75202

_____12-7-10_____
Date

_____
John Blevins
Director
Compliance Assurance and
Enforcement Division

# Attachment B

| DATE | RRC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|------|-----------|-----------|---------------|-------|
| January 14, 2011 | RRC staff meet with Range Resources. Range presents preliminary findings of well testing (Teal well), water well sampling and soil gas sampling. | | | |
| January 10, 2011 | The RRC hearing re: Range Resources, previously rescheduled for January 18, 2011, is rescheduled for January 19 to accommodate Mr. Rich's deposition. | | | |
| January 6, 2011 | RRC staff witnesses soil gas survey and water well sampling performed on Lipsky property. District personnel noted that the PVC line from the Lipsky well is not connected to the homes water supply tank. | | | |
| January 5, 2011 | Commission held hearing regarding motion to compel EPA staff, Mr. Lipsky and Ms. Rich to comply with discovery. The hearings examiner granted the motion that Mr. Lipsky and Ms. Rich give their depositions consistent with the terms proposed by their attorney, and Lipsky must provide access to his property. The Jan 10 hearing was continued to Jan 18th. | | | |
| January 4, 2011 | RRC staff contacts Range to request status update. Range reports that their consultants have completed all of the ground water and headspace samples at all of the water wells they targeted except for these exceptions: they were not granted access to the Lipsky well and the well that was identified as well #3 (person at this location stated there was no water well and that they were served by the public water supply system.) The last samples were taken today. Range also has collected samples of the production gas off the Butler Unit #1-H and Teal Unit #1-H and bradenhead gas off the Butler Unit #1-H. | | | |
| December 30, 2010 | RRC receives notice of Range's planned spatial segmented content bond log on the Teal Unit #1-H, scheduled for December 31. RRC staff witness is scheduled. | | | |
| December 30, 2010 | Soil gas survey, previously underway, is delayed due to weather. Range modifies RRC that work will resume January 3, 2011. | | | |
| December 28, 2010 | RRC receives via email Range's workplan for bradenhead sampling and water well sampling. RRC witnesses Range's MIT of the Teal Unit #1-H | | | |

O&G Docket No. 7B-0268629

Staff Exhibit No. 1

Page 1 of 7

| DATE | RRC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|---|---|---|---|---|
| December 24, 2010 | RRC receives via email Range's workplan for breathhead sampling and water well sampling. | | | |
| December 22, 2010 | RRC receives via email Range's procedure for MIT of the Teal Unit #1-H. | | | |
| December 17, 2010 | Phone call with Range discussing water well sampling and soil gas survey. Will submit workplan as soon as possible. | | | |
| December 16, 2010 | RRC staff sends a letter to Range requesting a workplan on or before December 31, 2010. | | | |
| December 15, 2010 | | EPA and Range meeting. | | |
| December 14, 2010 | RRC meets with Range to discuss action items. Range delivers a notebook of information about Butler and Teal wells, and information regarding water wells and occurrence of natural gas in the area. Range reports that gas meters have been installed at the two homes, and water supply has been offered to both homes but not accepted. | | | |
| December 10, 2010 | RRC contacts Range to confirm installation of gas monitors. Monitors installed at Lipsky. Monitors will be installed at Hayley on Saturday. Range contacts RRC staff to request a meeting on Tuesday, Dec 14. | | Lipsky's attorney notifies RRC that RRC is not allowed access to the property. | |
| December 9, 2010 | RRC contacts Range and Lipsky to assure that gas monitoring meters are being installed at Lipsky and Hayley properties and that water supply has been offered. Range installed meter at Lipsky property. | | | |
| December 8, 2010 | RRC staff Recommendation for Hearing. Hearing set for January 10, 2011. | | | |
| December 7, 2010 | | EPA issues Emergency Administrative Order | | |
| December 7, 2010 | RRC sends letter acknowledging receipt of Range's letter and establishing contacts and timetable for agreed actions. RRC staff forwards copies of water well compliants to EPA staff via email | | | |
| December 3, 2010 | Range sends letter to RRC agreeing to take additional actions. Letter outlines plans to test production well and collect environmental data. RRC staff begins gathering information on either water well complaints, per EPA request. RRC staff notifies EPA staff of the Dec 3 letter from Range and email PDF of the letter. | EPA calls RRC staff to ask about other occurrences of gas in shallow sands. RRC returns call and advises of two other complaints in area. EPA requests copies of the files. | | |

