**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF TEXAS
3                    AUSTIN DIVISION
4    *  *  *  *  *  *  *  *  *  *  *  *  *
5    RANGE PRODUCTION
     COMPANY,                      *
6          Plaintiff,
                                   *
7    VERSUS
                                   *
8    UNITED STATES
     ENVIRONMENTAL          *  NO. A-11-CA-011-LY
9    PROTECTION AGENCY
     AND LISA PEREZ          *
10   JACKSON,
     ADMINISTRATOR,          *
11   UNITED STATES
     ENVIRONMENTAL           *
12   PROTECTION AGENCY,
         Defendants.        *
13
     *  *  *  *  *  *  *  *  *  *  *  *  *
14
15
16
17
18        30(b)(6) Videotaped Deposition of the
19   U.S. ENVIRONMENTAL PROTECTION AGENCY, through
20   its designated representative, JOHN BLEVINS,
21   taken on Tuesday, January 25, 2011, commencing
22   at or about 9:17 a.m., in the offices of 500
23   Poydras Street, Suite B-210, New Orleans,
24   Louisiana.
25
```

**Page 3**

```
1    APPEARANCES:
2    Representing Range Production Company:
3    VINSON & ELKINS
     Attorneys-at-Law
4    2801 Via Fortuna
     Suite 100
5    Austin, Texas 78746-7568
6    BY: JOHN A. RILEY
7       - AND -
8    HARRIS, FINLEY & BOGLE
     Attorneys-at-Law
9    777 Main Street
     Suite 3600
10   Fort Worth, Texas 76102
11   BY: ANDREW D. SIMS
12
13   Representing United States Environmental
     Protection Agency:
14
15   U.S. DEPARTMENT OF JUSTICE
     Attorneys-at-Law
     Environmental Defense Section
16   P.O. Box 23986
     Washington, DC 20026-3986
17
     BY: BRIAN H. LYNK
18
19
     ALSO PRESENT: Tina Arnold, EPA Region 6
20            Cheryl Seager, EPA Region 6
              Keith Tashima, EPA, DOJ, via phone
21            Jeffrey Sands, EPA, DOJ, via phone
              Aaron Palmer, Videographer
22
23
     Reported by:  Barbara S. McGee
24             Certified Court Reporter
               State of Louisiana
25
```

**Page 2**

```
1                I N D E X
2
3                           Page
4
5    Caption                  1
6    Appearances              3
7    Agreement of Counsel     4
8
9    Examination
10     JOHN A. RILEY          7
11
12   Witness' Attestation     326
13   Reporter's Certificate   327
14
15   Exhibits:
16   No. 1 (42 USC, Section 300i)          25
17   No. 2 (U.S. EPA administrative record)  68
18   No. 3 (List of Dr. Beak's experience)   81
19   No. 4 (Emergency administrative order)  83
20   No. 5 (Photograph of Hurst water well)  182
21   No. 6 (Graph of Barnett shale)          193
22   No. 7 (Article)              241
23   No. 8 (Aerial photograph)              248
24   No. 9 (Alisa Rich e-mail)              309
25
```

**Page 4**

```
1                S T I P U L A T I O N
2
3         It is stipulated and agreed by and
4    between counsel for the parties that the
5    30(b)(6) videotaped deposition of the U.S.
6    ENVIRONMENTAL PROTECTION AGENCY, through its
7    designated representative, JOHN BLEVINS, is
8    hereby being taken under the Federal Rules of
9    Civil Procedure for all purposes permitted under
10   the law.
11
12        That the formalities of sealing and
13   certification are hereby waived.  The witness
14   reserves the right to read and sign the
15   deposition.  The party responsible for service
16   of the discovery material shall retain the
17   original.
18
19        All objections are to be made in
20   accordance with the Code of Civil Procedure.
21
22        Barbara S. McGee, Certified Court
23   Reporter in and for the State of Louisiana,
24   officiated in administering the oath to the
25   above-named witness.
```

**43**

1  Commission just on setting up field visits.
2  They may have been conversations with the
3  Railroad Commission to confirm that certain
4  information was submitted to the railroad -- or
5  exchanged between us and the Railroad
6  Commission. We did not include all of those
7  conversations as -- or deem those as necessary
8  for the administrative record.
9     Q.   Who participated in going through each
10  of those documents and determining what would be
11  part of the administrative record and what would
12  be excluded from the administer --
13  administrative record?
14     A.   That would be Chris Lister, Jerry
15  Saunders, Scott McDonald were the primary people
16  responsible for making sure the administrative
17  record was built for and submitted for this
18  case. And as the record indicates Jerry
19  Saunders was the one that certified the record.
20     Q.   What criteria did they use to determine
21  what would go into the administrative record and
22  what would be withheld?
23     A.   I guess I don't understand the
24  question.
25     Q.   Sure. You had a group of folks that

**44**

1  you just described, Chris Lister, Scott
2  McDonald, Jerry Saunders, and they apparently
3  parsed through some EPA records, the best I
4  understand you just testified to, and they made
5  a decision and this will go into the record,
6  this one won't, this document will, this
7  document won't. So I'm assuming based on my own
8  personal experience in government that a list of
9  criteria for determining what would go into the
10  record was compiled before three staff members
11  were allowed to decide what's part of the
12  administrative record and what's not. So I'm
13  asking you for that list of criteria.
14     A.   There's not to -- there's not a list of
15  written criteria. The criteria are the
16  documents that are necessary to support the
17  decision or the documents submitted into the
18  record.
19     Q.   What about documents that didn't
20  support EPA's conclusion, were they also
21  included in the administrative record?
22     A.   Again, I've already answered that once.
23  The documents that we believed were necessary to
24  support the conclusions within our admin -- our
25  order were submitted into the record.

**42**

3     Q.   So there may have been other contacts
4  that are not reflected in the record?
5     A.   At the staff level, yes. But they
6  weren't -- they weren't deemed necessary as part
7  of the administrative record, but they were part
8  of our ongoing discussions with the Railroad
9  Commission.
10     Q.   Is it safe to conclude that those
11  conversations were not documented and,
12  therefore, are not incorporated into the
13  administrative record?
14     A.   It's safe to say that those
15  conversations are not included in the
16  administrative record.
17     Q.   So they may be documented in other EPA
18  records but they're just not included in the
19  administrative record; is that correct?
20     A.   That's correct.
21     Q.   Why were those documents excluded then
22  from the administrative record?
23     A.   They weren't deemed necessary to
24  support the action that we took. Those may have
25  been routine discussions with the Railroad

45

1    Q.  See, what I'm hearing, though, is that
2  there may be documents that were not in the view
3  of Mr. Lister, Mr. McDonald and Mr. Saunders
4  supportive of EPA's conclusions that may have
5  been withheld from the administrative record.
6         MR. LYNK:
7               Objection, assumes facts not in
8  evidence.
9         MR. RILEY:
10              Well, that's what I heard so...
11        THE WITNESS:
12              That's not what I stated.
13  EXAMINATION BY MR. RILEY:
14    Q.  Okay.  So, again, there's a -- imagine
15  a stack of documents.
16    A.  I mean, that's not what I stated.  I
17  said the documents that were necessary to
18  support our decision were put in the
19  administrative record.
20    Q.  Okay.  And what I'm understanding from
21  that is that there may be other documents that,
22  to use your words, were not necessary to support
23  the administrative order that were withheld from
24  the administrative record.  Have I gotten that
25  piece right?

46

1         MR. LYNK:
2               Same objection.
3               Go ahead.
4         THE WITNESS:
5               I don't believe they were withheld.
6  I don't believe they were put into the record
7  because that's not the standard against which we
8  built the record.  The record was built to
9  support our action.  We reviewed our files and
10  put those documents that we deemed appropriate
11  to support our record.
12  EXAMINATION BY MR. RILEY:
13    Q.  Okay.  So let's suppose as a
14  hypothetical that there's a record that does not
15  support the order.  Is that found in the
16  administrative record?
17    A.  I'm not comfortable addressing a
18  hypothetical question as speaking for the
19  Agency.
20    Q.  Okay.  How is it that when you use the
21  word support the way I am interpreting your use
22  of that word is that there are documents that
23  validate or would lead one to conclude the way
24  EPA did in its administrative order, that's what
25  I'm understanding support to mean.  Do you

47

1  understand -- am I understanding your use of the
2  word support correctly?
3    A.  My use of support is that we made
4  certain determinations, findings of fact within
5  our administrative order, we built a record to
6  show what are the documents necessary to support
7  those facts that are included in the record.
8    Q.  Okay.  Now, are there any documents
9  that EPA possesses that don't support EPA's
10  findings of fact and conclusions of law that are
11  in the record?  Excuse me.  Let me try that
12  again.
13        Are there any documents in EPA's
14  possession that do not support EPA's findings of
15  fact in the administrative order?
16    A.  Okay.  Say that one more time.
17    Q.  Certainly.  Are there any records in
18  EPA's position that do not support, in other
19  words, contradict the findings of fact that are
20  in the administrative order?
21    A.  The Agency does have documents in its
22  possession that were submitted by parties such
23  as Range which they contend do not support our
24  action.
25    Q.  Why are they not included -- those

48

1  documents, why are they not included in the
2  administrative record?
3    A.  Because those documents were not relied
4  upon or -- to support the decision that we made.
5    Q.  So I haven't gotten it wrong, then.
6  Documents that contradicted any findings of fact
7  are not in your administrative record; is that
8  true?
9    A.  Again, I would not --
10        MR. LYNK:
11             Object to form.
12             Go ahead.
13             Object to form.
14        THE WITNESS:
15             I would not say it that way.  I
16  would say the documents in the record are the
17  records that we, the Agency, used to make our
18  decision.
19  EXAMINATION BY MR. RILEY:
20    Q.  All right.  But you specifically used
21  an example of there are documents that Range
22  submitted that would tend to contradict or
23  undermine the administrative order; is that
24  true?
25        MR. LYNK:

49

1      Object to form.
2      THE WITNESS:
3          There are documents that we possess
4   that other parties have submitted evidence from
5   their perspective that make alternate -- are
6   alternate facts or make alternate arguments.
