UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | No. 3:11-CV-00116-F |
| | : | |
| v. | : | |
| | : | |
| RANGE PRODUCTION COMPANY, | : | |
| a Delaware Corporation; and | : | |
| RANGE RESOURCES CORPORATION, | : | |
| a Delaware Corporation, | : | |
| | : | |
| Defendants. | : | |

---

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ......................................................................................................................... 3

EPA's Concerns About Explosivity and Health Risks Posed by Methane and Benzene
    Contamination in the Trinity Aquifer ........................................................................... 3

Procedural History: Proceedings of the Railroad Commission of Texas and Federal Litigation ... 4

Statutory Framework of the Safe Drinking Water Act ....................................................... 5

ARGUMENT ............................................................................................................................... 9

**I.   EPA'S SAFE DRINKING WATER ACT EMERGENCY ORDER IS A
REVIEWABLE "FINAL AGENCY ACTION" BECAUSE IT IMPOSES NEW
OBLIGATIONS ON RANGE** ........................................................................... 10

**II.  RANGE HAS FAILED TO SHOW THAT THE ACT'S EMERGENCY POWERS
PROVISIONS ARE UNCONSTITUTIONAL BECAUSE IT HAS NOT BEEN
DEPRIVED OF A PROTECTED PROPERTY INTEREST WITHOUT THE
OPPORTUNITY FOR A HEARING** ............................................................... 12

**III. EVEN IF RANGE HAD SUFFERED A DEPRIVATION WITHOUT THE
OPPORTUNITY FOR A HEARING, DUE PROCESS DOES NOT REQUIRE A PRE-
DEPRIVATION HEARING IN EMERGENCY CIRCUMSTANCES** ......................... 14

    A.   A Pre-Deprivation Hearing Is Not Required in Emergency Circumstances ................. 14

    B.   The Balancing of the Parties' Interests Under *Mathews v. Eldridge* Tips Clearly in the
Government's Favor ........................................................................................................ 16

**IV. THE STATUTE CREATES IMPORTANT RIGHTS TO SEEK JUDICIAL REVIEW
THAT SATISFY DUE PROCESS** .................................................................... 17

    A.   Review on Administrative Record by the Court of Appeals Satisfies the Requirements
of Procedural Due Process............................................................................................. 17

    B.   Range Is Entitled to a Hearing Before this Court on the Amount of Civil Penalties to be
Imposed for the Degree of its Non-Compliance with the Emergency Order ................ 18

**V.   RANGE'S RELIANCE ON OTHER AUTHORITIES IS MISPLACED** ..................... 19

    A.   *TVA v. Whitman* Does Not Apply to Section 1431 of the Act or the Facts of This Case
and Is Easily Distinguished ........................................................................................... 19

    B.   Range's Reliance on CERCLA Cases and *Sackett v. EPA* Is Similarly Misplaced ....... 21

**VI.  THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER THE SAFE DRINKING WATER ACT AND SATISFIES BOTH *IQBAL* AND *TWOMBLY* ......... 22**

A.  The Complaint Alleges that Range Is A Person Who Failed to Comply with an Order in this Action to Enforce ......................................................................................................... 23

B.  The Complaint Readily States a Plausible Claim......................................................... 24

**CONCLUSION** ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases:**

Alaska v. U.S. E.P.A., 244 F.3d 748 (9th Cir. 2001) aff'd, 540 U.S. 461 (2004) ........................ 11

Allen v. Scott, No. 3:10-CV-02005, 2011 WL 219568 (N.D. Tex. Jan. 19, 2011) ..................... 22

American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40 (1999) .................................................... 13

Amoco Oil Co. v. U.S. E.P.A., 959 F. Supp. 1318 (D. Colo. 1997) ............................................. 21

Ashcroft v. Iqbal, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ......................................................... 24

Barclays Bank PLC, 594 F.3d 383 (5th Cir. 2010) ....................................................................... 22

Bennett v. Spear, 520 U.S. 154 (1997) ................................................................................... 10, 11

Cox v. City of Dallas, 256 F.3d 281 (5th Cir. 2001) .................................................................... 23

Employers Ins. of Wausau v. Browner, 52 F.3d 656 (7th Cir. 1995) ........................................... 21

Hodel v. Virginia Surface Mining and Reclamation Assoc., 452 U.S. 264 (1981) .......... 14, 15, 16

Industrial Safety Equip. Ass'n v. E.P.A., 837 F.2d 1115 (D.C. Cir. 1988) .................................. 13

Kelley v. E.P.A., 15 F.3d 1100 (D.C. Cir. 1994) .......................................................................... 21

National Pork Producers Council l v. U.S. E.P.A., 635 F.3d 738 (5th Cir. 2011) ................. 10, 11

Mathews v. Eldridge, 424 U.S. 319 (1976) ........................................................................... 13, 16

Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir. 1996) ........................ 21

Ross Incineration Serv., Inc. v. Browner, 118 F. Supp. 2d 837 (N.D. Ohio 2000) ..................... 21

Sackett v. U.S. E.P.A, 622 F.3d 1139 (9th Cir. 2010) ................................................................. 22

So. Pines Assocs. v. United States, 912 F.2d 713 (4th Cir. 1990) ............................................... 21

Trinity Am. Corp. v. U.S. E.P.A., 150 F.3d 389 (4th Cir. 1998) .......................................... passim

TVA v. Whitman, 336 F.3d 1236 (11th Cir. 2003) .............................................................. passim

United States v. Stringfellow, No. CV-83-2501, 1984 WL 3206
  (C.D. Cal. Apr. 5, 1984) ............................................................................................................ 24

<u>Unification Church v. Attorney General</u>, 581 F.2d 870 (D.C. Cir. 1978) ................................... 18

<u>United States v. Hooker Chem. & Plastics Corp.</u>, 749 F.2d 968 (2d Cir. 1984) ................. 7, 8, 15

<u>W.R. Grace & Co. v. EPA</u>, 261 F.3d 330 (3d Cir. 2001) ........................................................ 7, 24

<u>Woods v. Federal Home Loan Bank Bd.</u>, 826 F.2d 1400 (5th Cir. 1987) ...................... 17, 18, 21

<u>WWBITV, Inc. v. Village of Rouses Point</u>, 589 F.3d 46 (2d Cir. 2009) ............................. 15, 16

<u>Yearous v. Niobrara Cty Mem. Hosp.</u>, 128 F.3d 1351 (10th Cir. 1997) ................................... 21

## **Statutes:**

Clean Air Act,
   Section 303, 42 U.S.C. § 7603 .......................................................................................... 6, 12

Clean Water Act,
   Section 504, 33 U.S.C. § 1364 ................................................................................................. 6

Comprehensive Environmental Response, Compensation and Liability Act of 1980
   Section 106(a), 42 U.S.C. § 9606(a)........................................................................................ 21

   Section 113(h), 42 U.S.C. § 9613(h) ...................................................................................... 21

Resource Conservation and Recovery Act,
   42 U.S.C. § 6973 ........................................................................................................................ 6