| DATE | RRC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|---|---|---|---|---|
| December 1, 2010 | RRC staff in Austin calls EPA to discuss sample results. During the call, EPA notifies RRC staff of intent to issue a finding of "endangerment". | EPA staff contacts RRC Abilene District Office and asks to discuss the sample results. Notifies the District that the December 2, 2010, meeting will not happen because Range declined the request. | | |
| November 30, 2010 | RRC staff in Austin meet to discuss next steps and agree that RRC staff should conference call into the EPA/Range meeting. | | | |
| November 23, 2010 | | EPA sends via email the results of water and gas samples to use RRC. EPA notifies RRC that they asked to meet with Range on December 2, 2010, to discuss the sample results and they invited RRC staff to attend. | | |
| October 26, 2010 | At the request of the RRC, Range Production Co. collected gas samples from tubing, injection gas, headcushed gas from Butler Unit. Also production gas from Teal Unit. | EPA collects water samples from Lipsky and Hayley wells, gas from Lipsky well, and gas from Butler Unit and water from Butler Unit. | Mr. Lipsky meets with RRC inspectors, EPA reps, Range consultant at site. General discussion about environmental investigations and testing of water and air inside residence. | District Office Cleanup Coordinator (DOCC) for Abilene reports that during the discussion of previous environmental testing he was informed that air monitors had been placed inside the house in various rooms/bathrooms. RRC inspectors did not enter the house to verify, re date of placement nor location was noted on the RRC DForms. See 8/10/10 entry. |
| October 25, 2010 | RRC District Office requests Range to collect additional gas samples. | | | |
| October 21, 2010 | 2:00 PM - RRC staff in Austin calls EPA staff at their request to discuss sampling objectives. | 10:06 AM - EPA contacts RRC staff in Austin by email and requests phone call to discuss plans to sample the Lipsky water well and Range Butler Unit well. | | |
| October 14, 2010 | At the request of RRC staff, Range Production Co. Pressure tests the Butler Unit 1H well production casing from #13T feet to surface that was witnessed by the district personnel. Well Held 845 psi. | | | |
| October 13, 2010 | District Office sends email to Austin requesting technical assistance with review of data. | | | |

Page 3 of 7

58

| DATE | RRC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|---|---|---|---|---|
| October 13, 2010 | 10:14 AM Steve Lipsky called to get RRC staff's email address to forward water analysis taken by his environmental company for comparison. He gave me Rick Hailey's phone number, has adjacent property and water well that has had some problems, suggested I call Mr. Hailey, 175 Old Ranch Court. EPA is coming later in Oct to test Mr. Lipsky's water well with some new technology to determine source of his gas. Mr. Lipsky stated he discovered heavy mud sediment in the bottom of the water storage tank and was having it analyzed. | | | |
| October 13, 2010 | 11:00 AM Phone conversation with Jack Watts, Watts Water Well Service, (817) 991-5589, regarding occurrences of gas in water wells drilled in the area. Requested Mr. Watts document specific occurrences and problem wells and forward to the Dirt office. | | | |
| September 21, 2010 | 03:01 PM Call from Mr. Lipsky. He asked if I had drawn any conclusions and I advised him that I was compiling data and would send him the summary map. Advised him that his request for information had been processed this morning and he should receive it soon. | | | |
| September 20, 2010 | Range Prod. Co. samples Butler Unit 1H Brotanhood Gas and production Gas for chemical analysis. | | | |
| September 16, 2010 | Called Mary Palme, Range Resources to request gas samples be collected from the Butler Unit 1H production tubing and brotanhood for analysis. Requested the Butler Unit production testing be pressure tested. | | | |
| September 15, 2010 | 11:46 AM Mr. Lipsky called to advise he would meet with Range Resources at his home to inspect the well on Thurs 9/23/10. | | | |
| September 13, 2010 | 11:46 AM Mr. Lipsky called to advise he had moved his family out of the residence in Graham, Tx. Mr. Lipsky advised he had retained legal counsel. | | | |