7   But the Agency has not, again, used those in
8   making its determination because those are not
9   facts that we generated to support our order.
10  EXAMINATION BY MR. RILEY:
11     Q.   Am I correct that the Agency did not
12  include in the administrative record
13  contradictory evidence or arguments as pertains
14  to the findings and conclusions in the
15  administrative order?
16     MR. LYNK:
17          I'm going to object that the
18  question is vague as to time frame. Are you
19  asking him about documents the Agency had before
20  prior to or on the 7th of December or after?
21  EXAMINATION BY MR. RILEY:
22     Q.   Well, the administrative record was
23  compiled when?
24     A.   **The administrative record was certified**
25  **on January 13th.**

50

1      Q.   When did this sorting process you
2   described occur, the sorting process that Mr.
3   Lister and Mr. McDonald and Mr. Saunders engaged
4   in? When did they do that?
5      A.   **It occurred kind of over a period of**
6   **time leading up to the certification on January**
7   **13th.**
8      THE VIDEOGRAPHER:
9          Counsel, you have five minutes of
10  tape left.
11  EXAMINATION BY MR. RILEY:
12     Q.   So the sorting process to determine
13  what constituted the administrative record
14  occurred after December 7, 2010, true?
15     A.   **It occurred before and after.**
16     Q.   Okay. So let's use -- since counsel is
17  concerned about time frame, let's use the date
18  on which the record was compiled and certified.
19  Which is what again? I'm sorry. I've just
20  forgotten. What date was the administrative
21  record cer -- compiled and certified?
22     A.   **There is no specific date for**
23  **compilation of the record. The record was**
24  **certified on January 13th.**
25     Q.   Okay. But I thought I understood you

51

1   to say that that activity occurred after
2   issuance of the order?
3      A.   **Before and after.**
4      Q.   Okay.
5      A.   **It started before and it was finished**
6   **after.**
7      Q.   And the sorting process we talked about
8   with Mr. Lister, Mr. McDonald and Saunders, that
9   occurred both before and after?
10     A.   **That's correct.**
11     Q.   So during that sorting process some
12  matters were considered part of the
13  administrative record and some matters were
14  considered not part of the administrative
15  record?
16     A.   **That's correct.**
17     MR. RILEY:
18          Why don't we take a break and
19  change tape.
20     THE VIDEOGRAPHER:
21          Going off the record. The time is
22  now 10:10. This is the end of tape 1.
23     (Recess was taken.)
24     THE VIDEOGRAPHER:
25          This is the continued videotaped

52

1   deposition of John Blevins. We're back on the
2   record. The time is now 10:17. This is the
3   beginning of tape 2.
4      MR. RILEY:
5          Counsel?
6      MR. LYNK:
7          Let me note for the record John
8   indicated to me during the break he wishes to
9   add to his answer regarding how the record was
10  compiled from just prior to the break.
11     MR. RILEY:
12          Certainly.
13     THE WITNESS:
14          Yeah. Just to clarify -- and I
15  apologize if I wasn't clear -- the record
16  includes documents that were in the Agency's
17  possession that we relied on up to the date of
18  the issuance of the order which was December
19  7th. So those were the documents that we -- the
20  administrative record was built on and that are
21  captured in the certified record that you have.
22  So there may -- the Agency has come into
23  possession of other documents after the decision
24  that are not included in the record because the
25  record is to support the decision which occurred

53

1   on December 7th.
2   EXAMINATION BY MR. RILEY:
3       Q.   Okay. Let's talk about that just for a
4   second. With respect to information received by
5   EPA after December 7th, first, has there been
6   information received by EPA that bears on the
7   ultimate question of whether the Range wells,
8   the Butler and Teal wells are causing or
9   contributing to contamination of underground
10  source of drinking water?
11      A.   There has been information submitted to
12  the Agency prior to December -- not prior to,
13  after December 7th related to additional
14  information by outside parties to the Agency
15  that they would like us to consider as we
16  consider the question of the relationship
17  between the Butler well and the two wells cited
18  in our order, yes.
19      Q.   And has EPA considered that
20  information?
21      A.   We are -- we have reviewed all that
22  information and are continuing to evaluate that
23  information, yes.
24      Q.   Does EPA have the authority to withdraw
25  the emergency order that is the subject of this

54

1   proceeding?
2       A.   Yes.
3       Q.   Recently the EPA filed the -- the
4   United States Department of Justice on behalf of
5   EPA filed an action in the northern district of
6   Texas seeking to enforce the administrative
7   order; is that correct?
8       A.   Yes.
9       Q.   And I'm not trying to go into that
10  lawsuit, but I just want to understand whether
11  that lawsuit is premature in your mind because
12  EPA has not fully evaluated all of the
13  information it now has available?
14          MR. LYNK:
15          Object to form.
16          You can answer.
17          THE WITNESS:
18          No, I do not believe that the
19  enforcement of our emergency order is premature.
20  EXAMINATION BY MR. RILEY:
21      Q.   Irregardless of whether you've
22  evaluated all of the information that's come in
23  after December 7, 2010?
24      A.   We have and continue to evaluate that
25  information but to date and up to the date that

55

1   DOJ asked to enforce that order we have not seen
2   anything that would alter EPA's position that
3   the order is necessary and needs to be enforced.
4       Q.   All right. So let me talk about then
5   prior -- I'm sorry. I dropped my microphone.
6           In compiling the record, which as you
7   explained would constitute information EPA had
8   available prior to issuance of the order on
9   December 7, 2010, in compiling the
10  administrative record did EPA have information
11  that tended to contradict its findings of facts
12  that are enumerated in the administrative order?
13      A.   Will you ask that once again, please?
14      Q.   Sure. And we're -- we're --
15      A.   No, I understand.
16      Q.   We were fumbling with time frame
17  earlier. Really what I'm trying to get to is
18  the process of sorting the EPA records to
19  compile the administrative record. As I
20  understood your earlier answers is that the
21  three individuals, Chris Lister, Scott McDonald
22  and Jerry Saunders, sorted through EPA documents
23  and determined based on some criteria that
24  certain items would be included in the
25  administrative record and certain records or

56

1   items would not be included. Am I right so far?
2       A.   Yes.
3       Q.   The -- with respect to the information
4   that was not included is there any information
5   in that -- in those documents that would tend to
6   contradict EPA's findings of fact or conclusions
7   of law that are enumerated in the administrative
8   order?
9       A.   There are -- there is information that
10  the Agency possessed prior to our decision on
11  the 7th of December that within EPA's possession
12  it would -- there's additional information that
13  exists that would -- that helped to educate and
14  inform EPA on the situation that existed in --
15  related to these two wells. Some of that
16  information clearly was not put into the
17  administrative record.
18      Q.   Let me try my question again. Is there
19  any part of that information that would
20  contradict EPA's findings that are enumerated in
21  the administrative order?
22      A.   I'm struggling with the word
23  contradict.
24      Q.   Okay. Let me give you an example.
25      A.   I'm hesitant to use the word

57

1  contradict. I think there's evidence out there
2  as in any case that would -- that would exist
3  that you might -- somebody could create a
4  scenario that says: Oh, that evidence doesn't
5  support your decision. When EPA compiled its
6  record we don't believe we had any evidence in
7  front of us that would -- would undermine or
8  contradict our decision making that we made, the
9  findings of fact that we made in the order. We
10  think the findings of fact stand on their face
11  and that there isn't data that we had in our
12  possession prior to the decision that would say
13  a piece of our data was not scientifically
14  valid, a piece of our data was not drawn on
15  scientifically supported conclusions.
16     Q.  All right. Let me give you an example.
17  Did EPA -- does EPA have any documents from any
18  source whatsoever indicating that domestic water
19  wells in the area that is the subject of our
20  discussion have been found to contain or have
21  associated with domestic water well's natural
22  gas?
23     A.  Prior to our decision and post our
24  decision, yes, we were aware of those facts.
25     Q.  Are those facts included in the

58

1  administrative record?
2     A.  No, because we do not believe those
3  facts were part of the record that we used to
4  make our decision because we don't believe
5  they're germane or relevant to the issue at
6  hand.
7     Q.  Well, explain to me EPA's position on
8  why in that area historically prior to any
9  Barnett shale production there have been
10  instances where natural gas has been found in
11  domestic water wells and how that is not germane
12  to EPA's conclusion that Range is causing or
13  contributing to contamination of the Lipsky or
14  Hayley water wells?
15     A.  Because I don't think EPA anywhere in
16  its order or in its position that we've stated
17  related to this case has ever said that we don't
18  believe there's drinking water wells that can be
19  con -- can be impacted by natural gas. We in
20  fact know there are, there have been
21  historically, there always will be. We believe
22  the data we have it shows a direct relationsh --
23  relationship between the gas found in the
24  production well owned by Range Corporation and
25  the gas found in the Lipsky and Hayley wells.

59

1  Because of that fact we don't think that the
2  idea of gas from other sources is necessarily
3  contradictory to our findings nor does it
4  contradict what we found.
5     Q.  Let me see if I understand that then.
6  Is it your position -- by "you" I mean EPA's
7  position -- that it has done sufficient testing
8  to conclusively determine that gas from the
9  Range production wells, the Butler and Teal
10  wells is that the gas found in those wells is
11  the same gas as found in the Lipsky and Hayley
12  water wells?
13     A.  We believe that we have enough data --
14  the Agency believes we have enough scientific
15  data that is valid to support the issuance of an
16  order which, again, we made from information
17  that we believe the Range efforts in and around
18  the Butler and Teal well caused or contributed
19  to the contamination of the underground source
20  of drinking water and presented an imminent and
21  substantial endangerment.
22     Q.  Okay. So let's try my question.
23  There's a -- there's a type of gas being
24  produced by Range. What term would you like to
25  apply to that gas? What -- what is comfortable

60

1  to you from the Butler and Teal wells?
2     A.  We believe the gas that we found in the
3  Lipsky well and the Hayley well are sufficiently
4  similar to the gas that we found in the Butler
5  production stream to support the issuance of our
6  order under the provision of the statute that we
7  cited 1431.