Safe Drinking Water Act,
   Sections 1401-1465,
   42 U.S.C. §§ 300f – 300j-26……………………………………………………...passim

## **Regulations:**

Fed. R. Civ. P. 12(b)(6 ...................................................................................... …. .22

40 C.F.R. § 147.220 ..................................................................................................... 3

## **Congressional Materials:**

H.R. Rep. No. 93-1185 (1974), <u>reprinted in</u> 1974 U.S.C.C.A.N. 6454...........................................1

S. Rep. No. 96-172 (1980), <u>reprinted in</u> 1980 U.S.C.C.A.N. 5019.............................................24

## PRELIMINARY STATEMENT

This enforcement action arises out of Defendants Range Production Company and Range Resources Corporation's (collectively, "Range") violation of an Emergency Administrative Order, dated December 7, 2010 ("Emergency Order" or "Order"), through which the United States Environmental Protection Agency ("EPA") properly exercised its authority under Section 1431 of the Safe Drinking Water Act, 42 U.S.C. §§ 300f – 300j-26 (the "Act"). A true and correct copy of the Order is attached as Exhibit A to the Complaint. In its Motion to Dismiss ("Motion"), Range seeks to curtail EPA's emergency powers under the Act in a manner that would seriously harm EPA's ability to use this special authority to address risks to underground sources of drinking water and public water systems, even in instances of a "potential terrorist attack." Section 1431, 42 U.S.C. § 300i.[1] As an alternative to dismissal, Range asserts that the Complaint fails to state a claim. Neither argument has merit.

In enacting Section 1431, Congress intended "to confer completely adequate authority to deal promptly and effectively with emergency situations which jeopardize the health of persons," H.R. Rep. No. 93-1185 (1974), reprinted in 1974 U.S.C.C.A.N. 6454, 6487, and the Court should not countenance the abridgment of those powers sought by Range. As an initial matter, the Emergency Order constitutes a final agency action because it represents the consummation of EPA's decision-making process and determines Range's rights and obligations or is one from which legal consequences flow. Accordingly, on receipt of the Emergency Order, Range

---

[1] Section 1431 is entitled the "Emergency powers" provision of the Act, 42 U.S.C. § 300i. The term "emergency" in this context should be afforded the legal interpretation intended by Congress, that is, not whether an "emergency" exists in lay terms, but whether the contamination "may present an imminent and substantial endangerment." See, e.g., Trinity Am. Corp. v. EPA, 150 F.3d 389, 399 (4th Cir. 1998) (noting that "only the 'risk of harm' must be 'imminent'" to justify a Section 1431 order); United States v. Valentine, 856 F. Supp. 621, 626 (D. Wyo. 1994) ("An endangerment need be neither immediate nor tantamount to an emergency to be imminent and warrant relief.")

possessed a statutory right to challenge the validity of the Order in the Court of Appeals for the Fifth Circuit and to seek immediate relief from it by seeking a judicial stay.  Range could have exercised both of those rights immediately, without incurring compliance costs.  Contrary to its primary assertion, Range was <u>not</u> deprived of any constitutionally-protected property or liberty interest without the opportunity for a hearing – which is all that the Fifth Amendment's Due Process Clause requires.  That Range instead chose to wait to seek the Fifth Circuit's review (and never sought a judicial stay) while incurring costs voluntarily or in compliance with State authority is of no moment constitutionally, because unless Range was deprived of a protected interest without the opportunity for a hearing, there can be no due process violation.  The Motion should be denied because Section 1431 is constitutional and Range failed to establish (or even allege) that it has suffered the deprivation of a significant property interest without the opportunity for a hearing.  Moreover, the Motion should also be denied because even if Range had established such a deprivation, no pre-deprivation hearing is required under the emergency exception to Due Process jurisprudence.[2]

In addition, Range's argument that the Complaint fails to state a claim for relief should be rejected.  The elements necessary to the claim that Range violated the Emergency Order are few. Because of the nature of EPA's emergency powers under Section 1431, 42 U.S.C. § 300i, the claim is complete without any assertion of violation of some statutory or regulatory provision or of ongoing harm to a particular individual.  Thus, Range's alternative ground for dismissal should be rejected because the Complaint states a claim for which relief may be granted pursuant to Section 1431, 42 U.S.C. § 300i:  Range violated the Emergency Order.

---

[2]  Alternatively, since the Court of Appeals for the Fifth Circuit has been asked to decide the same constitutional issues in the context of Range's petition for review of the Order, this Court may delay ruling on the instant motion as a matter of judicial economy.

**BACKGROUND**

**EPA's Concerns About Explosivity and Health Risks Posed by Methane and Benzene Contamination in the Trinity Aquifer**

In early August 2010, EPA became aware of high levels of methane and other contaminants in a private drinking water well, located approximately 40 miles west of Fort Worth, in Hood County ("Domestic Well 1"). Order ¶¶ 7-37; Plaintiff's Appendix ("Pl. Appx.") 59-61. While EPA was aware of at least one instance in which a private water well drilled into the Trinity Aquifer produced some gas during or shortly following drilling operations, what was particularly unusual in this case is that although Domestic Well 1 was drilled in 2005, it did not begin to show signs of natural gas contamination until <u>after</u> Range had concluded drilling and hydraulic fracturing activities at the Butler Unit Well 1-H and the Teal Unit Well 1-H ("Butler and Teal Wells") in 2009. Order ¶¶ 13-14; (Pl. Appx. 4-58). When apprised of these circumstances, the Railroad Commission of Texas ("RRC") – the State entity with primary enforcement responsibility over the administration of the Underground Injection Control Program ("UIC Program") under the Act, <u>see</u> 40 C.F.R. § 147.2201 – looked first (and only) at Range's operations. (Pl. Appx. 4-5.)

Later in August 2010, EPA learned of elevated levels of methane, ethane, and propane in another nearby residential water supply well ("Domestic Well 2") and earlier signs of effervescence in the water. Order ¶¶ 36-37. Water samples taken from Domestic Well 1 in or around August 2010 showed elevated levels of benzene, toluene, ethane, and a high level of methane (measured at that time at 7,810 µg/L). Order ¶ 18. Following an EPA sampling effort, undertaken in October 2010, the presence of dissolved methane in Domestic Well 1 had become much higher (20,100 µg/L). Order ¶¶ 18, 28. EPA memorialized its concern that methane and benzene contamination (among other contaminants) "may present an imminent and substantial

endangerment to the health of persons" in the Emergency Order on December 7, 2010. Order ¶ 41. EPA based this determination on its concern that "methane in the levels found by EPA are potentially explosive or flammable, and benzene if ingested or inhaled could cause cancer, anemia, neurological impairment and other adverse health impacts." Order ¶ 41.

In October 2010, EPA also sampled the gas from Domestic Well 1 and the production gas from Range's Butler Well and performed compositional and isotopic fingerprinting analyses. Order ¶ 21. Isotopic fingerprinting is a method for determining the ratio of different isotopes of a particular element in a material such as gas. Order ¶ 22. Based on the results of EPA's investigation, EPA determined that "the presence of gas in Domestic Well 1 is likely to be due to impacts from gas development and production activities in the area." Order ¶ 27.