Page 4 of 7

59

| DATE | RBC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|------|-----------|-----------|---------------|-------|
| September 7, 2010 | Call to Larry Peck, Peck's Water Well Service (817) 594-4177, to obtain water well completion and information for the Lipsky water well. Discussed occurrence of gas in water wells drilled in area. Mr. Peck filed complaints No. TB-96642, Job No. 10-0397, Carrizo C&C, Mustel-Lipscomb "A" Unit Lease 221560, for well leaking gas and a fresh water supply well adjacent to the gas well leaking gas. No gas leaks were found and the complaint was closed. This well is ½ mile west of the Lipsky water well, west of the Brazos River | | | |
| September 2, 2010 | Range Prod. Co. samples Butler Unit 1H Bradenhead Gas for chemical analysis | | | |
| August 27, 2010 | Advised Subba Jenna to inspect well of concern Mr. Lipsky had inquired about. For Subba's inspections, 1 active well near the highway, no other active wells in the Silverado subdivision. Records searched indicate Devon Energy, Durant East Unit Lease (224569) Well No. 1H was P&A'd 8/31/07. | | | |
| August 27, 2010 | Call to Paul Martinez (325)206-1722 and Mary Fatton (817)869-4140, Range Production to discuss procedure to address bradenhead pressure. | | | |
| August 26, 2010 | Call from Mr. Lipsky inquiring about a problem well behind the Silverado Home Barn on a gravel road directly behind the arena. His concern was the well was used for a year and a half and persisted from Malone Well Service advised Mr. Lipsky that the well had a bad frac job, they had lost control and had to plug the well. | | | |
| August 26, 2010 | RBC sampled Lipsky well with two tedlar bag gas samples. Site visit by Alisa Rich of Wolf Eagle Env., Bryn Meredith and David Ritter of Taylor Olsen Law Firm | | Mr. Lipsky Env. Consultant Wolf Eagle Env., including Taylor and Olson Law firm witness RBC collected gas samples from water wellhead. Mr. Lipsky stated that he will discontinue use of the well for house use. The 5000 gallon holding tank will be flushed and filled with potable water | |
| August 19, 2010 | Contacted Anacore, Melissa Knight for instructions to collect gas samples from a water well. Ms. Knight advised she would verify the procedure and forward information to the District office. | | | |

Page 5 of 7

60

| DATE | RRC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|---|---|---|---|---|
| August 19, 2010 | Call from Mr. Peck. Peck Water Well Service. RRC requested a well configuration of the Lipsky water well. Mr. Peck indicated he would fax a copy to the Dist office. | | | |
| August 18, 2010 | 11:45 AM Called Pecks Water Well Service to inquire about Lipsky well configuration and completion. Left message to call back. | | | |
| August 18, 2010 | 13:00 called Amacon to check on the status of the 2nd samples sent, received in good condition. | | | |
| August 17, 2010 | RRC contacted Mr. Lipsky at his residence and obtained water samples. Samples brought to Abilene and forwarded to Amacon | | | |
| August 17, 2010 | | RRC District 7B officer contacted by Ron Van Wyk, (214)665-6439, Water Enforcement Branch, EPA, 1445 Ross Avenue, Dallas, TX 75202, regarding Lipsky complaint. Sent gives sheet notice on complaint. Will ask EPA to cc on complaint letters. Operations. Will add EPA to cc on complaint letters. | Mr. Lipsky locates/spoons underground 1000 gallon propane tank, septic tanks and septic drain field for RRC inspector. | |
| August 16, 2010 | Called and left voice mail messages for Mr.Lipsky to arrange to resample water well, 11:20, 14:20, 16:45, no answer. | | | |
| August 13, 2010 | Amacon email stating the samples were above the required temperature, advised sample would be retaken and submitted. | | | |
| August 12, 2010 | 16:55 PM Mr. Lipsky called stating his environmental company called to advise him that the concentration of gas in his water was very concentrated and to stay away from the well. Mark Wiley, Parker County Judge had been to the well. Mr. Lipsky's residence to survey the well situation. Mr. Lipsky stated that the water from the well acted like aika-seltzer. | | | |
| August 12, 2010 | Water samples sent to Amacon via FedEx | | | |
| August 11, 2010 | RRC Field Inspection to collect water samples, Bubba Jonas Dan Long (817)624-5859; Ryan Albert, TCEQ/Alicia Rich, Wolf Eagle Environmental/Shawn Scott, Parker County Fire Marshall | | Mr. Lipsky informs RRC that his Env. Consultant (Wolf Eagle Env), Parker County Fire Marshall Shawn Scott, TCEQ personnel Ryan Albert would be at his house at 2:30 pm. Mr. Lipsky informs RRC that Wolf Eagle Env detected natural gas inside his house. Wolf Eagle collected samples of unknown type. | |