8     Q.  Okay. I'm really trying to get at your
9  earlier statement that the EPA possesses and possessed
10  information the EPA possesses and possessed
11  prior to December 7, 2010 is, for lack of a
12  better term, inconsequential to EPA's
13  determination to issue the order; is that true?
14     A.  I would not use the word
15  inconsequential.
16     Q.  Well, of what consequence then is it?
17     A.  It was part of the data, it was part of
18  the information known. We looked at that
19  information. We did not believe it was germane
20  or relevant to the findings that we cited in our
21  order, that there was gas in one well that was
22  sufficiently similar to gas in another well, a
23  private well, coming from an underground source
24  of drinking water that we thought presented an
25  imminent and substantial endangerment. Again,



**61**

1  if you read the order itself, we don't use the
2  word conclusive.  We don't use the word is the
3  same.  We use very likely the source.  We
4  believe there is a link between the two and we
5  believe that we were within the authority that
6  the Agency has to ask Range to undertake
7  activities to, one, eliminate the risk that we
8  perceived existed; and, two, to conduct
9  additional infor -- additional data gathering to
10  try to conclus -- to see if we could get to a
11  point of determining conclusively exactly where
12  that gas was coming from.
13      Q.   So the way I'm hearing you and
14  particularly that last piece you're not sure,
15  EPA is not sure if the Range wells are causing
16  or contributing to any contamination of the
17  USDW; is that true?
18      A.   No, that's not true.  We issue --
19      Q.   So you're certain?
20      A.   No.
21      Q.   So you're certain?
22      A.   And I don't -- I didn't say I was
23  certain.

**62**

**63**

**64**



**72**

11  EXAMINATION BY MR. RILEY:
12      Q.   And, again, it's prior to December 7,
13  2010.
14      **A.   Again, ask that again.  I'm just --**
15      Q.   Sure.  If the administrative record is
16  actually -- as that term is employed if that is
17  intended to be a complete compilation of all
18  records that bear on the questions and issues
19  raised by the administrative order then the
20  administrative record in Deposition Exhibit No.
21  2 is incomplete; is that true?
22      **A.   That's a huge hypothetical question.**
23  **If you're asking me if all the records that the**
24  **Agency possesses related to the Range Resource**
25  **issue are in this administrative record for this**

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e



**73**

1   order the answer is no.  But I do believe that
2   the documents that are here comprise the
3   administrative record for this order.
4       Q.   Okay.  Because that was EPA's ambition
5   only to find documents that supported its facts
6   and conclusions of law as described in the
7   administrative record; is that true?
8       A.    We built an administrative record to
9   support the issuance of our order, yes.

93

EXAMINATION BY MR. RILEY:

17 Q. Well, let's suppose, okay, that it was
19 incumbent on EPA to consider alternative
20 scenarios, do you think that was an obligation
21 of EPA to consider what other sources there
22 might be for contamination of the Lipsky water
23 well?
24 MR. LYNK:
25 I'm going to object to form.

94

1 THE WITNESS:
2 I think we -- the Agency has a
3 responsibility to consider alternative
4 scenarios, yes.
5 EXAMINATION BY MR. RILEY:
6 Q. In that case, then, what alternative
7 scenarios did the Agency consider?
8 A. Again, we started our investigation
9 looking to see what scenarios might be out
10 there. Is there another source of the methane
11 gas and other contaminants that entered into the
12 Hayley and Lipsky well that might account for
13 the levels that we found and the concentrations
14 that we found and the risk that we found. So
15 those could include somebody tampering with the
16 well; those could include the Hayley well or the
17 Lipsky well being drilled or screened in a -- in
18 a part of the geologic formation that contains
19 its own source of methane gas. So we, again, as
20 part of our investigation considered those
21 options as we move forward. That's again not
22 where we landed. We landed with our order.
23 Q. Tell me what steps EPA took to exclude
24 the other scenarios it considered?
25 A. Again, the record is very clear on

95

1 that. We collected air data; we collected water
2 data; we made some analysis on the composition
3 of the water; we made some analysis on the
4 composition of the head space air and then based
5 on that we -- it led us to the conclusions that
6 we ended up with.
7 Q. Well, I didn't see in the record, and
8 please point me to the part of the record that I
9 missed, where it shows that you tested any other
10 natural gas production well in the area.
11 A. Again, as the record says our belief is
12 there is not another natural gas production well
13 in the area that had the potential to impact
14 those wells. And that is part of the record.
15 Q. Then I didn't see in the record where
16 you evaluated the geology below the Lipsky site.
17 A. Correct, we did not.
18 Q. Okay. So I'm looking for -- since you
19 had a list of scenarios that you obviously were
20 under obligation and duty to consider, which you
21 just explained a moment ago, I would like to
22 know what other things you did to consider
23 alternate sources of methane gas or natural gas
24 in the Lipsky water well.
25 A. Again, one, I did not say or use the

96

1 words obligation or duty. You used those words,
2 I did not. Two, I've told you what we did.
3 Q. So --
4 A. I've answered the question. We took
5 samples, analytical samples to determine if
6 there were -- what the composition of the gas
7 was, what the composition, what the contaminants
8 in the water itself were and looked for, again,
9 as you would say scenarios that might lead to
10 that. We did not find any. We did not find any
11 evidence in the construction information that's
12 contained in the record about the construction
13 of the Lipsky well that would lead us to
14 believe, as I said in my earlier answer, that
15 potentially let's say it was screened in a part
16 of the formation that could have led to the
17 contaminants we found being present in the well.
18 We did not look underneath the Lipsky well nor
19 did -- I would state that we had the obligation
20 to look at the geology beneath the Lipsky well.
21 Q. Well, how were you able to determine
22 whether the Lipsky well is screened in a
23 geologic formation that may contain natural gas
24 if you didn't look at the geology below the
25 Lipsky property?

97

1    A.   We read the well logs provided to us as
2  to the well logs from the driller who drilled
3  and -- and analyzed that.  And nothing in the
4  record, nothing in the drill welling logs that
5  were provided to us would indicate there was
6  anything found in the Lipsky well when was
7  drilled that would indicate this problem.  And
8  then again as we move into the compositional
9  data that's in the record and the isotopic data
10  we think it showed the link back to the source
11  of the natural gas which is where the --
12    Q.   And I know you --
13    A.   -- formation --
14    Q.   -- want to keep saying that, Mr.
15  Blevins --
16    A.   Okay.
17    Q.   but I didn't ask you that question.
18    A.   Okay.  I think you did, so I'm sorry.
19    Q.   All right.  And I apologize to you too.
20  I'll try to be more precise --
21    A.   Okay.
22    Q.   -- if you'll try to be more succinct.
23  My question is about your investigation into the
24  geology below the Lipsky well.  That's the --
25    A.   And I answered that.

98

1    Q.   -- the context of my question.  So my
2  question is --
3    A.   I said no.
4    Q.   It's going to be helpful if you wait
5  for me -- until I stop speaking before you start
6  speaking and I'll do the same for you.
7    A.   Okay.
8    Q.   The -- can you name me the
9  stratigraphic layers from surface to the Barnett
10  shale underneath the Lipsky property?
11    A.   No.
12    Q.   Can you tell me what if any
13  stratigraphic formation has or contains natural
14  gas?
15    A.   No.
16    Q.   Can you tell me whether in any
17  stratigraphic formation that is below the Lipsky
18  property whether there is any thermogenic
19  natural gas found?
20    A.   Yes, of course there's thermogenic
21  natural gas found below the Lipsky well.  That's
22  the -- that's the thermogenic natural gas that
23  you guys have tapped into with your production
24  well.
25    Q.   Okay.  So that's the only thermo --

99

1  only --
2    A.   I don't know if that's the only one.
3  You said did I know of any.  I said yes.
4    Q.   Okay.  So you know of the Barnett
5  shale?
6    A.   Right.
7    Q.   Do you know of any other?
8    A.   No.
9      THE VIDEOGRAPHER:
10        Five minutes left, Counselor.
11  EXAMINATION BY MR. RILEY:
12    Q.   Have you ever heard of the Strawn
13  formation?
14    A.   Yes.
15    Q.   And what is that?
16    A.   I've heard of the Strawn formation.  I
17  do not know the technical details of what it is.
18    Q.   Is it a natural gas bearing zone
19  underneath the Lipsky property to the best of
20  your knowledge?
21    A.   I know it's a natural gas bearing zone
22  but I do not know where it exists or where it
23  does not exist based on the size and nature of
24  the formation.
25    Q.   Tell me all the things that EPA did to

100

1  investigate alternate sources of natural gas
2  underneath the Lip -- Lipsky property in the
3  concept -- context of geologic formations?
4      MR. LYNK:
5        Object to form.
6        Go ahead.
7      THE WITNESS:
8        Again, I think I've already
9  answered that.  We have done no geologic
10  investigation.
11  EXAMINATION BY MR. RILEY:
12    Q.   Distinguish for me the -- the label
13  thermogenic and biogenic.
14    A.   Thermogenic is -- well biogenic is the
15  easier one.  Biogenic means it's methane
16  produced from a biological activity that occurs
17  in certain substrates.  Thermogenic is natural
18  gas that's formed by, to the best of my
19  knowledge, heat or pressure or maybe the better
20  answer is and/or pressure but...

105

106

Q.   Is -- there's a Strawn formation -- let
me withdraw that portion.
     I think you said a moment ago or a
short while ago that you were familiar with the
Strawn formation in broad strokes; is that
correct?

**A.   I'm aware that it exists and it exists
in the general vicinity of the Lipsky and Hayley**

107

wells.
     Q.   Do you know if it's a natural gas
producing formation?
     **A.   I don't know that for a fact but it's
my understanding that it is.**
     Q.   Did EPA do any testing of Strawn
formation natural gas to determine whether it is
thermogenic or biogenic?
     **A.   Not related to this case, no.**
     Q.   In other cases has EPA done any
analysis of Strawn formation natural gas in that
context as to whether it's thermogenic or
biogenic?