Starting in August and continuing through December 2010, EPA consulted with representatives of RRC and determined that appropriate State and local authorities had "not taken sufficient action to address the endangerment described herein and do not intend to take such action at this time." Order ¶ 40. EPA also consulted with RRC on the accuracy of the information on which the Emergency Order was based. Order ¶ 40. EPA memorialized in its Conclusions of Law that, among other things, contaminants were present in an underground source of drinking water; that Range had caused or contributed to the endangerment; and that the action being taken was necessary to protect the health of persons. Order ¶¶ 42-49.

## Procedural History: Proceedings of the Railroad Commission of Texas and Federal Litigation

On December 8, 2010, one day after EPA issued its Emergency Order, RRC called a hearing to consider whether Range's operation of the Butler and Teal Wells was causing or contributing to contamination of certain domestic water wells. (Pl. Appx. 62-66.) On December

9, 2010, counsel for Range advised EPA that it disputed the validity of the Order and would not agree to comply with it.  (Pl. Appx. at 67-68.)  On December 15, 2010, representatives of Range met with EPA pursuant to paragraph 71 of the Order.

On January 18, 2011, the United States commenced this civil enforcement action, seeking injunctive relief and civil penalties arising out of Range's non-compliance with three of the six Ordered Provisions.  (Compl. ¶¶ 33-38.)  Two days later, on January 20, 2011 – 44 days after the Order was issued – Range filed its petition for review of the Order with the Court of Appeals for the Fifth Circuit.  Thereafter, on January 19-20, 2011, RRC held hearings concerning whether Range's operations caused or contributed to the contamination of Domestic Wells 1 and 2, and in a final order, dated March 22, 2011, RRC ordered, among other things, that Range's operations had not and are not causing or contributing to contamination of any domestic water wells.

Range submitted its opening brief to the Court of Appeals, asserting (as it does here) that Section 1431 would be unconstitutional if it were construed to be a final agency action.  Alternatively, Range seeks a determination from the Court of Appeals that EPA's action in issuing the Order was arbitrary and capricious.  Range has filed a motion seeking an order from the Court of Appeals supplementing the Administrative Record.  The United States opposed that motion, in part, and the Court, by order dated May 9, 2011, granted Range's motion, in part.

**Statutory Framework of the Safe Drinking Water Act**

Congress enacted the Act "to assure that water supply systems serving the public meet minimum standards for protection of public health."  Trinity Am. Corp. v. EPA, 150 F.3d 389, 394 (4th Cir. 1998) (internal quotation and citations omitted).  Among other things, the Act requires that EPA establish regulations specifying maximum levels of contaminants in drinking water.  Id.; see 42 U.S.C. § 300g-1.  The Act also requires that EPA establish minimum

requirements regulating the practice of underground injection (the UIC Program), including injection wells related to oil and gas production.  See 42 U.S.C. § 300h.

EPA has a number of enforcement options under the Act.  First, as EPA did in this case, EPA may exercise special emergency authority that, in contrast to some other "imminent and substantial endangerment" emergency powers, authorizes issuance of an order upon receipt of information that a contaminant "may present an imminent and substantial endangerment."  Compare Clean Air Act Section 303, 42 U.S.C. § 7603 ("is presenting an imminent and substantial endangerment") and Clean Water Act Section 504, 33 U.S.C. § 1364 (same) with Section 1431, 42 U.S.C. § 300i ("may present an imminent and substantial endangerment").  The Resource Conservation and Recovery Act ("RCRA") contains a similar provision.  42 U.S.C. § 6973.  In addition, Congress did not include the requirement that EPA demonstrate that a respondent caused or contributed to the endangerment as a prerequisite to issuing an Emergency Order, except as a narrow limitation in those situations in which an order requires the provision of alternative water supplies.  Trinity Am., 150 F.3d at 396.

Second, with regard to the enforcement of drinking water regulations relating to public water systems, the United States retains enforcement authority to issue an administrative order or to commence a judicial action, even in situations in which a State has sought and obtained primary enforcement authority.  See 42 U.S.C. §§ 300g-3(a)(1)(B), 300g-3(b), 300g-3(g).  In connection with such violations, EPA may seek civil penalties and injunctive relief.

Third, in connection with the protection of underground sources of drinking water ("USDW") under EPA's UIC Program, EPA has similar authority to issue orders or commence a civil action, and may seek the imposition of civil and criminal penalties for violations of

requirements (including administrative compliance orders) relating to the protection of USDWs from the underground injection of fluids.  See 42 U.S.C. §§ 300h-2(a) through (c).[3]

Consistent with its legislative history, courts have observed that the Act authorizes EPA to "give paramount importance to the sole objective of the public health," Trinity Am.,150 F.3d at 394-95 (internal quotation and citation omitted); see also W.R. Grace & Co. v. EPA, 261 F.3d 330, 339 (3d Cir. 2001) (statute confers "broad authority" by authorizing EPA action "when there is but a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm").  Criminal penalties may be imposed in instances relating to tampering, see 42 U.S.C. § 300i-1, or for violations of administrative orders issued under the UIC Program, see 42 U.S.C. § 300h-2(b)(2); however, Section 1431 does not authorize the imposition of criminal penalties associated with violations of a Section 1431 order.

When interpreting Section 1431 of the Act, courts have also observed that when the government sues to enforce an emergency order, such a suit is not one "to enforce established regulatory standards.  On the contrary, emergency actions are 'designed to deal with situations in which the regulatory schemes break down or have been circumvented.'" United States v. Hooker Chem. & Plastics Corp., 749 F.2d 968, 988 (2d Cir. 1984) (citing United States v. Waste Indus. Inc., 734 F.2d 159, 164 (4th Cir. 1984)).  As reflected in the statute's legislative history, "[t]he authority to take emergency action is intended to be applicable not only to potential hazards presented by contaminants which are subject to primary drinking water standards, but also to those presented by unregulated contaminants."  H.R. Rep. No. 93-1185 at 33.

---

[3] The Energy Policy Act of 2005 excluded "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal activities" from the definition of "underground injection," thereby exempting those practices from the UIC Program.  Pub. L. 109-58, Title III, § 322, 119 Stat. 694 (Aug. 8, 2005); 42 U.S.C. § 300h-1(d)(1)(B)(ii).

The recipient of a Section 1431(a)(1) order may seek immediate federal judicial review by filing a petition for review in the United States Court of Appeals and must generally do so within forty-five (45) days of the final agency action.  42 U.S.C. § 300j-7(a)(2); <u>Trinity Am.</u>, 150 F.3d at 394.  Congress bifurcated jurisdiction over such orders by placing review of the validity of orders before the Courts of Appeals while contemplating that the enforcement of orders and assessment of penalties for noncompliance would be adjudicated by the district courts.[4]  In other words, while the Court of Appeals reviews the validity of the order on the administrative record under the arbitrary and capricious standard of review, the district courts provide the opportunity to be heard on the degree to which the respondent may have complied with the order and whether (based on evidence of compliance and other evidence) any civil penalties should be assessed.  Neither criminal penalties nor treble damages for non-compliance are available to EPA, which may only secure civil penalties at the discretion of the district court when EPA brings an action, such as this one, to enforce the order.