| DATE | RRC ACTION | EPA ACTION | LIPSKY ACTION | NOTES |
|------|-----------|-----------|---------------|-------|
| August 10, 2010 | Telephone call from Sid Slocum, Water Station Mgr (817)598-5901, 2109 Gravel Drive, Fort Worth, TX 76118, TCEQ re: Complaint No. 7B-9601 | | Mr. Lipsky informs RRC that he is having the water tested for natural gas, including the air inside his house and the building that houses a 5000 gallon storage tank. | |
| August 10, 2010 | RRC inspects Range Production, Teal Unit 1H. RRC inspects Range Production Butler Unit 1H. | | | |
| August 6, 2010 | RRC field inspection, water well survey, Randy Hobbs, 0 mg/L Chloride, gas smell | | | |
| August 6, 2010 | Steve Lipsky complains of natural gas in domestic water well. Complaint No. 7B-9601 | | | |



**RAILROAD COMMISSION OF TEXAS**
OFFICE OF GENERAL COUNSEL
HEARINGS SECTION

**OIL & GAS DOCKET NO. 7B-0268629**

---

**COMMISSION CALLED HEARING TO CONSIDER WHETHER OPERATION OF THE RANGE PRODUCTION COMPANY BUTLER UNIT WELL NO. 1H (RRC ID 253732) AND TEAL UNIT WELL NO. 1H (RRC ID 253729) IN THE NEWARK, EAST (BARNETT SHALE) FIELD, HOOD COUNTY, TEXAS, ARE CAUSING OR CONTRIBUTING TO CONTAMINATION OF CERTAIN DOMESTIC WATER WELLS IN PARKER COUNTY, TEXAS**

---

## FINAL ORDER

The Commission finds that, after statutory notice in the above-numbered docket, heard on January 19-20, 2011, the examiners have made and filed a report and proposal for decision containing findings of fact and conclusions of law, which was served on all parties of record, and that this proceeding was duly submitted to the Railroad Commission of Texas at conference held in its offices in Austin, Texas.

The Commission, after review and due consideration of the proposal for decision and the findings of fact and conclusions of law contained therein, and any exceptions and replies thereto, hereby adopts as its own the findings of fact and conclusions of law contained therein, and incorporates said findings of fact and conclusions of law as if fully set out and separately stated herein.

It is accordingly **ORDERED** that production from the Butler Unit Well No. 1H and Teal Unit Well No. 1H, operated by Range Production Company, shall be allowed to continue as Range Production Company has established that the operations of the wells have not caused or contributed, and are not causing or contributing to contamination of any domestic water wells.

Each exception to the examiners' proposal for decision not expressly granted herein is overruled. All requested findings of fact and conclusions of law which are not expressly adopted herein are denied. All pending motions and requests for relief not previously granted or granted herein are denied.

It is further **ORDERED** by the Commission that this order shall not be final and effective until 20 days after a party is notified of the Commission's order. A party is presumed to have been notified of the Commission's order three days after the date on which the notice is actually mailed. If a timely motion for rehearing is filed by any party at interest, this order shall not become final and effective until such motion is overruled, or if such motion is

**64**

**Oil & Gas Docket No. 7B-0268629**
**Final Order**                                                    **Page 2**

granted, this order shall be subject to further action by the Commission.  Pursuant to TEX. GOV'T CODE §2001.146(e), the time allotted for Commission action on a motion for rehearing in this case prior to its being overruled by operation of law, is hereby extended until 90 days from the date the parties are notified of the order.

Done this _____ of _____, 2011.

**RAILROAD COMMISSION OF TEXAS**

_____
**CHAIRMAN ELIZABETH A. JONES**

_____
**COMMISSIONER MICHAEL L. WILLIAMS**

_____
**COMMISSIONER DAVID PORTER**

**ATTEST:**

_____
**SECRETARY**

65