     **A.   Not to my knowledge.  But, again, EPA
is a large organization.**
     Q.   Sure.  But to the best of your
knowledge there's no record that is in the
assembly of documents that may or may not be
administrative record as it pertains to this
case where there's any analysis of Strawn
formation natural gas; is that right?
     **A.   For this case, no.  Yes, you're
correct.  Sorry.**

108



153

155

EXAMINATION BY MR. RILEY:
Q.   So the question I asked you and I want to be clear that was a risk assessment done to evaluate the safety of the Lipsky drinking water by EPA?
**A.   And I answered you no.**
Q.   Were any contaminants identified by EPA that were above maximum concentration levels according to EPA's drinking water quality standards?

154

156

**A.   As contained in the record there is a sample that was analyzed for benzene and that sample was above the MCL.**
Q.   Who took that sample?
**A.   The Railroad Commission did.**
Q.   On what date?
**A.   On August 17, 2010.  It's item No. 19 in the order.**
Q.   After August 17, 2010 EPA performed its own sampling of the drinking water in the Lipsky well; is that correct?
**A.   Yes.**
Q.   On what date did that occur?
**A.   October 26th was the sampling of the Lipsky well.**
Q.   What was the -- what did the EPA's analysis reveal as it pertains to the constituent benzene at the -- based on the October 26th sampling of that?
**A.   The level was report at 4.55 parts per billion.**
Q.   4.55 ppb?
**A.   Parts per billion.**
Q.   And that's below the maximum concentration level that EPA considers safe as

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

157

1  it pertains to the constituent benzene; is that
2  true?
3     A.  That is true.
4     Q.  On December 7, 2010 when the EPA issued
5  the administrative order what constituents, if
6  any, found in the Lipsky drinking water were of
7  concern from a human health perspective?
8     A.  I think there was a wide Range of
9  compounds found that were of a concern from a
10 human health perspective.
11    Q.  Okay. I didn't seek to limit you so
12 please tell me what those constituents were.
13    A.  Well, basically, again, any of the
14 sam -- any of the compounds that were tested for
15 in the water. There's a long list. I mean, I
16 can go through all of them. But the reason we
17 test for them is we want to make sure we know
18 what the concentrations are and whether they
19 exist above or below a standard.
20    Q.  Okay. So you tested on October 26,
21 2010. EPA took samples, had them analyzed and I
22 would say based on your last response concerned
23 itself with a long list of constituents that
24 potentially could be in the Lipsky drinking
25 water, correct?

158

1     A.  Correct.
2     Q.  And was an analysis complete as to each
3  of those constituents?
4     A.  That's what's the date that's in the
5  record you can see, yes.
6     Q.  Now, from that list based on EPA's
7  sampling what constituents remained a concern
8  after EPA's sampling and analysis?
9     A.  Well, as shown on Exhibit 2 there's
10 concentrations of benzene in the Lipsky water;
11 there's concentration of hexane in the Lipsky
12 water; there's concentrations of tolnene in the
13 Lipsky water; there's concentration of ethane,
14 methane and propane. Plus there's other
15 indicator compounds that exist as well. I can
16 go through all of them. There's boron; there's
17 chlorides; there's total alkalinity. All of
18 those had positive results based on EPA's
19 sampling on 10-26.
20    Q.  When you say positive results, what do
21 you mean?
22    A.  Above the detection limit.
23    Q.  For each of those compounds were any of
24 them identified as above any applicable drinking
25 water standard?

159

1     A.  Not in the 10-26 sampling event, no.
2     Q.  So at that stage would you agree with
3  me that the Lipsky water well was safe for human
4  consumption based on EPA's maximum concentration
5  levels for the various constituents you've
6  described?
7        MR. LYNK:
8           Object to the extent it calls for a
9  legal conclusion.
10       THE WITNESS:
11          I don't think I can say either way.
12 We have a sample collected by the Railroad
13 Commission that shows an exceedance of the MCL
14 for benzene. We have a sample by EPA that is
15 slightly below the MCL. As you know those are
16 snapshot samples. So I would say there's still
17 a concern but not an exceedance on the 26th.
18 But we do have a sample that showed an
19 exceedance in the same general time frame.
20 EXAMINATION BY MR. RILEY:
21    Q.  But not a sample EPA took, that's
22 one -- that's a sample the Railroad Commission
23 took; is that correct?
24    A.  That is correct.
25    Q.  But based on EPA's careful sampling and

160

1  analysis there was no constituent above an EPA
2  approved maximum concentration level; is that
3  true?
4     A.  Based on EPA's sampling that is true.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**161**

1     A.   **We did not.**
2     Q.   As I understand it Mr. Lipsky had
3 before even receiving that advisory from EPA
4 discontinued use of that water well. Is that
5 your understanding as well?
6     A.   **That is my understanding.**
7     Q.   Describe then if you would, assuming it
8 to be the case that Mr. Lipsky had voluntarily
9 discontinued use of the drinking water well;
10 that is, domestic well No. 1 as identified in
11 the emergency order, how Mr. Lipsky was in
12 imminent and substantial peril?
13     A.   **Because exactly the reason the words**
14 **you used. He was doing that on a voluntary**
15 **nature and there was no guarantee that at any**
16 **time he might not start using that water again**
17 **and introduce the potential for those gases to**
18 **be transmitted by the water into his home, the**
19 **gas is released into his home and be collected**
20 **in an area that could be subject to an ignition**
21 **source and an explosion could occur.**
22     Q.   What action has EPA taken to prevent
23 Mr. Lipsky from using the water well we're
24 discussing?

**162**

1     A.   **The action was we ordered Range to**
2 **provide alternative water supply under the order**
3 **which is an enforceable order.**
4     Q.   How does that prevent Mr. Lipsky from
5 using his well if he decides to?
6     A.   **It doesn't but there's -- we believe**
7 **there's a better guarantee that if he's provided**
8 **alternative water supply that he's not**
9 **financially responsible for that he won't turn**
10 **on the water in his house.**
11     Q.   Do you know Mr. Lipsky's financial
12 means?
13     A.   **That's not relevant to me or to the**
14 **Agency.**
15     Q.   Okay. But could you have ordered Mr.
16 Lipsky to -- to not use the water well? Could
17 EPA have done that?
18     A.   **No.**

**163**

**164**

2     Q.   Sure. If a water well was drilled --
3 drilled at -- let's phrase it differently. If a
4 water well was drilled into the Strawn formation
5 which we talked about earlier has historically
6 produced natural gas would it surprise you to
7 learn that natural gas was found in that water
8 well?
9     A.   **I don't have a surprise either way on**
10 **that one. It would just be a piece of data that**
11 **the Agency would look at.**
12     Q.   Okay. Did the Agency look at the
13 relationship of the Lipsky water well to the
14 Strawn formation in this case?
15     A.   **Again we were aware of it, yes. Did we**
16 **do an investigation to collect data, no.**
17     Q.   Did anyone ever advise you internally
18 or externally that that was a necessary element
19 to any conclusion as to the source of natural
20 gas in the Lipsky water well?
21     A.   **No. But, again, I don't think that's a**
22 **necessary element. The Agency doesn't believe**
23 **that's a necessary element to support the**
24 **decision we make.**
25     Q.   So alternate sources of natural gas in

165

1   the Lipsky water well is not something the
2   Agency needs to investigate prior to issuing the
3   December 7, 2010 order; is that a correct
4   statement?
5       A.   No.
6       Q.   Okay.  Tell me --
7       A.   Again, we went through this earlier.
8   There -- there are other potential migration
9   pathways.  We followed the data we had before
10  us.  We did not have anything in the data that
11  was in front of us on December 7th that would
12  show that there was gas from the Strawn
13  formation entering into the Lipsky well or that
14  the Lipsky well was drilled into the Strawn
15  formation.  So that data was not in front of us
16  when we made our decision.
17      Q.   Did you investigate it?
18      A.   And, again, I've answered that before
19  and I said no.
20      Q.   So you didn't look to see whether there
21  was --
22      A.   We did not investigate it.
23
24
25

166

168

11      Q.   Sure.  And I'm going to go over that.
12  You seem to have made this decision.  By you
13  again I'm not speaking about you personally but
14  EPA since you're the designated
15  representative -- made this decision without
16  consultation with a geologist that defined or
17  illuminated the geological stratum underneath
18  the Lipsky formation.  Have I stated that
19  correctly?
20      A.   Say it again, please.
21      Q.   Sure.  You didn't consult a geologist
22  before issuing the order; is that true?
23      A.   We did not because we didn't deem it
24  necessary for the order.
25

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

**169**

**170**

15     Q. Now, let's pick that apart a bit, Mr.
16 Blevins. Is the gas that is found in the Strawn
17 formation substantially similar to the gas found
18 in the Lipsky water well?
19     **A. I have no data, the Agency has no data**
20 **to say that it is.**
21     Q. Tell me all the things, every single
22 thing the Agency did to discover whether the gas
23 found naturally occurring in the Strawn
24 formation is substantially similar to the gas
25 found in Lipsky water well.

**171**

1     A. We have no data, as I've told you, that
2 would say it does. We did nothing to go find
3 the gas in a Strawn formation and test it
4 because as our investigation evolved we found
5 the gas in the formation as being produced by
6 Range and compared it to the gas we found in the
7 Lipsky formation. And if you refer to, you
8 know, item 2 in the record, page 3 in the record
9 we believe that there's a close correlation
10 between those two gas sources.

**172**



173

174

175

176

Q.   And tell me the treatment system, if
any, Mr. Lipsky has at his home before it would
enter his home?  How is his water well plumbed
to his home?
   A.   He passes it through a -- into a tank
and through a treatment system.  But I'm not
exactly sure that I know what the treatment
system is.  I'd have to look in the depositions
to see if we mentioned it in the record.
   Q.   Please take your time.
   A.   Again, the letter from Mr. Lipsky's
lawyer to us talks about a purification system
that includes a purging cycle on the holding
tanks.  Let me -- I'll have to see if Chris
Lister in his declaration mentions anything.  I
don't see anything in the record that would go
beyond what was contained in Exhibit 33.