As noted in the House Report, Congress intended "to confer completely adequate authority to deal promptly and effectively with emergency situations which jeopardize the health of persons." H.R. Rep. No. 93-1185, at 33.  This authority allows EPA to issue orders to "any other person whose action or inaction requires prompt regulation to protect the public health," <u>id.</u>, and is intended to reach beyond those who violated the particular statute or who failed to comply with a regulation.  <u>See</u> <u>Hooker Chem.</u>, 749 F.2d at 988.  The common sense behind this enactment is as clear as it is unassailable.  When it comes to the protection of a public drinking water supply – <u>where in many cases the effect of contamination may be immediately devastating</u>

---

[4]  Section 1448 of the Act states, in pertinent part, "[a]ction of the Administrator with respect to which review could have been obtained [in the courts of appeals] under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or in any civil action to enjoin enforcement." 42 U.S.C. § 300j-7(a).

to human health – Congress granted EPA the authority to order persons to act or not act in order to prevent harm and to secure relief in district court for their failure to do so.  This grant of emergency powers to EPA does not infringe upon the due process rights of order recipients because the statute allows immediate review of final orders in the Courts of Appeal and because respondents may only be subject to civil penalties for noncompliance with such orders assessed at the discretion of the district court.

## ARGUMENT

Range invites this Court to relegate EPA's Emergency Order to the same fate as the Eleventh Circuit imposed on a Clean Air Act administrative compliance order in TVA v. Whitman, 336 F.3d 1236 (11th Cir. 2003).  The result of its argument would leave Range "free to ignore," TVA, 336 F.3d at 1240, the Emergency Order as a non-final agency action.  EPA would instead be required to prove the statutory requisites and secure relief in each instance, while a drinking water supply could continue to show elevated levels of contamination and an entire drinking water aquifer could be endangered.  This is not the result Congress intended.

To advance its position, Range accuses EPA of issuing a "far-reaching and oppressive" order that "purports" to do many things it does not (Def. Br. 2, 19).  Range overstates the substance of the Emergency Order, creating an illusory argument that EPA's emergency order authority is unconstitutional.[5]  The import of this conclusion, Range contends, is that such orders are non-final agency actions that are unreviewable either before this Court or in the Court of Appeals.  To the contrary, the Order is a final agency action within applicable Supreme Court precedent.  Moreover, because Section 1431 is constitutional, there is no need for this Court to

---

[5] Defendants' argument – that Paragraph 50(F) of the Order would provide EPA with ultimate relief in violation of its due process rights – is patently wrong.  (Def. Br. 19 n.15.)  The Emergency Order contains no requirement that Defendants remediate the Aquifer; it merely requires Defendants to "develop and submit a plan" to do so.  Order ¶ 50(F).

save the statute from an unconstitutional interpretation by deeming the Order non-final.  Finally,

Range's alternative arguments that the United States has failed to state a claim are without merit.

## I.  EPA'S SAFE DRINKING WATER ACT EMERGENCY ORDER IS A REVIEWABLE "FINAL AGENCY ACTION" BECAUSE IT IMPOSES NEW OBLIGATIONS ON RANGE

As an initial matter, the Emergency Order is a final agency action that Congress

contemplated would be immediately reviewable in the Court of Appeals.  See Bennett v. Spear,

520 U.S. 154 (1997); 42 U.S.C. § 300j-7.  In Bennett, the Supreme Court stated that

> As a general matter, two conditions must be satisfied for agency
> action to be "final": First, the action must mark the
> "consummation" of the agency's decisionmaking process . . . – it
> must not be of a merely tentative or interlocutory nature.  And
> second, the action must be one by which "rights or obligations
> have been determined," or from which "legal consequences will
> flow. . . ."

Bennett, 520 U.S. at 177-78 (internal citations omitted); see also National Pork Prod. Council v.

EPA, 635 F.3d 738, 756 (5th Cir. 2011) (to meet second prong of Bennett, action "must affect . .

. rights or obligations or create new legal consequences") (citing Bennett, 520 U.S. at 178).  The

Order issued by EPA in this case clearly satisfies both prongs of the Bennett test.  First, as EPA

has done in other instances in which it exercised this authority, EPA has characterized the Order

as a "final agency action."  Order ¶ 70; see Trinity Am., 150 F.3d at 394.[6]  In addition, EPA has

not only prepared and certified the Administrative Record, but it has also referred the

enforcement of the Order to the Department of Justice, which commenced this action.[7]

Accordingly, the Order bears the hallmarks of finality and is neither tentative nor interlocutory.

---

[6]  Although an agency's characterization may not be decisive of the legal import of an order, "an agency's description is evidence of its character."  Pennzoil Co. v. FERC, 645 F.2d 394, 399 (5th Cir. 1981).

[7]  Range contends EPA's request for information on March 9, 2011 suggests that EPA is "still clearly in an investigative mode" (Def. Br. 15), but a request for information does not mean that EPA had not consummated an earlier decision-making process.

Second, the particular Emergency Order at issue – though this may not be the case for all Section 1431 orders[8]– creates new obligations from which legal consequences for non-compliance will flow.  See Bennett, 520 U.S. at 178; Nat'l Pork Prod., 635 F.3d at 756.  Unlike an administrative compliance order EPA could issue using Section 1423 to a person for violating a requirement of the UIC Program, here EPA has imposed new obligations (e.g., providing alternative water supplies, installing explosivity meters, and performing sampling and analyses) with legal consequences on a party whose operations are otherwise exempted from coverage (Range's operations are exempt from the UIC Program by virtue of the Energy Policy Act of 2005, unless it uses diesel fuels in its hydrofracking operations.  See footnote 3, supra, at 7).  This Emergency Order is a final agency action.  See Alaska v. EPA, 244 F.3d 748, 750-51 (9th Cir.), aff'd., 540 U.S. 461 (2004); see also Alaska Dep't of Envt'l Cons. v. EPA, 540 U.S. 461, 481 n.10 (2004) (noting "finality requirement was met because the stop-construction order imposed new legal obligations") (internal quotation marks and citations omitted).