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e



177

179

1  at the Lipsky residence or around the Lipsky
2  property that EPA's order seeks to address?
3    **A.   The threat of explosion.**
4    Q.   From where?
5    **A.   From the gases that are contained in**
6  **the wellhead, anywhere that they can potentially**
7  **migrate to, collect and explode.**
8    Q.   Tell me all the places EPA has
9  concluded the gases could migrate to on the
10  Lipsky property.
11    **A.   Within the wellhead, within the holding**
12  **tank, within the home.**
13    Q.   Did EPA test anywhere other than the
14  wellhead, namely the holding tank and the home?
15    **A.   Again, as the record says, no.**

178

180

23    Q.   What type of threat then, Mr. Blevins,
24  is it that EPA took action on?  What
25  specifically was EPA concerned with might happen

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e



**181**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**183**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17   Q.   Okay.  So that's a different ques --
18   different answer to my question.  All the
19   documents that we've discussed earlier would be
20   a bigger set of documents than what's contained
21   in the administrative record; is that true?
22   A.   Do we -- there are other documents that
23   exist, yes.  I have not seen all of them, no.
24   Q.   So there are 42 documents that are
25   contained in the administrative record and that

**182**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**184**

1   means at least in EPA's records there might be a
2   document 43 up to who knows what that might
3   pertain to the administrative order; is that
4   correct?
5   A.   I guess I'm confused on the term
6   contained or pertaining to.  Do we have other
7   records related to the situation in and around
8   Parker County, yes.  Do they pertain to the
9   order, the administrative record, are those
10   documents that we compiled to support the
11   issuance of the order, and that includes all
12   documents pro or con that we had at the time
13   that we used in making the decision to issue our
14   administrative order, our emergency order.
15
16
17
18
19
20
21
22
23
24
25

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

213

3      Q.   I asked you a little while ago whether
4  EPA could have issued an order to Mr. Lipsky
5  and/or Mr. Hayley -- actually, I asked you about
6  Mr. Lipsky to be fair -- precluding Mr. Lipsky
7  from using domestic water well No. 1.  Remember
8  that question?
9      A.   Yes.
10     Q.   And you said you could not, EPA could
11  not issue that order; is that correct?
12     A.   That's my understanding, yes.
13     Q.   And to your understanding why not?
14     A.   I don't believe we have the statutory
15  authority to issue an order to a private well
16  owner.  Now, that's, again, a legal decision.
17  But that's my understanding.
18     Q.   Was it considered by EPA to prevent
19  imminent and substantial endangerment in this
20  case to simply order the property owners, the
21  Lipskys and the Hayleys, not to use their water
22  wells until further investigation could be
23  conducted to determine the source of natural gas
24  in those wells?
25     A.   It was not considered.

215

10     Q.   Okay.  Well, what is the -- if -- I
11  think I heard you say, I may be wrong, that
12  the -- well, let -- let me go a different
13  direction.  Is it EPA's understanding that there
14  have been issues in domestic water wells
15  involving natural gas that predate any activity
16  by Range Resources in the context of the Butler
17  and Teal wells?
18     A.   Yes.
19     Q.   And does EPA have a theory as to those
20  prior instances of natural gas occurring in
21  domestic water wells in the area we're
22  discussing?
23     A.   I don't think we have a generic theory,
24  no.

214

216

221

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

222

1
2
3
4
5
6
7
8
9
10
11
12   Q.   So you've concluded Range caused or
13   contributed to transmission of natural gas to at
14   least domestic water well 1 and domestic water
15   well 2, correct?
16       A.   That's the basis of our order.
17       Q.   All right. That's not a hypothetical,
18   it's not a possibility, you've saying that
19   you've concluded that?
20       A.   That they may have contributed to --
21       Q.   See, that's the word I keep trying to
22   get to is may. That sounds to me like there's
23   an uncertainty as to whether it's actually
24   caused or that there's a suspicion it's causing.
25   You understand what I'm saying?

223

1       A.   I think the determination we made was
2   that Range may have caused or contributed and
3   that's the Agency's position.
4       Q.   Okay.  So you're -- the Agency's
5   position is then Range needs to investigate that
6   to find out whether they are indeed causing or
7   contributing as opposed to maybe causing and
8   contributing; is that right?
9       A.   We asked Range to collect additional
10   data to define the scope and nature of the
11   threat, if the threat exists beyond the two
12   wells that we identified in our order.  And as
13   part of that we gave Range the opportunity to
14   present additional data, conduct a study to
15   determine if the exact pathway and cause could
16   be defined.
17       Q.   So it's Range's obligation in EPA's
18   view to determine whether there is a pathway
19   from Range's -- that relates to Range's
20   activities; is that correct?
21       A.   I think it's Range's obligation to
22   collect data to satisfy the order.  And as part
23   of collecting that data Range collects data they
24   want to present to the Agency that would either
25   support or deny their liability they have that

224

1   opportunity.
2       Q.   Well, that's not what the order says,
3   is it, sir?  The order says different.  Let's
4   look at the ordering provisions.  The order
5   says -- let's skip A because that's just asking
6   for EPA's response -- excuse me, Range's
7   response to EPA.  The second one says do
8   something to Range, provide potable water
9   supplies -- water supplies to consumers of water
10   from domestic well No. 1 and domestic well No.
11   2, correct?
12       A.   Uh-huh (affirmative response).
13       Q.   So that's not an investigative step,
14   that's a remedy step?
15       A.   That is to address the imminent
16   substantial -- the imminent threat that we
17   identified.
18       Q.   Okay.  Now, by this point, December 7,
19   2010, the Lipskys have stopped using the water
20   well and are actually obtaining water from an
21   alternate source, having a truck to their
22   property; is that right?
23       A.   That's correct.
24       Q.   So that's not imminent and substantial
25   endangerment.  The Lipskys have already taken

225

1    care of order in provision B, 50-B by the time
2    this order is issued, correct?
3        A. The Lipskys had on their own
4    voluntarily provided themselves potable water
5    supply, yes.
6        Q. Why is it you think Range was then
7    obligated based on the base of information you
8    had on December 7, 2010 to take over that
9    activity --
10        A. Because --
11        Q. -- for the Lipskys?
12        A. Again, I think I've answered this once.
13    We believe that Range caused or contributed --
14    may have caused or contributed to the problem
15    and that Mr. Lipsky should not carry that burden
16    himself.
17        Q. So the other side of may is may not.
18    So Range may not have caused or contributed to
19    the natural gas in the Lipsky well too? That's
20    another possibility, right?
21        A. That's a possibility but that's not the
22    determination the Agency made.
23        Q. Now, your determination you've repeated
24    several times they may have caused or
25    contributed, that Range may have caused or

226

1    contributed.
2        A. Yes.
3        Q. So the exact opposite side of that coin
4    is they may not have, correct?
5        A. That's a theoretical question.
6    Again --
7        Q. So is the first part.
8        A. No. The first part we had to make a
9    formal determination, we did that in our order.
10    And that's what I'm here to give you the
11    Agency's position on. So our determination, our
12    position as the -- as EPA is that we believe
13    Range may have caused or contributed the
14    contamination in the drinking water supply that
15    led to an imminent and substantial endangerment.
16    We did not make a determination that Range may
17    not have caused or contributed to that -- those
18    two things and we still want them to do work.
19        Q. Okay. Distinguish for me the use of
20    the word may from the use of the word it's
21    possible or the words it's possible.
22    Distinguish that for me. When the Agency
23    determined Range may have caused or contributed
24    to natural gas in the Lipsky water well how is
25    that different from it's possible Range may

227

1    have -- it's possible Range -- Range's
2    activities led to the finding of natural gas in
3    the Lipsky water well.
4        A. Again, as the Agency's representative
5    the determination we made was may have caused or
6    contributed. I did not make a determination or
7    the Agency didn't make a determination if
8    possible. Those are words. They can -- people
9    can decide if they want to interchange them.
10    That's not the Agency's decision or
11    determination. Me speaking for the Agency, or
12    we believe the words we used is the words we
13    wanted to use which is may have caused or
14    contributed.
15        Q. And if I'm understanding then
16    correctly, Mr. Blevins, the Agency has not
17    conclusively determined that Range has --
18    Range's activities have caused or contributed to
19    natural gas in the Lipsky water well; is that
20    correct?
21        MR. LYNK:
22            Object, asked and answered.
23        THE WITNESS:
24            We have used the word may. I did
25    not use the word did cause or contribute, we

228

1    used the word may. I think it speaks for
2    itself.
3    EXAMINATION BY MR. RILEY:
4        Q. Okay. The way it speaks to me for
5    itself is there's not -- the Agency has not
6    concluded Range has caused or contributed to
7    natural gas being found in the Lipsky well. Am
8    I being obtuse or am I understanding you
9    accurately that that's the Agency's conclusion?
10        MR. LYNK:
11            Object to form. Objection, asked
12    and answered.
13        THE WITNESS:
14            Again, I understand what you're
15    saying but the Agency's position in speaking on
16    behalf of the Agency is we believe Range has --
17    may have caused or contributed. That's the
18    basis for the issuance of our order.

66 (Pages 261 to 264)



**261**

**262**

**263**

Q.   This is part of the administrative record this document Bates labeled page 639?

A.   **Right.**

Q.   And it appears to be someone's handwritten notes of conversations with Dennis Coleman and a Stephen something that begins with a P.

A.   **Correct.  They're Chris Lister's**

**264**

**handwritten notes that he has attached as part of his declaration.**

Q.   Can you read them?

A.   **I can't read all of them, no.**

Q.   Let's see if we can read the portion under Mr. Coleman's name.  The date of -- apparently the discussion was November 19, 2010. I can't make out the time.  Looks to be 10:05 a.m.