As noted above, Range premises much of its non-finality argument on the Eleventh Circuit's decision in TVA, 336 F.3d 1236, a decision the United States believes was incorrectly decided in a number of important respects.  This Court should not follow TVA both because it is not binding precedent in this Circuit and because the Clean Air Act statutory scheme underlying the administrative order at issue there is, in any event, materially different than the Safe Drinking Water Act statutory scheme here.  Moreover, though EPA ultimately disagrees with the Eleventh Circuit's holding in TVA, that case is distinguishable from this one because it concerned an administrative compliance order, not an emergency order.  Indeed, that court noted in dicta that

---

[8] Although the Emergency Administrative Order is a final agency action, this does not mean that all administrative compliance orders or emergency orders are final agency actions.  For example, issuance of an administrative compliance order issued under Section 1423 of the Act, which requires that an administrative hearing be held, see Section 1423(c)(3)(A); 42 U.S.C. § 300h-2(c)(3)(A), is a non-final agency action.

an order issued pursuant to EPA's emergency powers authority under the Clean Air Act, Section

303, 42 U.S.C. § 7603, would satisfy the second prong of the Bennett analysis.  See TVA, 336

F.3d at 1249 (noting that it was clear from the text of Section 303 that "Congress enabled the

EPA to issue orders with the status of law, but only in an extremely narrow context").[9]  In

contrast to an order that EPA may issue pursuant to Section 1423 requiring compliance with the

UIC Program, it is clear that this Emergency Order should be deemed a final agency action.

## II.     RANGE HAS FAILED TO SHOW THAT THE ACT'S EMERGENCY POWERS PROVISIONS ARE UNCONSTITUTIONAL BECAUSE IT HAS NOT BEEN DEPRIVED OF A PROTECTED PROPERTY INTEREST WITHOUT THE OPPORTUNITY FOR A HEARING

At this moment, Range is litigating its rights in two federal courts.  Congress

contemplated such bifurcated jurisdiction, and Range's argument that it has been deprived of due

process in this case is without merit.[10]  Range maintains that Section 1431 of the Act offends the

Due Process Clause as applied to Range (Def. Br. 3).[11]  If Range succeeds, it must then establish

---

[9]  In this regard, the Emergency Order is unlike the administrative compliance order at issue in Solar Turbines Inc. v. Seif, 879 F.2d 1073, 1081 (3d Cir. 1989) (also noting that Section 167 of the Clean Air Act does not identify adverse consequences for violation of the order), and that case is, therefore, distinguishable.

[10]  When deciding motions to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), courts do not assume the truthfulness of the allegations in the complaint.  Montez v. Dep't of Navy, 392 F.3d 147, 149 (5th Cir. 2004); Atlantic Cas. Ins. Co. v. Ramirez, 651 F. Supp. 2d 669, 672-73 (N.D. Tex. 2009).  Rather, courts may consider "(1) the complaint standing alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts" to decide whether subject-matter jurisdiction exists.  Id., at 672.  Although a court deciding challenges to subject-matter jurisdiction is free to weigh evidence and resolve disputed factual issues, Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005), when the disputed facts simultaneously control whether the court has subject-matter jurisdiction and the merits of the case, the court must assume jurisdiction and deny the Fed. R. Civ. P. 12(b)(1) motion.  Montez, 392 F.3d at 150.

[11]  While it is not clear whether Range is arguing that the statute is facially unconstitutional, if that is Range's argument, it "must establish that no set of circumstances exists under which the [challenged provisions of the] Act would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987).  For reasons discussed in the text, Range cannot even show that Section 1431 is

that the only way to save the statute from suffering this alleged defect is to deem that the

Emergency Order is not a "final agency action" (Def. Br. 3).  Range cannot sustain the first

condition, so its motion should be denied.[12]

The Constitution prohibits the Government from depriving parties of a protected interest

without due process of law.  U.S. Const. Amend. V; Mathews v. Eldridge, 424 U.S. 319, 333

(1976).  As the Supreme Court has stated, "[t]he first inquiry in every due process challenge is

whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"

American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999); see Industrial Safety Equip.

Ass'n v. EPA, 837 F.2d 1115, 1122 (D.C. Cir. 1988).  Only after finding the deprivation of a

protected interest does the court need to reach the second inquiry, concerning whether the

procedures followed satisfy due process.  American Mfrs. Mut., 526 U.S. at 59; Industrial Safety

Equip., 837 F.2d at 122.

Noticeably absent from Range's memorandum is any allegation that it has suffered the

deprivation of a significant property interest.  Based on this failure alone, the Court may find that

Range's due process arguments are baseless.  As noted above, the Emergency Order was a final

agency action.  From the moment Range received the Emergency Order, it had the statutory right

to immediately challenge the validity of the Order in the Court of Appeals.  Range could also

have sought relief from the Order by seeking a judicial stay of the Order in the Court of Appeals

(or it could have simply waited for the United States to commence this action and sought a stay

in this court).  Because Range could have exercised these rights prior to incurring any costs or

---

unconstitutional as applied to Range in this case; thus, by definition, Range cannot show that the
statute is unconstitutional in all circumstances.

[12] Because Section 1431 is constitutional, the Court need not apply the canon of statutory
construction that "every reasonable construction must be resorted to, in order to save a statute
from unconstitutionality." Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg & Const. Trades
Council, 485 U.S. 568, 575 (1988); see also Sackett v. EPA, 622 F.3d 1139, 1145 (9th Cir.
2010).  (Def. Br. 3, 10, 20.)

suffering any other deprivation of property or interest, it was not deprived of any

constitutionally-protected interest without the opportunity for a hearing.  Range's due process

challenge to the Order should, therefore, be rejected.

### III.   EVEN IF RANGE HAD SUFFERED A DEPRIVATION WITHOUT THE OPPORTUNITY FOR A HEARING, DUE PROCESS DOES NOT REQUIRE A PRE-DEPRIVATION HEARING IN EMERGENCY CIRCUMSTANCES

A.      A Pre-Deprivation Hearing Is Not Required in Emergency Circumstances

The Supreme Court has long recognized an exception to the requirement of a pre-

deprivation hearing in emergency situations.[13]  Hodel v. Virginia Surface Mining and

Reclamation Assoc., 452 U.S. 264, 299-300 (1981) (collecting cases).  In doing so, Hodel

observed "that due process ordinarily requires an opportunity for 'some kind of hearing' prior to

the deprivation of a significant property interest."  Id., at 299.  As the Second Circuit has recently

stated, "[w]here there is an emergency requiring quick action and where meaningful pre-

deprivation process would be impractical, the government is relieved of its usual obligation to

provide a hearing, as long as there is an adequate procedure in place to assess the propriety of the

deprivation afterwards."  WWBITV, Inc. v. Village of Rouses Point, 589 F.3d 46, 50 (2d Cir.

2009) (citing Parratt v. Taylor, 451 U.S. 527, 539 (1981), overruled on other grounds by Daniels

v. Williams, 474 U.S. 327 (1986)).

---

[13]  Relying on evidence submitted to RRC, Range inappropriately asserts that there was no "emergency" here, described in a manner by Range that invokes the lay definition of emergency rather than the appropriate legal standards governing the "imminent and substantial endangerment" orders.  (Def. Br. 2; see also Def. Br. 7).  Consistent with the United States' view that the validity of the order is an issue to be litigated in the proceedings before the Court of Appeals, Range has moved the Court of Appeals for an order supplementing the Administrative Record, which motion the Court granted, in part.  The validity of the Order, that is, whether the finding that the contamination "may present an imminent and substantial endangerment" is reasonable, should be resolved by the Court of Appeals, on the Administrative Record, pursuant to Section 1448, 41 U.S.C. § 300j-7.