A.   **Right.**

Q.   See at least for reference to the document you can see where --

A.   **Right.**

Q.   -- where I am?

A.   **I'm with you.**

Q.   Okay.  This conversation apparently predated the issuance of the -- of the order.

A.   **That's correct.**

Q.   And let's try to read -- let me try to read the note and see if you agree with my reading.

A.   **Right.**

Q.   It says, after the arrow:  Said that the isotopic signatures being as close as -- I can't make out that word -- as our two samples

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

265

1 indicates that, one, both are thermogenic in
2 origin; and, two, that they're like to be from
3 the same source given the proximity of the
4 production well to the water well.
5     And the next sentence: One must
6 valuate the potential for other sources that
7 would be thermogenic and the geology or
8 structures that would store or transmit the gas
9 from origin to aquifer to be certain.
10     Do you see that?
11 A. Yes.
12 Q. Do you agree with me that EPA did not
13 follow the recommendation of one of the experts
14 it cites in investigating the geology or
15 structure that would store or transmit the gas
16 from origin to aquifer to be certain?
17 **A. One, I would just say Chris captures**
18 **this on page 569. He recounts in his depo -- or**
19 **his declaration of what -- there's text in there**
20 **that matches up with his handwritten notes.**
21 **But --**
22 Q. Which one are you referring to?
23 **A. 569, No. 10.**
24 Q. No. 10.
25 **A. He talks about his discussion with Mr.**

266

1 **Coleman at Isotech. He goes through bullet 1**
2 **and 2, so...**
3 Q. Okay. Seems like I read it correctly
4 then?
5 **A. I think you did.**
6 Q. Go ahead.
7 **A. I just wanted to point out it was**
8 **there.**
9 Q. Thank you. That's helpful.
10
11
12
13
14
15 Q. No. It says that Mr. Coleman stated
16 that to be concern one must evaluate the
17 potential for other sources that would be
18 thermogenic in origin and evaluate the geology
19 or structure that would store or transmit the
20 gas from the origin to the Trinity Aquifer. EPA
21 did not act on Mr. Coleman's recommendation; is
22 that correct?
23 A. EPA acting on Mr. -- oh, sorry.
24     MR. LYNK:
25         Object to the form.

267

1     Go ahead.
2     THE WITNESS:
3         **EPA acting on Mr. Coleman's opinion**
4 **based -- captured in the order when the order**
5 **asked Range to work on that information for us**
6 **as part of the order. We did an evaluation,**
7 **again, to start that investigation but we've**
8 **asked Range to provide additional information in**
9 **that regard as part of the order.**
10 EXAMINATION BY MR. RILEY:
11 Q. Well, define for me where in the order
12 it says that Range should evaluate the geology
13 or structure that would store or transmit the
14 gas from the origin to the Trinity Aquifer.
15 **A. I believe that would be the -- where**
16 **we've asked them to look at pathways.**
17 Q. Okay. So Range should do a full-scale
18 all-out investigation of all of their sources in
19 geology to satisfy EPA; is that correct?
20     MR. LYNK:
21         Object to form.
22     THE WITNESS:
23         Again, I will just --
24     MR. LYNK:
25         Object as beyond scope as well.

268

1     Go ahead.
2     THE WITNESS:
3         The order asked Range to look at
4 pathways to do exactly what Mr. Coleman
5 suggested before a certain determination was
6 made. EPA's position is we haven't made a
7 certain determination. We made -- consistent
8 with the language earlier in here that we
9 believe that the gases are likely to be from the
10 same source.
11 EXAMINATION BY MR. RILEY:
12 Q. What does likely mean, Mr. Blevins? Is
13 it 50 percent possibility, 75 percent? Is there
14 any percentage you can affix to the word you
15 keep using likely?
16     MR. LYNK:
17         Objection, asked and answered.
18         Go ahead.
19     THE WITNESS:
20         I don't have a percentage to give
21 you. Again, there's no hard binder that I can
22 go to and pick a percentage up for you.
23 EXAMINATION BY MR. RILEY:
24 Q. Well, you could have -- EPA could have
25 taken the step recommended by Mr. Coleman

269

1  itself, correct?
2      A.   Yes, but...
3      Q.   I reviewed your budget just recently.
4  It's the highest in history.  So you have the
5  resources to do the investigation recommended by
6  Mr. Coleman, no?
7          MR. LYNK:
8              Object to form.
9          THE WITNESS:
10             No.  Again, I think that's a
11  misstatement the Agency's budget as a whole.
12  The Agency could do the work.  The Agency
13  doesn't believe that we need to do the work.
14  The Agency believes that the statute gives us
15  the authority to ask a company who we believe
16  may have caused or contributed to do the work,
17  to collect the data and that's what we've done.
18  And, in fact, that's consistent with again how
19  enforcement works for the Agency across the
20  nation.
21  EXAMINATION BY MR. RILEY:
22      Q.   Well, you know, I was in the
23  enforcement game myself for a good number of
24  years and I don't recall that particular aspect.
25  But maybe I just had a different experience from

270

1  the suspicion leads to accusation.  But let's
2  just move on and look at other recommendations
3  within EPA to do a similar thing.  I believe
4  it's from Dr. Beak.  He is an EPA employee,
5  correct?
6      A.   Correct.
7      Q.   And he so far as I can tell is your
8  most credentialed expert in the topic or on the
9  topic of isotopic analysis or gas
10  fingerprinting; would you agree with me?
11     A.   He's the most -- what word?  Sorry.
12     Q.   Credentialed.
13     A.   He is a doctor, yes.
14     Q.   Written a number of papers, seems to be
15  a fellow with some experience in the subject,
16  would you agree?
17     A.   He's written numerous papers, yes.
18     Q.   Would you look at -- I believe it's
19  item 41 in the administrative record.
20     A.   Page 724?
21     Q.   Yes, sir.
22     A.   Yes.
23     Q.   If you start with the second paragraph.
24     A.   Uh-huh (affirmative response).
25     Q.   And I'm looking for the particular

271

1  provision.  I'm going to pick up about four
2  lines down with the sentence:  With that said,
3  this is not conclusive evidence because of the
4  limited data set; however, it also does not rule
5  out gas migration from the production well to
6  the Lipsky well.  Do you see that?
7      A.   Sorry.  You're in the --
8      Q.   Sure.
9      A.   -- which paragraph?
10     Q.   Second paragraph.
11     A.   The little paragraph?  Oh the big --
12     Q.   The big paragraph.
13     A.   -- paragraph.  I'm sorry I was counting
14  paragraphs.
15     Q.   That's okay.  Begins with the word
16  with, fourth line down.
17     A.   Right.  I'm with you.
18     Q.   Okay.  And tell me if I read it
19  correctly.  With that said, and the width
20  referring to -- well, let me read it.  At the
21  beginning of the paragraph:  The isotope data
22  for the Lipsky well and the production well look
23  to be identical and are thermogenic in origin.
24  The gas composition of the production well and
25  the Lipsky are similar.  And the compositional

272

1  changes are what one might expect for a gas that
2  has migrated from the production well to the
3  Lipsky well.  With that said, this is not
4  conclusive evidence because of the limited data
5  set; however, it also does not rule out gas
6  migration from the production well to the Lipsky
7  well.  Did I read that correctly?
8      A.   Yes.
9      Q.   So -- and Dr. Beak's been in the
10  evidence collected by EPA to that date at least,
11  November 28, 2010, was not conclusive; is that
12  right?
13     A.   That's what he says in his e-mail, yes.
14     Q.   And then it says what will be very
15  important to document is the timeline of when
16  the well went into production and the appearance
17  of gas in the Lipsky well.  You see that?
18     A.   Yes.
19     Q.   I could not compare the analysis from
20  the Texas Railroad Commission with your
21  analysis.  The problem here is that the data
22  from any of the three analytical labs is present
23  as normalized data.  Did I read correctly so
24  far?
25     A.   Uh-huh (affirmative response).

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

273

1    Q.   This means that the data is normalized
2  to -- excuse me, normalized at least to what was
3  analyzed for and not all the labs analyzed the
4  same components or possibly used the same
5  method.  See that?
6    A.   Yes.
7    Q.   I would suggest in the future that the
8  data provided in terms of non-normalized data in
9  mass or concentration units.  Right so far?
10    A.   Uh-huh (affirmative response).
11    Q.   This way we can directly compare data
12  and normalize all data to the same set of
13  criteria.  The only way now to compare the data
14  would be to make assumptions to fill in data
15  gaps and I don't believe we have enough
16  experience at this site or data to do this at
17  this time.  Do you see that?
18    A.   Uh-huh (affirmative response).
19    Q.   Now, it doesn't seem as though Dr. Beak
20  felt that the time was right for EPA to conclude
21  that Range was the source or caused or
22  contributed to gas in the Lipsky well.  Do you
23  agree with --
24    A.   I don't agree with your summation, no.
25  I agree with what you've read.

274

1    Q.   Well, you agree with what I read
2  because I read it correctly.
3    A.   No.  All right.  I'm just saying --
4    Q.   But do you agree with the conclusions
5  reached by Dr. Beak in that paragraph?
6    A.   I agree with Dr. -- we agree with Dr.
7  Beak's analysis but that in no way precludes or
8  affects our ability to issue an order under the
9  statute.
10    Q.   So what is your -- since you brought it
11  up, I'm sure I'll get an objection as to scope.
12  You've said that it doesn't affect your ability
13  that the factual or the -- the analysis of the
14  data available to EPA from its most credentialed
15  consultant --
16    A.   He says additional data is necessary to
17  make a definitive conclusion.  We did not make a
18  definitive conclusion.  The Agency reacted to
19  what we believe is an imminent and substantial
20  endangerment.  We believe that the Agency needed
21  to take immediate action to address that
22  imminent and substantial endangerment.  And we
23  believe that consistent with Dr. Beak's
24  recommendation as well as recommendations from
25  Isotech, the people we worked with there, that

275

1  we needed to collect -- have additional data
2  collected.  We've asked Range to do that.
3    Q.   Well, you didn't ask them to do it,
4  right?
5    A.   No.  We ordered them to do that.
6    Q.   Right.  So you didn't send them a note
7  saying:  Yeah, it would be nice if you could do
8  that?
9    A.   Right.
10    Q.   Correct?  You just --
11    A.   That's not EPA's way of proceeding in
12  these efforts.