Based on the record before it, EPA determined on December 7, 2010 that the presence of contaminants in the Trinity Aquifer "may present an imminent and substantial endangerment to the health of persons," Order ¶ 41, and on the basis of its statutory authority, 42 U.S.C. § 300i, ordered Range: (i) to notify EPA whether it intended to comply, (ii) to provide potable water to two residences, (iii) to install explosivity meters in two residences, (iv) to conduct a survey and limited sampling of water supply wells in the area, (v) to submit plans for additional soil gas surveys and indoor air concentration analyses of two residences, and (vi) to submit plans to identify gas flow pathways, plans to eliminate gas flow if possible, and plans to remediate impacted areas. Order ¶ 50. Contrary to Range's statements, at no time did EPA ever order Range to actually remediate any portion of the Trinity Aquifer. (Def. Br. 19.) EPA did not order Range to stop its operations anywhere, and the limited relief EPA seeks falls well within the discretion of the agency, whose authority extends "most importantly, to deciding what the appropriate remedy should be." Hooker Chem., 749 F.2d at 988.

Assuming the costs of complying with the limited relief ordered in the Emergency Order were a protected property interest, not only did Range have an opportunity to immediately seek relief, but the property or liberty interests at stake in this action are also much less significant than those implicated in Hodel, which held that an order requiring the immediate cessation of a mining project did not violate due process in emergency circumstances. Hodel, 452 U.S. at 299-300. Here, Range was neither required to cease operations, nor required to pay a penalty before seeking judicial review. Finally, as noted above, Range has availed itself of the right to seek review of the validity of the Emergency Order before the Court of Appeals and will be entitled to a hearing on whether it has complied with the order and whether any civil penalties should be assessed. Such opportunities are precisely the kind of process and judicial review that Congress

intended in Section 1448, 42 U.S.C. § 300j-7, and which the Due Process Clause of the

Constitution has long tolerated in emergency circumstances.  See Hodel, 452 U.S. at 299-300;

Parratt, 451 U.S. at 539, WWBITV, 589 F.3d at 50.

      B.      The Balancing of the Parties' Interests Under *Mathews v. Eldridge* Tips Clearly in the Government's Favor

Range has not suffered the deprivation of any property interest, much less a "significant

property interest," Hodel, 452 U.S. at 299, that outweighs the public interest in abating the risks

that EPA found "may present an imminent and substantial endangerment."  Because Range was

immediately entitled to seek review of the validity of the Order the day it was issued, Range's

argument that it has been deprived of due process should be rejected.  Nevertheless, although

unnecessary to decide this motion, the balance of interests contemplated by Mathews, 424 U.S.

at 335, tips clearly in the government's favor.  Under Mathews, a three-part balancing test

weighs the private interest affected, the risk of an erroneous deprivation of that interest under the

process provided and the probable value, if any, of additional or substitute safeguards, and the

government's interest.  424 U.S. at 335.  In this case, the government's interest in being able to

respond promptly to potential threats to public drinking water supplies outweighs Range's

private interest and the risks of an erroneous deprivation.  Mathews, 424 U.S. at 335.

Range has failed to identify not only a deprivation it has allegedly suffered, but it has also

failed to identify which of its interests is adversely affected by the Order.  Presumably, Range

would articulate its interests as the costs of compliance and/or exposure to civil penalties.  As to

compliance costs, Range was not deprived of that interest on issuance of the Order.  To the

extent that Range has incurred compliance costs by virtue of its choice to comply with the order,

as discussed above, Range had the opportunity for a hearing before it could be required to incur

such costs; moreover, under these emergency circumstances, any pre-hearing deprivation is fully

justified.  As to potential exposure to civil penalties, such penalties cannot be assessed until this

Court has considered whether Range has complied with the Order and, if not, whether penalties

are warranted; there can be no question that a hearing in federal court satisfies due process.

The strong government interest also outweighs the risk of an erroneous deprivation.

Even if Range had been deprived of a protected property interest without the chance for a

hearing (which it has not), the government's interest in protecting human health from the special

threat of contamination in a source of drinking water merits ruling here that the process afforded

Range satisfies the Mathews standard.  Such a strong governmental interest easily outweighs the

minimal risk that Range might have been erroneously deprived of costs of compliance.

Accordingly, assuming the Court reaches the balancing analysis contemplated by Mathews v.

Eldridge, the government interest easily outweighs Range's competing interests and the due

process concerns are eliminated.

## IV.   THE STATUTE CREATES IMPORTANT RIGHTS TO SEEK JUDICIAL REVIEW THAT SATISFY DUE PROCESS

   A.   Review on Administrative Record by the Court of Appeals Satisfies the Requirements of Procedural Due Process

As the Court of Appeals has observed, "[p]rocedural due process is a flexible concept and

calls for such procedural protections as the situation demands."  Woods v. Federal Home Loan

Bank Bd., 826 F.2d 1400, 1410 (5th Cir. 1987) (internal quotations omitted) (citing Morrissey v.

Brewer, 408 U.S. 471, 481 (1972)).  Congress intended to bifurcate jurisdiction in cases such as

this, so that challenges to the validity of a final Section 1431 order are raised quickly before the

Court of Appeals, and the degree to which a party complied and the assessment of penalties are

issues to be heard by the district courts.  Even assuming that Range had suffered a deprivation of

property without the opportunity for a pre-deprivation hearing (which Range has not demonstrated), this statutory review scheme fully protects Range's due process rights.

In <u>Woods</u>, where the complaining party's assets were actually seized through the appointment of a receiver, the Court of Appeals expressly held that "a court review of agency action under the arbitrary or capricious standard – is adequate to assure against the risk of mistaken deprivations."  826 F.2d at 1411.  Similarly, in <u>Unification Church v. Attorney General</u>, 581 F.2d 870 (D.C. Cir. 1978), on a petition for review of orders of deportation, the Court held "that the requirements of due process were met in these circumstances by the availability of judicial review under the Administrative Procedure Act to determine if the district director's decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 581 F.2d at 878.  Here, the Court of Appeals is reviewing the validity of the order on the Administrative Record under the arbitrary and capricious standard of review, and the result should be the same: such review satisfies the Due Process Clause.

B.   Range Is Entitled to a Hearing Before this Court on the Amount of Civil Penalties to be Imposed for the Degree of its Non-Compliance with the Emergency Order

Pursuant to Section 1431(b), Range is entitled to a hearing before this Court as to the amount (if any) of civil penalties to be imposed for its non-compliance with EPA's Emergency Order, following the resolution of Range's petition before the Court of Appeals.  Therefore, the assertion that the Act effects an unconstitutional deprivation of due process is without merit. Range contends that to the extent that Section 1431 "purport[s] to authorize the imposition of penalties based solely on the alleged failure to comply with a unilateral administrative order issued without notice or opportunity for hearing, raise[s] significant due process concerns" (Def. Br. 3).  To make this argument, Defendants must ask this Court to ignore the statutory penalty provision that subjects the collection of any penalty to the discretion of this Court, <u>in this</u>

enforcement proceeding.  Section 1431(b) specifically provides, "[a]ny person who violates or

fails or refuses to comply with" an order such as the Emergency Order at issue in this case,

"may, in an action brought in the appropriate United States district court to enforce such order,

be subject to a civil penalty of not to exceed $15,000 for each day in which such violation occurs

or failure to comply continues." 42 U.S.C. § 300i(b) (emphasis added).  Because a full hearing in

district court will precede any award of penalties, and because the Court has full discretion over

how large a penalty to award – or whether to award any penalty at all – due process is satisfied.