276

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

70 (Pages 277 to 280)

277

279

Q. Well, who is in imminent and
substantial endangerment? What individuals are
in imminent and substantial endangerment in
EPA's view presently today?
   A. Anybody that --
      MR. LYNK:
         Object as beyond the scope.
      THE WITNESS:
         Anybody that encounters the gas
building up in the wellheads and near or with a
potential ignition source.
EXAMINATION BY MR. RILEY:

278

280

Q. You mean like if Mr. Lipsky were to
take a hose, jerry-rig it to the top of his well
and light it on fire, that would be imminent and
substantial endangerment?
      MR. LYNK:
         Object to form.
      THE WITNESS:
         That's an example.
EXAMINATION BY MR. RILEY:
   Q. Right. And that's what happened with
Mr. Lipsky in this case. He jerry-rigged a hose
to the top of his water well and lit it on fire;
is that right?
   A. That -- there is -- yes. There is
video evidence that that's what occurred.
   Q. Well, and that video evidence was sent
by Mr. -- excuse me, Ms. Rich to Dr. Armendariz,
was apparently received at some point by you and
you've reviewed it that Mr. Lipsky is opening
his well, allowing natural gas to escape and
lighting it on fire; is that right?
   A. I don't think that's -- there's a
dispute of that, no.
   Q. There's no dispute that he's done that,
correct?

6ca5e12a-c1a8-4ecf-9121-7eb12af1784e

281

1    A.   He's done that.
2    Q.   All right.  And that's conscientious in
3  your mind, correct?
4    A.   The Agency has no position on that.
5  That's an act of an individual homeowner related
6  to property that they own.
7    Q.   And so he's allowed to do that
8  according to EPA?
9    A.   EPA can't stop him from doing that.
10   Q.   That's your view, correct?
11   A.   That's the Agency's belief.
12   Q.   So EPA couldn't order this well to be
13  sealed; is that your understanding?
14   A.   I think I've answered that before.  We
15  believe we couldn't order Mr. Lipsky to seal the
16  well.



### ENVIRONMENTAL PROTECTION AGENCY
### REGION VI

| | |
|---|---|
| IN THE MATTER OF: | )    Docket Number: SDWA-06-2011-1208 |
| | ) |
| RANGE RESOURCES CORPORATION | ) |
| and | ) |
| RANGE PRODUCTION COMPANY | ) |
| | ) |
| Respondents. | ) |
| | ) |
| (Texas RRC Operator I.D. No. 691703) | ) |
| | ) |
| Proceedings Under Section 1431(a) of the | ) |
| Federal Safe Drinking Water Act, 42 U.S.C. | ) |
| § 300i(a). | ) |
| | ) |

### DECLARATION OF CHRIS LISTER

I, CHRIS LISTER, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am an Environmental Engineer in the Water Resources Section, Water Enforcement Branch of the United States Environmental Protection Agency, Region VI. I make this declaration based on my personal knowledge and based on my review of official agency records in the above-captioned action.

2.    During the course of conducting official business on behalf of EPA, it is my usual practice to receive analytical results of water samples and communicate these results to consumers of the water that was sampled. In communicating these sampling results to the water consumers, I oftentimes must interpret the results so as to render a "layman's version" of highly technical content. On occasions when my communications with the water consumers are limited to the "layman's version" and basic health information (e.g. contaminant levels are above the level considered safe for consumption), it is generally not my practice to create a record of conversation or other notation memorializing the

000567

Range Resources Corp.
Docket: SDWA-06-2011-1208

Administrative Record #32

conversation. It is my usual practice to provide copies of the sampling results contemporaneous to or shortly after these communications.

3. Attached hereto as Exhibit A is a true and correct copy of sampling results from water samples taken from two domestic water wells in connection with this action.

4. Attached hereto as Exhibit B is a true and correct copy of an email from TestAmerica including an electronic copy of the Exhibit A.

5. Based on my usual practices, my recollection and a review of communications with TestAmerica, *see* Exs. A and B, I spoke with Mr. Steven Lipsky in person on or about November 17, 2010 in connection with EPA's receipt of the sampling results. I visited Mr. Lipsky's home shortly after receiving the sampling results from TestAmerica, and I apprised him of EPA's receipt of the sampling results, communicated a "layman's version" of the results to him, and provided him with a paper copy of the results. During this visit, I told Mr. Lipsky that the sampling results raised concerns regarding water quality and potential for explosion and advised Mr. Lipsky against using the water source. Because Mr. Lipsky did not request additional information or have questions at that time, no formal record of communication or other notation was created.

6. Based on my usual practices, my recollection and a review of communications with TestAmerica, *see* Exs. A and B, I attempted to contact Mr. Rick Haley and Ms. Devyn McLain on or about November 19 or 22, 2010 in connection with EPA's receipt of the sampling results. Shortly after receiving the sampling results from TestAmerica, I left a voicemail for Mr. Haley and apprised him of EPA's receipt of the sampling results. When Mr. Haley returned my call, I communicated a "layman's version" of the results to him. During this call, I told Mr. Haley that the sampling results raised concerns

000568

96

regarding water quality and potential for explosion due a nearly 60 fold increase in methane content since the last test two months ago, and advised Mr. Haley that he may wish to discontinue using the water source, particularly if the methane content continues to increase at the same rate. Because Mr. Haley did not request additional information or copies of the sampling results at that time, no formal record of communication or other notation was created.

7. Attached hereto as Exhibit C is a true and correct copy of an electronic mail to Ms. McLain through which I provided Mr. Haley and Ms. McLain with the sampling results referenced above.

8. During the course of conducting official business on behalf of EPA, it is my usual practice to create handwritten notes; however, on occasion, I may make a type-written Record of Communication to memorialize important conversations, including voice mail.

9. Attached hereto as Exhibit D is a true and correct copy of one page of my handwritten notes recorded in connection with this action.

10. Based on a review of my notes, see Ex. D, I spoke with Mr. Dennis Coleman, co-founder of Isotech Laboratories, Inc., on November 19, 2010. Mr. Coleman said that the isotopic signatures of the samples from Mr. Lipsky's water well (Domestic Well 1) and the Butler 1-H gas well being as close as they are indicates that 1) both are thermogenic in origin and 2) that they are likely to be from the same source, given the proximity of the production well and the water well. Mr. Coleman stated that, to be certain, one must evaluate the potential for other sources that would be thermogenic in origin and evaluate the geology or structure that would store or transmit the gas from the origin to the Trinity Aquifer.

000569

97

11.  Based on a review of my notes, see Ex. D, I spoke with Mr. Steve Pelphrey, Lab Manager
     at Isotech Laboratories, Inc., on November 23, 2010. Mr. Pelphrey said that the samples
     from Mr. Lipsky's water well and the Butler 1-H gas well indicate that both gases are
     very wet gases with ethane, and that the ethane/propane ratio and the propane/butane
     ratio are very similar. Mr. Pelphrey also explained that the methane fraction of the gas is
     a good indicator because methane is the largest fraction and the methane migrates more
     readily and would be expected to be a higher fraction in the water well sample than the
     source. Mr. Pelphrey indicated that some oxygen and nitrogen were likely introduced
     during sampling of the Butler Well, which would affect the percentages and the BTU
     value; however, this would not affect the isotopic signature of the methane. Mr. Pelphrey
     also said that the Haley well might be a good subject for isotope testing.

12.  During the course of conducting official business on behalf of EPA, I occasionally visit
     sites of potential or actual contamination and meet with affected persons. It is my usual
     practice to maintain a "Field Activity Log" for these visits.

13.  Attached hereto as Exhibit E is a true and correct copy of a Field Activity Log prepared
     on August 26, 2010, documenting a site visit to Mr. Lipsky's property, during which time
     I spoke with Mr. Lipsky.

14.  Based upon my personal recollection and a review of the Field Activity Log, see Ex. E, I
     visited the Lipsky property on August 26, 2010. During this visit, Mr. Lipsky showed me
     his water well and opened the valve on the tubing-casing annulus, with obvious vapors
     emanating from the valve. Mr. Lipsky offered to ignite the end of hose attached to the
     valve; however, EPA declined, and Mr. Lipsky showed me a video he recorded on his
     iphone showing flames shooting three to four feet from the end of the hose he previously

offered to ignite.   Mr. Lipsky then invited me inside, where he filled a drinking glass

with water from an upstairs tap.  The water clearly effervesced and did not have a strong

odor.  Mr. Lipsky indicated that he first noticed the bubbling around Christmas of the

prior year 2009.  He also indicated that in July of 2010, he began experience problems

pumping water, which a well service company told him was due to gas locking resulting

from the large volume of gas entering the wellbore.  Mr. Lipsky indicated that he had

contracted for water samples to be analyzed, but the analysis was not yet complete.  Mr.

Lipsky also stated that air testing was performed in his upstairs bathroom and at the

wellhead, and some samples exceeded TCEQ standards.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:      January 12, 2011
                       Dallas, Texas


_____
CHRIS LISTER

<u>Isotope Testing of Natural Gas</u>

<u>Isotech - Alan</u>

11/19/2010  10:45 am
Dennis D. Coleman → Said that the isotope signature being as close as our two
samples indicates that 1) both are thermogenic in origin and
2) that they are likely to be from the same source given
the proximity and geology of the production well &
the water well. We must evaluate the potential for other
sources that would be thermogenic and the geology or structure
that would store or transmit the gas from origin
to aquifer, to be certain.

Tucker Henson - assigned attorney - will visit on 11/22 to bring him up to speed.

Steven Pelphrey - Ethane/Propane →       Very wet gas if ethane  877 362-4190
    Botech Labs Manager   Propane/Butane →  ratios are very close     217 398 3490

Might do isotope on Hayley well, would need 1 liter, would be borderline
+/- 5 D, +/- 3 C  $10 per container w/biocide        for extraction flow tests

Methane migrates more readily and the methane fraction would be expected to be
                Butler:
high. Likely that oxygen and some nitrogen were introduced during sampling
which effects the BTU and the BTU value but not the isotopic signature.