## V.      RANGE'S RELIANCE ON OTHER AUTHORITIES IS MISPLACED

### A.      *TVA v. Whitman* Does Not Apply to Section 1431 of the Act or the Facts of This Case and Is Easily Distinguished

Range contends that TVA, supra, requires this Court to hold that Section 1431 violates

constitutional requirements of due process and separation of powers.  (Def. Br. 16-17.)  Given

the significant substantive and procedural differences between the Clean Air Act administrative

compliance order at issue in TVA and EPA's emergency powers order authority under the Act,

the Court can reject Range's arguments because TVA is readily distinguishable.

First, in contrast to the administrative compliance order at issue in TVA, the order issued

to Range in this case is an order issued pursuant to EPA's emergency powers provision.  Indeed,

the TVA court recognized that orders issued pursuant to emergency powers authority are

different and might not warrant the degree of concern the TVA court expressed in its holding

concerning compliance orders.  TVA, 336 F.3d at 1249, 1258 n.38.  Moreover, the Emergency

Order is final agency action subject to immediate judicial review, which avoids the due process

concern addressed in the TVA decision.

In addition, the TVA court was concerned by the government's ability to impose "severe

civil and criminal penalties" on the basis of a respondent's failure to comply with the Clean Air

Act administrative compliance order.  <u>TVA</u>, 336 F.3d at 1258, 1260.  In this case, the Act does

<u>not</u> provide for criminal penalties for non-compliance with an emergency order issued under

Section 1431, 42 U.S.C. § 300i.  In addition, the Court in <u>TVA</u> interpreted the CAA to permit the

recovery of "severe civil" penalties on the "sole basis" of noncompliance with an administrative

compliance order – without first determining the order's validity.  Because a respondent such as

Range was able to immediately seek review of the Section 1431 order in the Courts of Appeals,

and because EPA must first bring an action to enforce the order and/or to recover civil penalties,

there is no risk of a due process violation here.  <u>See</u> Section 1431(b), 42 U.S.C. § 300i(b).[14]

Accordingly, because Range's non-compliance does not "automatically [lead] to the imposition

of severe civil penalties and perhaps imprisonment," the Eleventh Circuit's constitutional

analysis does not apply.  <u>TVA</u>, 336 F.3d at 1256.

　　Second, in this action, Range has had significantly greater post-order process than was

available to respondent in <u>TVA</u>.  Consistent with EPA's position that this Emergency Order is a

final agency action, Section 1448, 42 U.S.C. § 300j-7, provided Range with the ability to seek

immediate judicial review in the Court of Appeals.  It is worth noting that, in this case, Range

did not immediately exercise those rights and, in fact, waited 44 days to do so.  Its failure to

immediately exercise these due process rights cannot result in a ruling that its rights were

unconstitutionally denied.  <u>See</u>, <u>e.g.</u>, <u>Yearous v. Niobrara Cty Mem. Hosp.</u>, 128 F.3d 1351, 1355

(10th Cir. 1997) (in employment context, voluntarily relinquishing property rights does not

support claim of deprivation without due process).  Finally, Range acknowledges, as it must, that

---

[14]  Curiously, Range trumpets the risk of exposure to civil penalties as one reason why the Court should deem Section 1431 unconstitutional (Def. Br. 16-17), but at the same time, Range advocates in the context of its finality argument that "[c]ourts emphasize that such an order itself does not impose any penalties" (Def. Br. 13 n.9).  The United States contends that it is not the imposition of civil penalties that renders the Emergency Order "final," but that the change in Range's obligations is what satisfies the second prong of the finality analysis under <u>Bennett</u>, 520 U.S. at 177-78.

the TVA court expressly declined to assess the constitutionality of the Clean Air Act's emergency powers provision, which is the CAA provision most analogous to Section 1431 of the Act. TVA, 336 F.3d at 1258 n.38. While Section 303 of the CAA contains requirements beyond those of Section 1431, due process tolerates lesser protections where the protection of public health from the special threat of contamination in a source of drinking water is at stake. Woods, 826 F.2d at 1410.

      B.      Range's Reliance on CERCLA Cases and *Sackett v. EPA* Is Similarly Misplaced

Range broadly and inaccurately compares EPA's emergency authority under the Act to EPA enforcement authority in CERCLA cases and cites only one other case under a regulatory statute in support of its position. (Def. Br. 17-18.) Range erroneously relies on cases interpreting EPA's authority to issue administrative orders under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), in support of its position here, because – unlike Section 1431 – those orders are subject to a statutory bar against pre-enforcement review under Section 113(h) of CERCLA, 42 U.S.C. § 9613(h). See Kelley v. EPA, 15 F.3d 1100 (D.C. Cir. 1994), Employers Ins. of Wausau v. Browner, 52 F.3d 656 (7th Cir. 1995), and Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir. 1996); see also Ross Incineration Serv., Inc. v. Browner, 118 F. Supp. 2d 837 (N.D. Ohio 2000) (holding that RCRA precludes pre-enforcement review of § 7003 orders); Amoco Oil Co. v. EPA, 959 F. Supp. 1318 (D. Colo. 1997) (similar); So. Pines Assocs. v. United States, 912 F.2d 713, 717 (4th Cir. 1990) (finding that Clean Water Act precluded pre-enforcement review of administrative compliance order).

The statutory right to seek immediate pre-enforcement review in this case distinguishes not only the CERCLA cases noted above, but applies with similar force in the context of Range's conclusion that Sackett v. EPA, 622 F.3d 1139 (9th Cir. 2010), also applies here. Unlike the

Clean Water Act administrative compliance order challenged in <u>Sackett</u>, Section 1431(b) of the

Act expressly authorizes EPA to bring an action for violation of an imminent and substantial

endangerment order.   See <u>Sackett</u>, 622 F.3d at 1145 (ruling that CWA Section 1319(b) does not

authorize enforcement actions for violations of administrative compliance orders); Section

1431(b), 42 U.S.C. § 300i(b) ("Any person who violates. . . any order issued . . . under

subsection (a)(1)" may be subject to civil penalties in an action to enforce the order).

## VI.    THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER THE SAFE DRINKING WATER ACT AND SATISFIES BOTH <u>IQBAL</u> AND <u>TWOMBLY</u>

In order to state a claim under Section 1431(b), the United States must allege that Range

is (1) any person; (2) who failed or refused to comply with an order issued under Section 1431(a)

of the Act.   Section 1431(b), 42 U.S.C. § 300i(b).   Based on those allegations, the United States

may seek in this Court: (1) to enforce an order issued under Section 1431(a), and/or (2) civil

penalties.   In its Complaint, the United States seeks both injunctive relief and civil penalties

pursuant to Section 1431(b) of the Act.