- Mike Middlebrook V.P. Operations would be the one to meet with, per Mary Patton.
Mary Patton left message asking for our test results and then they will set up
a meeting w/us. Let Gerry & Willie know.

000639

100

Re: Results of Water and Gas Testing performed by EPA 📄

Doug Beak  to: Chris Lister                                                     11/28/2010 10:31 PM

| History: | This message has been replied to. |

Hi Chris,

I hope you had a good holiday. I looked over the data that you sent to me and have a few comments I thought I would pass along to you.

The isotope data for the Lipsky well and the production well look to be identical and are thermogenic in origin. The gas composition of the production well and the Lipsky are similar and the compositional changes are what one might expect for a gas that has migrated from the production well to the Lipsky well. With that said, this is not conclusive evidence because of the limited data set, however it also does not rule out gas migration from the production well to the Lipsky well. What will be very important to document is the timeline of when the well went into production and the appearance of gas in the Lipsky well. I could not compare the analysis from the Texas Railroad Commission with your analysis. The problem here is that the data from any of the three analytical labs is presented as normalized data. This means that the data is normalized at least to what was analyzed for and not all the labs analyzed the same components or possibly used the same method. I would suggest in the future, that the data is provided in terms of non normalized data in mass or concentration units. This way we can directly compare data and normalize all data to the same set of criteria. The only way now to compare the data would be to make assumptions to fill in data gaps and I don't believe we have enough experience at this site or data to do this at this time.

The organic analysis shows that BTEX and other solvents are also present in the Lipsky well. Although this could be further evidence of contamination from the production well, it will be important to ensure that other potential sources of these chemicals can be eliminated and the production well sampled for these constituents if possible.

Inorganic analysis needs to be more complete. I'm partial to inorganic analysis from my training and I really can not put together a picture of water quality with the data we have. The pH of the water is fairly alkaline and could be representative of HF fluids, but we also know that there is sulfide in the water because of the water treatment. With a pH this high I would expect there to be considerable alkalinity, which is the case. Sulfide could be a source of alkalinity, but bicarbonate and hydroxide could also play a role. Hydroxide alkalinity could be natural or it has been implicated as a potential indicator of HF fluids because of the use of hydroxides in the HF process. With the data we have right now we can not pin down the source of alkalinity. Are there any public drinking water wells in the area or water quality data for the aquifer that the Lipsky well is in? If so could you please let me know where I could obtain this data. I want to compare what we have with this "background" composition to get more of an idea of what impacts could be.

Suggestions based on the information I have at this time.

1. If possible ascertain what was used in the HF fluids and as much information as we can on the drilling and completion of the production well and domestic wells in the area.

2. Continue to monitor the production well and Lipsky well for gas composition and isotopic analysis. Be sure to request non normalized data and if possible from the same lab using the same methods.

3. We need more wells in the area. Sample other wells in the area for gases, inorganic and organic contaminants identified already as well as the Lipsky and production well.

4. Monitor suggested wells for major cations and anions, and bicarbonate/carbonate, TDS, sulfide and pH. Bromide is in the produced water so this could be important to measure in other wells as well. With

Range Resources Corp.
Docket: SDWA-06-2011-1208          000724

Administrative Record #41

the data presented, trace metals don't seem to be important at this point, but we should at least get back ground data for additional wells and then revisit the importance later.

I've not had the chance yet to follow up with the USGS on a geologic cross section of this area, but hope to do so soon.  If you have any questions please feel free to contact me.  I hope this was helpful.

Doug

Dr. Douglas G. Beak

Geochemistry/ Environmental Chemistry
USEPA-ORD-NRMRL-GWERD-SRB
919 Kerr Research Dr.
Ada, OK 74820

email:  beak.doug@epa.gov
Phone:  580-436-8813
Fax:     580-436-8703
Blackberry:  580-235-7158

Chris Lister---11/19/2010 09:45:30 AM---Doug, Here are copies of the results of gas and water testing th...

| From: | Chris Lister/R6/USEPA/US |
|---|---|
| To: | Doug Beak/ADA/USEPA/US@EPA |
| Cc: | Michael Overbay/R6/USEPA/US@EPA |
| Date: | 11/19/2010 09:45 AM |
| Subject: | Results of Water and Gas Testing performed by EPA |

Doug,

Here are copies of the results of gas and water testing that we had done on the Lipsky, Hayley, and Range Production Butler 1-H wells.

[attachment "Isotech_gas_isotope_results.pdf" deleted by Doug Beak/ADA/USEPA/US] [attachment "Water Report TestAmerica.pdf" deleted by Doug Beak/ADA/USEPA/US]

This information and that contained in the previous email should be considered Enforcement Confidential at this time and not released outside of EPA.

I have found the well completion reports for the Lipsky and Hayley water wells, as well as a number of other domestic wells in the vicinity of the Lipsky well.  If you'd like copies of these reports please let me know.

Thanks,

Chris Lister
Environmental Engineer
U.S. EPA Region VI
Water Resources Section (6EN-WR)
Water Enforcement Branch
1445 Ross Ave., Suite 1200
Dallas, TX 75202-2733
tel. 214 665-6672
fax 214 665-2168

*****************************************************

000725

102

Confidentiality Warning:

This email may contain material that is confidential, privileged and/or attorney work product and is for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

000726

000727



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS, TX 75202-2733

March 9, 2011

CERTIFIED MAIL – RETURN RECEIPT REQUESTED: 7010 1060 0002 1872 0030

David P. Poole
Range Resources Corporation
100 Throckmorton Street, Suite 1200
Fort Worth, TX 76102

Re:  Information Request relating to SDWA 1431 Emergency Order issued to
     Range Resources Corporation on December 7, 2010

Dear Mr. Poole:

        The Environmental Protection Agency (EPA) is hereby requesting you to respond
to the enclosed Information Request (Request) by providing the information requested herein.
In order for EPA to undertake its responsibilities pursuant to the Safe Drinking Water Act,
EPA must have accurate and reliable information. Therefore, you must respond to this
Request fully and truthfully. The response should be signed by the individual to whom
it is addressed or a duly authorized official.

        You are hereby requested to respond to this Request within ten (10) business days
from the date of this letter. Please submit your response in hard copy and in electronic form
to Mr. Tucker Henson (6RC-EW) at the above address and at henson.tucker@epa.gov.

        If you have any questions, please contact Mr. Tucker Henson at (214) 665-8148.
Thank you for your attention to this matter.

                                        Sincerely,

                                        John Blevins
                                        Director
                                        Compliance Assurance and
                                        Enforcement Division

Enclosure

cc:     John Riley
        Vinson & Elkins LLP
        2801 Via Fortuna, Suite 100
        Austin, TX 78746

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on 100% Recycled Paper (40% Postconsumer)

**105**

Range Resources Corporation
Information Request
Page 1 of 3

INFORMATION REQUEST
RANGE RESOURCES

<u>INSTRUCTIONS</u>

1. Provide a separate narrative response to each request.

2. Precede the response to each request with the number of the request.

3. For each document produced in response to this request, indicate the number of the request to which the document relates.

4. The requested information must be provided even when contending that it includes confidential business information or trade secrets. You may assert a confidentiality claim with respect to all or part of the information provided. Unless you make a claim at the time that you submit responses to the requests set forth below, the information you provide may be made available to the public by EPA without further notice to you. If you wish to assert a business confidentiality claim in response to a request, you must clearly mark the response as "confidential business information," "proprietary information" or "trade secret information."

5. If you claim information submitted in response to a request is confidential, you must provide a redacted version of your response with all confidential information deleted.

Range Resources Corporation
Information Request
Page 2 of 3

## REQUEST

1) Please provide the date of installation of air monitors at the Steven Lipsky and Rick Hayley residences, type of monitors installed, locations of monitors, monitoring and reporting frequency and methods, and any monitoring results that have been collected to date.

2) Please provide a copy of any quality assurance/field sampling plan(s) for area drinking water wells, and a description of and results for any sampling activities conducted by Range or its contractors since December 7, 2010. Include locations of sample collection, dates of sampling, type of sampling, description of protocol, name of contractors or Range employees collecting samples, analytical tests that were run, name of the laboratory conducting the analyses, location and address of any analytical lab used, and the results of any analyses.

3) Concerning GeoMark gas composition and isotope analysis data submitted by Range on 12/15/2010. A gas sample was obtained by Texas Fabco representative, Sean Baker, on 10/26/2010 from the Lipsky domestic water well. Please provide the results of that sample analysis as well as a copy of any quality assurance/field sampling plan(s) and description of activities conducted by Range or its contractors in relation to this sample.

4) Concerning the information originally requested under item 7 of our December 9, 2010 Information Request. Please provide any information relative to the structural geology of the area, any geological cross-sections, any information concerning faults or other geologic structures in the area.

    A) The information contained in your previous response indicates potential faults in the area. EPA requests that the 3D dataset be provided in SEG-Y format and also requests the processing flow report.

    B) EPA requests digitally any VSP or checkshot information for both the Butler 1-H and the Teal 1-H, and Range's interpretation of the 3D at or near the producing horizon.

    C) EPA requests a 1":=2000' copy of the basemap showing the wells and 3D lines.

    D) EPA requests a 1":=2000' copy of the top Ellenburger depth contour map with all appropriate labeling and a description of the depth conversion used and the same information for the top of the Barnett Shale and any other formations that may have been mapped.

5) Reports of seismic or other studies completed in the vicinity of the Butler 1-H and the Teal 1-H wells, before, during, or after completion of drilling operations.

Range Resources Corporation
Information Request
Page 3 of 3

6)    Please provide information on any and all water sources used for drilling and completion operations, including hydraulic fracturing operations, for any Range well in southern Parker and northern Hood counties. Include latitude and longitude of the location of any ground water wells used or drilled for these purposes; total volumes of water withdrawn from each source and dates the wells were (are) in operation; and well information of any drilled water wells including, depth, completion information, screening intervals, and, if plugged, a description of the process used.