When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the "ultimate

question" before the Court is "whether the complaint states a valid claim when all well-pleaded

facts are assumed true and are viewed in the light most favorable to the plaintiff."   <u>Lone Star</u>

<u>Fund V (U.S.), L.P.  v. Barclays Bank PLC</u>, 594 F.3d 383, 387 (5th Cir. 2010) (citing <u>In re:</u>

<u>Katrina Canal Breaches Litig.</u>, 495 F.3d 191, 205 (5th Cir. 2007)); <u>Allen v. Scott</u>, No.

3:10-CV-02005-F, 2011 WL 219568, at *1 (N.D. Tex. Jan. 19, 2011).   To survive a 12(b)(6)

motion, the plaintiff  "must plead 'enough facts to state a claim to relief that is plausible on its

face,'" <u>In re: Katrina</u>, 495 F.3d at 205 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544,

555(2007); <u>Allen</u>, 2011 WL 219568, at *1.

A.     The Complaint Alleges that Range Is A Person Who Failed to Comply with an
       Order in this Action to Enforce

Section 1401 of the Act defines a "person" to include a corporation or company, and

agents of any corporation or company, 42 U.S.C. § 300f(12).  The Complaint alleges that

Defendants are corporations organized under the laws of the State of Delaware and are registered

to do business in Texas.  (Compl. ¶ 5.)  The Complaint also alleges that Range refused to comply

with the Emergency Order.  Id. at ¶¶ 30, 35, 38.  (Pl. Appx. at 67-68) (stating that ". . . as to

whether [Range] will adhere exactly to the remaining requirements of the order . . . [Range]

cannot agree to follow the precise ordering provisions found in Paragraph 50 A)-F).")  When

these allegations are viewed in the light most favorable to the United States, the Complaint

alleges the facts necessary to state claim for injunctive relief and civil penalties under Section

1431(b).  Therefore, the Motion to Dismiss should be denied.

Range relies on Cox v. City of Dallas, 256 F.3d 281 (5th Cir. 2001), for the proposition

that the United States must demonstrate in this instance that Range caused or contributed to a

public nuisance – under the public nuisance common law that the legislative history for

imminent and substantial endangerment statutes appear to partially codify.  In support of this

position, Range cites not to the Act's legislative history, but to other legislative history in the

form of the Senate Report on the Solid Waste Disposal Act Amendments of 1980.  (Def. Br. 20.)

Notwithstanding the fact that language in the legislative history of the Safe Drinking Water Act

demonstrates congressional intent to relax the degree to which EPA must demonstrate a nexus[15]

between the respondent and the endangerment, Range also ignores the language in the Solid

Waste Disposal Act Amendments of 1980 that conveys congressional intent in that enactment to

_____

[15]  Range appears to concede, contrary to its claim that EPA must allege that Range "caused or contributed" to the endangerment, that all that is really required under Section 1431(b) is that EPA plead "a rational nexus" between its conduct and the potential endangerment in this case. (Def. Br. 20-21).

relax the legal standards for determining liability under the common law of nuisance.  See H.R. Rep. No. 93-1185, at 33 (Section 1431 allows EPA to issue orders to "any other person whose action or inaction requires prompt regulation to protect the public health.").  See U.S. v. Stringfellow, No. CV-83-2501-MML, 1984 WL 3206, at *6 (C.D. Cal. Apr. 5, 1984) (noting intent to enlarge traditional equitable remedies to "meet an acute contemporary problem"); see also W.R. Grace, 261 F.3d at 339 (noting the Act's enhancement of courts' traditional equity powers).  Notably, the Senate Report that Range relies on states, "Section 7003 should not be construed solely with respect to the common law.  Some terms and concepts, such as persons 'contributing to' disposal resulting in a substantial endangerment, are meant to be more liberal than their common law counterparts."  S. Rep. No. 96-172, at 5 (1980), reprinted in 1980 U.S.C.C.A.N. 5019, 5023.

 B. The Complaint Readily States a Plausible Claim

 Range's Motion should be denied because the Complaint states a claim that is based on facts that allow this Court to conclude, when the allegations are viewed in the light most favorable to the government, that the United States has stated a plausible claim that Range is liable for its refusal to comply with the Emergency Order.  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")  Defendant misconstrues the plausibility of the United States' claims by arguing that the United States is required to plead facts that relate to the underlying elements of an order issued under Section 1431(a), or the validity of that order.  The United States is not required to plead such facts.  Rather, Section 1431(b) only requires that the United States allege that Range is a person who has refused to

comply with an order issued under Section 1431(a).  Range is a person who has refused to

comply with the Emergency Order.  (Compl. ¶¶ 5, 30, 35, 38.)  Thus, the Complaint readily

states a plausible claim and the Motion should be denied.[16]

### CONCLUSION

The United States respectfully requests that the Court enter an Order denying Range's

Motion to Dismiss the Complaint.

<div style="margin-left: 40%;">

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

s/Keith T. Tashima

</div>

Dated: May 9, 2011
<div style="margin-left: 40%;">

_____
JEFFREY K. SANDS
Senior Attorney
Maryland State Bar No. 199412150130
KEITH T. TASHIMA
Trial Attorney
New York State Bar No. 3938701
BRADLEY L. LEVINE
Trial Attorney
District of Columbia Bar No. 974925
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, DC 20044-7611
(202) 514-3908 (Sands)
(202) 616-9643 (Tashima)

</div>

---

[16] In any event, the Complaint does specifically allege that (1) contaminants such as methane, ethane, propane, benzene, toluene, and hexane; (2) were present in two underground sources of drinking water, the Lipsky and Hayley wells; (3) which may present an imminent and substantial endangerment to the health of persons because methane in the levels found by EPA are potentially explosive or flammable, and benzene if ingested or inhaled could cause cancer, anemia, neurological impairment and other adverse health impacts; and (4) that appropriate State and local authorities, including TRRC, had not taken sufficient action to address the endangerment.  (Compl. ¶¶ 23-24, 26-28.)

(202) 514-1516 (Levine)
(202) 616-2427 (fax)
jeffrey.sands@usdoj.gov
keith.tashima@usdoj.gov
bradley.levine@usdoj.gov

JAMES T. JACKS
UNITED STATES ATTORNEY

LYNETTE WILSON
Assistant United States Attorney
1100 Commerce Street, Suite 300
Dallas, TX  75242
(214) 659-8911
lynette.wilson@usdoj.gov


OF COUNSEL:

SCOTT McDONALD
Chief, Water Enforcement Branch
TUCKER HENSON
Assistant Regional Counsel, Water Enforcement Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region VI
1445 Ross Avenue, Suite 1200
Dallas, TX 75202
(214) 665-2718 (McDonald)
(214) 665-8148 (Henson)